# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | § <br> § Chapter 11 <br> § |
| ALPINE SUMMIT ENERGY PARTNERS, INC., *et al.* | § Case No. 23-90739 (DRJ) <br> § <br> § (Joint Administration Requested) |
| Debtors.¹ | § <br> § <br> § |

## DECLARATION OF CRAIG PERRY IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Craig Perry, hereby declare as follows under penalty of perjury:

1.  I am the Chairman of the Board of Directors and Chief Executive Officer of debtor Alpine Summit Energy Partners, Inc. ("ALPS") and hold various officer positions at certain of ALPS' affiliates which are debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Company"). I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2.  I have served as ALPS's Chief Executive Officer since September of 2021, prior to which I served as a senior officer of HB2 Origination, LLC ("HB2") since its founding in May of 2018. I have worked in the oil and gas industry for nearly seven years since founding Ironroc Energy Partners LLC in January 2017.

3.  Prior to my employment with HB2, I worked for more than 20 years as a senior executive managing alternative assets in the real estate and finance industries. I have served on the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Alpine Summit Energy Partners, Inc. (3755), HB2 Origination, LLC (6760), Ageron Energy II, LLC (1436), Ironroc Energy Partners LLC (9801), Ageron Ironroc Energy, LLC (N/A), Alpine Summit Energy Investors, Inc. (4428), and Alpine Carbon, LLC (N/A). The location of the Debtors' service address is: 3322 West End Ave, Suite 450, Nashville, TN 37203.

board of directors for both Cortland Partners and Brookfield DTLA Holdings. I hold a bachelor's degree in economics from Princeton University.

4. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' senior management, my review of relevant documents or, based on my experience and knowledge of the Debtors' operations and financial conditions, and my opinion. In making this Declaration, I have relied, in part, on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

5. To resolve immediate issues that may cause irreparable harm if not promptly addressed, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with the chapter 11 cases (the "Chapter 11 Cases").[2] I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings. I am familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading up to these Chapter 11 Cases.

6. This Declaration is divided into two parts. Part I provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Cases. Part II addresses the First Day Pleadings.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

## PART I – BACKGROUND

### A. Overview

7.      On July 5, 2023 (the "Petition Date"), the Debtors filed these Chapter 11 Cases. The purpose of these Chapter 11 Cases is to maximize the value of the Debtors' assets for the benefit of their estates, which is currently contemplated to include a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and a plan of liquidation to distribute the sales proceeds.

8.      Together, the Debtors and their non-debtor affiliates develop, own and operate oil and gas properties in several formations in Texas. The Debtors grew very quickly over the past several years and have developed these assets in highly desirable areas in the Austin Chalk and Eagle Ford formations, among others, located in the Central/East Texas and South Texas regions. The Debtors have developed 43 horizontal wells and one vertical well covering numerous leases. While the Debtors and their management team have a proven track record of acquiring and developing successful oil and gas assets, they have faced a series of headwinds that led to this filing. Those issues include: (i) a substantial and sustained drop in natural gas prices (down 53.7% Year over Year in the three months ending March 31st); (ii) limited available financing for the oil and gas industry, which ultimately made it impossible to fund our rapid expansion; (iii) an untimely force majeure event involving our primary midstream provider that limited our ability to deliver product to market, which depressed the bids in a prepetition marketing process; and (iv) vendor pricing and payment issues, which are a subject of the Debtors' ongoing review and investigation. Each of these issues is described in more detail herein.

9.      To fund these Chapter 11 Cases through the sale and plan confirmation process, the Debtors have secured approximately $15.5 million in postpetition debtor in possession financing

to be provided by their existing bank group. Of this $15.5 million in post-petition financing, $8 million will be available upon entry of an interim order approving the financing and the balance will be available upon entry of the final order.

**B.  The Debtors' History and Corporate Structure**

10.     The Debtors comprise ALPS and certain of its subsidiaries and affiliates which form an oil and natural gas development company that operates and develops oil and gas wells. ALPS was incorporated under the name "Red Pine Petroleum Ltd." on July 30, 2008 under the Business Corporations Act (British Columbia). On April 8, 2021, ALPS entered into a Business Combination Agreement ("BCA") pursuant to which Red Pine Petroleum Ltd. agreed to complete a series of transactions to effectuate a combination between Red Pine Petroleum Ltd. and HB2 and changed its name to "Alpine Summit Energy Partners, Inc." upon completion of the BCA.

11.     The Company focuses its drilling activity in two main areas, the Austin Chalk and Eagle Ford formations in the Giddings Field in Austin, Fayette, Lee, Robertson and Washington Counties, Texas (the "Giddings Assets") and the Hawkville Field in Webb and La Salle Counties, Texas (the "South Texas Assets"), both well-positioned acreage locations in Texas which have produced substantial amounts of oil, natural gas, and NGLs for decades.

12.     Since the Debtors' inception, their core business plan has centered on the development of oil and gas assets as the primary driver of value for their stakeholders. The Debtors' management and investors have executed upon the belief, which has since been confirmed by experience, that the active drilling of oil and gas properties provides outsized returns relative to alternative forms of capital allocation. Since 2018, the Debtors have drilled 44 wells and grown production from 0 to in excess of 24,000 BOE/day. In the past twenty-four months, the

Company has completed 31 wells as continued successful wells results enabled exponential growth.

13. The Debtors derive their consolidated revenue primarily from (i) the production and sale of natural gas (approximately 40.5%), (ii) the production and sale of natural gas liquids ("NGLs") (approximately 10.2%), and (iii) the production and sale of oil (approximately 49.3%).

14. ALPS maintains three types of voting shares: (1) Class A Subordinate Voting Shares ("SVS") which, among other things, are entitled to one vote in respect of each SVS held; (2) Multiple Voting Shares ("MVS") which, among other things, are entitled to 100 votes in respect of each MVS held; and (3) Proportionate Voting Shares ("PVS") which, among other things, are entitled to 1,000 votes in respect of each PVS held. ALPS' SVS has been listed on the Toronto Stock Venture Exchange since 2021 under the symbol "ALPS.U" and on the NASDAQ since 2022 under the symbol "ALPS."

15. As of July 1, 2023, the Company's executive officers and directors beneficially owned approximately 39.8% of Subordinate Voting Shares. I am, personally, the single largest shareholder in ALPS holding approximately 29.2% of Subordinate Voting Shares directly and indirectly. I have not sold a share during or after ALPS' public listing process.

16. The business has been funded primarily by Company insiders and like-minded individuals who shared the same view around the attractiveness of the underlying unit economics and that a transition away from fossil fuels would likely take much longer than public consensus anticipates. Notwithstanding the Debtors' relatively "small" cap status, the Debtors' overall development track record compares quite favorably with their larger peers and these results enabled significant growth rates well in excess of competitors. Even in the months leading up to the Chapter 11 Cases, the Debtors brought online four wells in their South Texas Assets position,

which are some of the most productive wells ever drilled in Webb County. Execution of our development-heavy strategy has required three primary ingredients: (1) experienced human capital, (2) attractive development locations, and (3) access to capital to support reinvestment.

17. An organizational chart for the Company, including certain non-Debtor affiliates, is attached hereto as **Exhibit A**.

18. Ironroc Energy Partners LLC and its subsidiary, Ageron Ironroc Energy, LLC (collectively, the "Ironroc Debtors"), act as the operator for the Debtors' oil and gas assets where the Debtors operate the assets pursuant to the applicable operating agreement. Substantially all of the Debtors' contracts and agreements with vendors are with the Ironroc Debtors. Title to substantially all of the Debtors' producing assets are held by HB2 or Ageron Energy II, LLC.

**C. The Debtors' Management and Workforce**

19. The Debtors' management ("Management") has largely been in place since HB2's formation in 2018.

20. The Debtors' core Management consists of the following individuals:

| Name | Position |
|---|---|
| Craig Perry | Chief Executive Officer and Chairman of the Board of Directors |
| Darren Moulds | Chief Financial Officer |
| William Wicker | Chief Investment Officer |
| Travis Reagan Brown | Chief Administrative Officer |
| Chrystie Holmstrom | Chief Legal Officer and Corporate Secretary |

21. As of the Petition Date, the Debtors have 19 full-time employees[3] located in both Canada and the United States and three independent contractors.

22. On May 30, 2023, the Debtors placed their Chief Operating Officer, Michael McCoy ("McCoy"), on unpaid administrative leave pending an investigation being conducted on behalf of the ALPS Board of Directors by Porter Hedges, LLP into possible misconduct by McCoy. On June 26, 2023, McCoy provided written notice claiming he has "good reason" to terminate his engagement with HB2 under the Member Services Agreement entered into between HB2 and McCoy on September 7, 2021 (the "MSA"). McCoy's notice states that his engagement under the MSA will terminate within 30 days if the Debtors do not cure the conduct alleged to constitute "good reason." As of the date of this Declaration, the investigation remains ongoing.

**D. The Debtor's Capital Structure[4]**

23. As of the Petition Date, the Debtors' primary debt obligations consisted of approximately $54,038,461.52 in principal and $510,363.23 in interest ($15,010.68 per diem in interest) under the Credit Agreement (as defined below). As of the Petition Date, the Debtors estimate that various trade vendors and suppliers may assert approximately $90.7 million in claims against the Debtors, with some vendors and suppliers asserting liens. The Debtors dispute a significant portion of this number and are in the process of evaluating both the validity of the vendor and supplier claims as well as any liens asserted.

---

[3] As of the Petition Date, two of the Debtors' U.S. employees are on paid leave while one of the Debtors' U.S. employees is on unpaid leave.

[4] The following description of the Debtors' capital structure is for information purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

1.   **Revolving Credit Facility with Bank7**

24.   HB2 entered into the First Amended and Restated Credit Agreement dated September 30, 2022 with Bank7 (the "Credit Agreement") to borrow up to $65 million under a reducing revolving line of credit at an interest rate that is the greater of 5% and the prime rate plus 1.75% with a Final Maturity Date of April 1, 2023 (the "Bank7 Facility").

25.   HB2's obligations under the Credit Agreement are guaranteed by certain Debtor and non-debtor subsidiaries and secured by certain of the Debtors' interests in producing assets and the proceeds thereof.

26.   On March 21, 2023, pursuant to an Extension Agreement, Bank7 agreed to extend the time for payment under the Credit Agreement and associated Promissory Note to July 1, 2023. Bank7 further entered into an Amended and Restated Omnibus Waiver Agreement dated March 21, 2023 waiving all covenants contained in Article VII of the Credit Agreement until July 1, 2023.

2.   **ABS Facility**

27.   In April and September 2022, Alpine Summit Funding LLC (the "SPV")—a wholly-owned subsidiary of HB2 and a non-debtor—issued two tranches of notes, initially in an aggregate principal amount of $135 million, under an asset backed securitization facility (the "ABS Facility") with affiliates of Kuvare Insurance Services LP. The ABS Facility is secured by substantially all of the SPV's assets (as well as a pledge by Alpine Summing Funding Holdings LLC (another wholly-owned subsidiary of HB2 that is not a debtor) of the equity interests of the SPV), which assets are not part of the Bank7 collateral. UMB Bank, N.A. serves as the Indenture Trustee under the ABS Facility. Debtor HB2 provided a limited guaranty of the ABS Facility.

28.     On or about March 23, 2023, the SPV obtained a waiver of any covenant breaches through July 1, 2023 and obtained an extension of the initial maturity date of the first tranche under the ABS Facility until July 1, 2023.

**3.    Development Partnerships**

29.     The Debtors have established development partnerships (the "Development Partnerships") as a mechanism to partially finance certain of their development projects and activities. Through a series of agreements and wholly owned subsidiaries, the Debtors sponsor and manage the Development Partnerships to participate in the Debtors' drilling initiatives and to accelerate the Company's growth. As part of the Development Partnerships, investors will provide funding to be used for the development of wells. In return, the investors receive partnership units that provide a specified return, plus participation in the residual of those wells that can be realized via redemption. The Development Partnerships are limited partnerships structured to minimize drilling risks on repeatable prospects and optimize tax advantages for private investors. Insiders, including myself, are investors in these underlying partnerships—representing approximately 15% of the current outstanding partnerships.

30.     As of the Petition Date, the Debtors maintain three active Development Partnerships—none of which are Debtors in these Chapter 11 Cases.

**E.  Vendor Indebtedness**

31.     As previously mentioned, the Company maintained an active development program, especially in relation to its peer group. While, in general, the wells the Company targeted have IRR hurdles in excess of 60%, the expected payout on these locations was still, typically, in excess of nine months. Therefore, the Company's business plan relied on financing "takeout" to ensure that vendor credit terms could be maintained. The March 2023 credit freeze coupled with

9

the plunge in natural gas prices came at a particularly inopportune moment for our field partners, many of whom relied on the Company's extensive payment history, only to find that the Company had insufficient funds to pay their invoices. This situation was exacerbated by the midstream force majeure event, which resulted in significant and further liquidity constraints.

### F. Events Leading to Bankruptcy

32. Despite their recent successes, a myriad of factors impacted the Debtors' profitability, including a historic fall in gas prices, significant service cost inflation, an extended force majeure event impacting the Debtors' offtake partner, and significant credit contraction both in the broader economy as well as in the oil and gas industry.

33. The primary driver, however, for the Chapter 11 Cases is the absence of even basic credit availability for the Debtors' newly developed assets. The Debtors rely on third party credit institutions to extend credit against wells that are brought online. Over the past several years, following two historic E&P industry downturns, finding reliable counterparties that are willing to extend credit for oil and gas assets has become increasingly difficult as ESG initiatives and concerns with the E&P industry model across the United States banking system winnowed down the pool of available lenders for the industry. Nevertheless, until recently, the Debtors had successfully navigated this landscape.

34. After ALPS's third quarter board meeting in 2022, certain members of senior management, including myself, flew to Oklahoma to visit with our primary lender and bank agent—Bank7—about its interest in leading an upsize of our existing PDP-only borrowing base loan to $125 million. At the time of that meeting, the approximately $65 million Bank7 Facility comprised only 40% of the PDP asset base securing it. Management and the Debtors repeatedly expressed their interest and confidence in growing the existing partnership with Bank7 and to make

Bank7 a part of a longer term solution for the Debtors' platform. Management believed it had a mutual understanding with Bank7 that this upsize would be accomplished over time as additional collateral in the development pipeline came online and was suitably seasoned to achieve an extension of credit. Ultimately, however, in March of 2023, Bank7 and the syndicate of regional banks did not approve an upsize of the Bank7 Facility amidst a broader retrenchment in credit witnessed by the Company. During the first quarter, Management concurrently engaged with numerous other alternative capital providers to source liquidity but, despite the Company's active outreach, also received a muted response.

35. The basic inability of the Debtors to find third party financing led to and continues to be the root source of the Debtors' challenges because the Debtors' explicit and public development plans relied upon continued borrowing against their developed assets. The Debtors were executing a high-growth development plan that could not be funded solely by internally generated cash flows in the near term.

36. The precipitous fall in natural gas prices since December 2022—63% decline from $6.97/Mcf on December 15, 2022 to $2.53/Mcf on June 15, 2023—also significantly impacted the Debtors' short term cash flows as well as it curbed their access to financing as the underlying reserve base against which credit could be extended diminished in value. Comparing the three months ending March 31, 2022 and March 31, 2023, the price of oil declined from $92.83/Bbl to $73.20/Bbl (decline of 21.1%); the price of natural gas declined from $4.36/Mcf to $2.02/Mcf (decline of 53.7%); and the price of NGLs declined from $36.56/Bbl to $25.26/Bbl (decline of 30.9%). Procyclical lending behavior in response to significant deviations from the 25-year average price for natural gas further exacerbated the Debtors' diminished cash position.

37. Notwithstanding the significant decline in natural gas prices, third party reserve analysis confirms the existence of a meaningful number of highly economic and attractive developed locations in the Debtors' asset base, even in a depressed pricing environment. Further, the South Texas Assets are uniquely positioned to benefit from the growing global LNG market and to feed gas into the numerous projects that are in development along the Gulf Coast. In response to inquiries received about our South Texas assets amid depressed natural gas pricing, ALPS engaged Stephens Inc. to conduct a robust marketing and sale process for the South Texas Assets. This broad process resulted in signed non-disclosure agreements from over 35 parties. During the marketing process for the South Texas Assets, however, the Debtors' South Texas Assets midstream partner announced a force majeure event, beginning on April 13, 2023 and ending on May 15, 2023. This prolonged period of significantly reduced volume—and cash flow— and had a meaningfully negative impact on potential buyers' perceptions of value, resulting in the Debtors receiving no satisfactory bids.

38. Further exacerbating the Debtors' liquidity crisis in the months leading up to the Chapter 11 Cases, certain of the Debtors' operating partners and contract counterparties have refused to pay the Debtors pursuant to their contracts or otherwise taken action to restrict the Debtors' ability to utilize cash. An example of this is detailed in HB2's Adversary Complaint against Dallas Petroleum Group, LLC ("DPG") seeking turnover of estate property and alleging breach of contract, contemporaneously filed with the first day pleadings (the "DPG Litigation"). Specifically, DPG has unilaterally and without notice ceased making payments to HB2 and refused to assign interests on producing wells, as required under the parties' agreements.

39. During the period leading up to the Petition Date, the Debtors engaged a financial advisor, investment banker, and legal counsel to explore all potential alternatives and ultimately determined to file these Chapter 11 Cases.

40. Effective as of April 24, 2023, the Debtors engaged Porter Hedges LLP as its restructuring counsel.

41. On or about May 24, 2023, the Debtors retained Huron Consulting Services LLC as its financial advisor. Thereafter, on or about July 3, 2023, the Debtors retained Ryan Bouley of Huron Consulting Services LLC as Chief Restructuring Officer and Sean Clements of Huron Consulting Services LLC as Deputy Chief Restructuring Officer.

42. On or about May 25, 2023, the Debtors retained Houlihan Lokey Capital, Inc. as its investment banker.

43. As part of the Debtors' preparation for these Chapter 11 Cases, the Debtors, with Houlihan Lokey Capital, Inc., ran a robust search for debtor in possession financing. Ultimately, the Debtors received only one actionable term sheet from their existing prepetition lender, Bank7, thereby confirming the continuing lack of credit options to the Debtors.

44. Bank7 agreed to provide post-petition financing to the Debtors in the aggregate amount of $15.5 million (the "DIP Facility"), with $8 million to be available upon entry of the Interim Order (the "Interim DIP"). The Debtors need immediate access to the Interim DIP in order to maintain their operations in the first four weeks of the case, including to pay operating expenses, payroll, vendors who will maintain production, taxes, and land and lease expenses, among other operational and administrative expenses. Without immediate access to the Interim DIP, the Debtors would not be able to maintain production, would likely be required to shut in production on producing wells, and would not be able to market and sell their production, all to the detriment

of the Debtors' estates. Shutting in producing wells, even temporarily, may cause significant lasting harm to the Debtors' ability to bring those wells back online and get them producing once more or in the same volumes.

45. The DIP Credit Facility will be secured by, among other things, priming liens, subject to the Carve Out, and, until entry of a final order, Permitted Prior Liens (each as defined in the DIP Motion), on all of Debtor HB2's assets, and Bank7 will be entitled to a super-priority administrative claim and other protections as more fully set forth in the DIP Motion (defined below) and accompanying order.

46. The DIP Facility also imposes a number of Milestones (as defined in the DIP Motion) to guide the sales and confirmation processes:

| Milestone[5] | Deadline |
|---|---|
| Interim DIP Order Entered | July 10, 2023 (Petition Date + 5 days) |
| Debtors file Motion to Sell Pursuant to Section 363 of the Bankruptcy Code for Main Sale and Giddings Sale (each as defined in the DIP Motion) | July 12, 2023 (Petition Date + 7 days) |
| Final DIP Order Entered | August 9, 2023 (Petition Date + 35 days) |
| Approval of Bidding Procedures for Main Sale and Giddings Sale | August 14, 2023 (Petition Date + 40 days) |
| Main Sale Approved | October 3, 2023 (Petition Date + 90 days) |
| Giddings Sale Approved | October 13, 2023 (Petition Date + 100 days) |
| Main Sale Consummated (including consummation of a Liquidating Plan for Main Sale, if applicable) | October 18, 2023 (Petition Date + 105 days) |
| Giddings Sale Consummated (including consummation of a Liquidating Plan for Giddings Sale, if applicable) | October 28, 2023 (Petition Date + 115 days) |

---

[5] Extension of any Milestone is subject to the written consent of Bank7 at its sole discretion.

47. Approval of the Interim DIP is necessary to maintain the ongoing operations of the Debtors during the first four weeks of the Chapter 11 Cases. Failure to approve the Interim DIP would significantly impair the Debtors' ability to operate their business and maintain production, leading to irreparable harm and loss of value to the Debtors' estates, their creditors and all other parties in interest.

48. As described earlier, the retrenchment of the Debtors' lenders leaves them with a uniquely positioned capital structure. The Debtors have a significant number of vendors which, while completing work on the wells, have still not been paid.

## PART II – FIRST DAY MOTIONS[6]

49. Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of the Chapter 11 Cases, and expedite a swift and smooth section 363 sale and confirmation of a liquidating plan.

**A. Administrative Motions**

- **Joint Administration Motion:** *Debtors' Emergency Motion for Entry of An Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief*

- **Complex Case Designation:** *Notice of Designation as Complex Chapter 11 Bankruptcy Case*

- **Claims and Administration Agent Application, Declaration, and Order:** *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent*

- **Schedules and Statements Extension** *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and*

---

[6] Capitalized terms not otherwise defined in this section have the meanings ascribed to them in the applicable motion.

15

*Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports and (II) Granting Related Relief*

- **Creditor Matrix Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors, (B) File a Consolidated List of the Thirty Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information; (II) Approving the Form and Manner of Notifying the Creditors of the Commencement of These Chapter 11 Cases; (III) Modifying the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief*

B.  **Finance Motions:**

- **DIP Motion:** *Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bank. P. 2002, 4001 and 9014 (I) Approving Postpetition Financing; (II) Allowing Use of Cash Collateral; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "DIP Motion").

- **Motion to Seal Letter Agreement**: *Debtors' Motion for Entry of An Order (I) Authorizing the Debtors to File the Letter Agreement Under Seal and (II) Granting Related Relief*

C.  **Operational Motions:**

- **Cash Management Motion:** *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Operating Its Cash Management System; (B) Honor Certain Prepetition Obligations, and (C) Maintain Existing Bank Accounts and Business Forms and (II) Granting Related Relief*

- **Insurance Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Thereunder and (B) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies and (II) Directing Financial Institutions to Honor All Related Payment Requests*

- **Utilities Motion:** *Debtors' Emergency Motion to (I) Approve Adequate Assurance of Payment to Utility Companies, (II) Establish Procedures to Resolve Objections by Utility Companies, and (III) Prohibit Utility Companies from Altering, Refusing, or Discontinuing Service*

- **Employee Wages Motion:** *Debtors' Emergency Motion to (I) Pay Prepetition Wages, Salaries, and Other Compensation and (II) Continue Certain Employee Benefit Programs*

- **Taxes Motion:** *Debtors' Emergency Motion for Entry of a Final Order Authorizing (I) the Debtors to Pay Certain Prepetition Taxes and Related Obligations and*

16

> *(II) Authorizing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Related to Such Obligations*

- **Lien Claimant Motion:** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to Pay Certain Lien Claimant Obligations; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief*

- **Royalty Interests Motion:** *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to Honor Prepetition and Postpetition Obligations to Holders of Royalty Interests, Overriding Royalty Interests, and Working Interests, and (II) Granting Related Relief*

- **Net Operating Loss Motion:** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Certain Transfers of and Declaration of Worthlessness with Respect to Common Stock of Alpine Summit Energy Partners, Inc. and Claims Against Debtors (II) Granting Related Relief*

50. I am familiar with the content and substance of the First Day Motions. I have consulted with advisors regarding and understand each of the First Day Motions and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

51. I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximum value preservation during the pendency of the Chapter 11 Cases. I also understand that the relief requested in the First Day Motions is supported by Bank7. Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their business, and the estates. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 6, 2023.
      Nashville, TN

By:   */s/ Craig Perry*
Name: Craig Perry
CEO and Chairman of the Board
Alpine Summit Energy Partners, Inc.