## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **In re:** | § Chapter 11 |
| | § |
| **ALPINE SUMMIT ENERGY PARTNERS,** | § **Case No. 23-90739 (DRJ)** |
| **INC.,** *et al.*, | § |
| | § **(Jointly Administered)** |
| Debtors.[1] | § |

### NOTICE OF SELECTION OF STALKING HORSE BIDDER

**PLEASE TAKE NOTICE** that on July 25, 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. 228] (the "Bidding Procedures Order").[2]

**PLEASE TAKE FURTHER NOTICE** that in accordance with the Bidding Procedures Order, the Debtors selected San Isidro Energy Company II, LLC, Ageron Holdings, LLC, and Needmore Minerals, LLC to act as the Stalking Horse Bidder, substantially on the terms of and in accordance with the Stalking Horse Agreement attached hereto as **Exhibit A**. The Base Purchase Price for the South Texas Assets that are proposed to be sold to the Stalking Horse Bidder is $83,000,000.

**PLEASE TAKE FURTHER NOTICE** that, consistent with the Bidding Procedures Order, the Stalking Horse Agreement provides for, among other things, (a) a Break-up Fee equal to three percent (3%) of the Base Purchase Price and (b) an Expense Reimbursement up to an aggregate amount of $500,000.

**PLEASE TAKE FURTHER NOTICE** that any objection to the designation of the Stalking Horse Bidder or to the Bid Protections set forth herein and in the Stalking Horse Agreement (a "Stalking Horse Objection") shall be filed no later than August 23, 2023 (the "Objection Deadline").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Alpine Summit Energy Partners, Inc. (3755), HB2 Origination, LLC (6760), Ageron Energy II, LLC (1436), Ironroc Energy Partners LLC (9801), Ageron Ironroc Energy, LLC (N/A), Alpine Summit Energy Investors, Inc. (4428), and Alpine Carbon, LLC (N/A). The location of the Debtors' service address is: 3322 West End Ave, Suite 450, Nashville, TN 37203.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Bidding Procedures Order or the Stalking Horse Agreement, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, if a timely Stalking Horse Objection is filed, the proposed designation of the Stalking Horse Bidder and Bid Protections provided for under the Stalking Horse Agreement shall not be deemed approved unless approved by separate order of the Court.

**PLEASE TAKE FURTHER NOTICE** that, if no Stalking Horse Objection is timely filed and served, the Bid Protections with respect to such Stalking Horse Bidder shall be deemed approved without further order of the Court upon the expiration of the Objection Deadline, and shall be payable in accordance with, and subject to the terms of, the Stalking Horse Agreement.

**PLEASE TAKE FURTHER NOTICE** that the Debtors and the Stalking Horse Bidder reserve all of their rights to amend, modify, change, revise, or otherwise alter in any respect the Stalking Horse Agreement in accordance with the terms of the Stalking Horse Agreement and the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these Chapter 11 Cases are available: (a) free of charge upon request to Kroll Restructuring Administration LLC (the notice and claims agent retained in these Chapter 11 Cases) by (i) calling (844) 219-3705 (Toll Free) or +1 (646) 440-4844 (International); or (ii) visiting the Debtors' restructuring website at https://cases.ra.kroll.com/Alpine; or (b) for a fee via PACER by visiting http://www.txs.uscourts.gov.

*[Remainder of page intentionally left blank]*

Dated: August 16, 2023
Houston, Texas

By:/s/ Eric M. English
**PORTER HEDGES LLP**
Eric M. English (TX 24062714)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
Michael B. Dearman (TX 24116270)
James A. Keefe (TX 24122842)
Jordan Stevens (TX 24106467)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 226-6248
eenglish@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
mdearman@porterhedges.com
jkeefe@porterhedges.com
jstevens@porterhedges.com

**PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION**

**<u>Certificate of Service</u>**

      I certify that on August 16, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court of the Southern District of Texas.

*/s/ Eric M. English*
Eric M. English

## Exhibit A

**Stalking Horse Agreement**

**PURCHASE AND SALE AGREEMENT**

**between**

**HB2 ORIGINATION, LLC, and**

**AGERON ENERGY II, LLC,**

**as Sellers,**

**and**

**SAN ISIDRO ENERGY COMPANY II, LLC,**

**AGERON HOLDINGS, LLC, and**

**NEEDMORE MINERALS, LLC,**

**as Purchasers**

Executed August 16, 2023

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

ARTICLE I DEFINED TERMS; INTERPRETATION ........................................................... 1
    1.1        Defined Terms ..................................................................................... 1
    1.2        Interpretation ...................................................................................... 1

ARTICLE II PURCHASE AND SALE ................................................................................... 2
    2.1        Purchase and Sale of Assets ............................................................... 2
    2.2        Acquired Assets .................................................................................. 2
    2.3        Excluded Assets .................................................................................. 4
    2.4        Assumption of Liabilities ................................................................... 6
    2.5        Effective Time .................................................................................... 6

ARTICLE III PURCHASE PRICE .......................................................................................... 6
    3.1        Purchase Price ..................................................................................... 6
    3.2        Deposit ................................................................................................ 6
    3.3        Adjustments to Purchase Price ........................................................... 6
    3.4        Preliminary Settlement Statement; Closing Amount ......................... 9
    3.5        Final Settlement Statement; Final Purchase Price .............................. 9
    3.6        Allocation of Purchase Price ............................................................ 12

ARTICLE IV DUE DILIGENCE REVIEW; DISCLAIMERS ............................................. 12
    4.1        Due Diligence ................................................................................... 12
    4.2        Access to Records ............................................................................. 13
    4.3        Access to Acquired Properties .......................................................... 13
    4.4        Limitations and Disclaimers ............................................................. 14

ARTICLE V TITLE MATTERS ............................................................................................ 16
    5.1        Defensible Title ................................................................................ 16
    5.2        Permitted Encumbrances .................................................................. 17
    5.3        Title Claim ........................................................................................ 19
    5.4        Title Claim Value ............................................................................. 19
    5.5        Dispute Resolution ........................................................................... 20
    5.6        Special Warranty of Title in the Assignment ................................... 21
    5.7        Changes in Prices; Well Events ........................................................ 22
    5.8        Exclusive Remedy ............................................................................ 22

ARTICLE VI ENVIRONMENTAL MATTERS .................................................................... 22
    6.1        Exclusive Remedy ............................................................................ 22

ARTICLE VII REPRESENTATIONS AND WARRANTIES OF SELLERS ....................... 23
    7.1        Organization, Existence, and Qualification ...................................... 23
    7.2        Authority, Approval, and Enforceability .......................................... 23
    7.3        Bankruptcy ........................................................................................ 23
    7.4        Brokers' Fees .................................................................................... 24
    7.5        Foreign Person .................................................................................. 24
    7.6        Taxes ................................................................................................. 24
    7.7        No Conflicts ...................................................................................... 24
    7.8        Material Required Consents .............................................................. 24

i

| | | |
|---|---|---|
| 7.9 | Preferential Rights | 24 |
| 7.10 | Litigation | 24 |
| 7.11 | Legal Compliance | 25 |
| 7.12 | Environmental | 25 |
| 7.13 | Material Contracts | 25 |
| 7.14 | Current Commitments | 26 |
| 7.15 | Imbalances | 26 |
| 7.16 | Suspense Accounts | 26 |
| 7.17 | Leases | 26 |
| 7.18 | [Reserved] | 27 |
| 7.19 | Non-Consent Operations | 27 |
| 7.20 | Wells and Equipment | 27 |
| 7.21 | Casualty Loss and Condemnation | 27 |
| 7.22 | Permits | 27 |
| 7.23 | Royalties | 27 |
| 7.24 | Insurance; Bonds | 28 |
| 7.25 | [Reserved.] | 28 |
| 7.26 | Certain Limitations; Schedules | 28 |
| ARTICLE VIII | REPRESENTATIONS AND WARRANTIES OF PURCHASERS | 28 |
| 8.1 | Organization, Existence, and Qualification | 28 |
| 8.2 | Authority, Approval, and Enforceability | 28 |
| 8.3 | Bankruptcy | 29 |
| 8.4 | Brokers' Fees | 29 |
| 8.5 | No Conflicts | 29 |
| 8.6 | Consents | 29 |
| 8.7 | Litigation | 29 |
| 8.8 | Financing | 29 |
| 8.9 | Regulatory | 29 |
| 8.10 | Independent Evaluation | 29 |
| 8.11 | Securities Matters | 30 |
| ARTICLE IX | CERTAIN COVENANTS AND AGREEMENTS | 30 |
| 9.1 | Conduct of Business prior to Closing | 30 |
| 9.2 | Successor Operator | 32 |
| 9.3 | Governmental Bonds; Guarantees | 32 |
| 9.4 | Material Required Consents and Preferential Rights | 32 |
| 9.5 | Casualty Loss | 34 |
| 9.6 | Revenues | 35 |
| 9.7 | Suspense Accounts | 35 |
| 9.8 | Confidentiality, Non-Interference; Non-Solicitation | 35 |
| 9.9 | Public Announcements | 35 |
| 9.10 | Record Retention | 36 |
| 9.11 | Commercially Reasonable Efforts | 36 |
| 9.12 | Amendment of Schedules | 37 |
| 9.13 | Executory Contracts and Cure Costs | 37 |
| 9.14 | Bankruptcy Court Approval | 39 |
| 9.15 | Bankruptcy Court Filings | 41 |
| 9.16 | Commitment Letters | 41 |
| 9.17 | Bulk Sales | 41 |

ARTICLE X CONDITIONS TO CLOSING ........................................................................ 41
    10.1    Mutual Conditions to Closing ................................................................. 41
    10.2    Sellers' Conditions to Closing ................................................................ 42
    10.3    Purchaser's Conditions to Closing ......................................................... 42

ARTICLE XI CLOSING ................................................................................................... 43
    11.1    Date of Closing ....................................................................................... 43
    11.2    Closing Obligations ................................................................................ 43
    11.3    Records ................................................................................................... 44
    11.4    Risk of Loss ............................................................................................ 44

ARTICLE XII TERMINATION ........................................................................................ 45
    12.1    Termination ............................................................................................. 45
    12.2    Effect of Termination .............................................................................. 46
    12.3    Return of Documentation and Confidentiality ........................................ 47

ARTICLE XIII TAX MATTERS ....................................................................................... 47
    13.1    Property and Production Taxes ............................................................... 47
    13.2    Tax Reports and Returns ......................................................................... 48
    13.3    Transfer Taxes ........................................................................................ 48

ARTICLE XIV ASSUMPTION; SURVIVAL .................................................................. 48
    14.1    Assumption by Purchasers ...................................................................... 48
    14.2    No Third-Party Claims ........................................................................... 49
    14.3    Exclusive Remedy .................................................................................. 49
    14.4    Survival .................................................................................................. 49
    14.5    Waiver of Right to Rescission ................................................................ 49
    14.6    Non-Compensatory Damages ................................................................. 50

ARTICLE XV MISCELLANEOUS ................................................................................. 50
    15.1    Legal Fees .............................................................................................. 50
    15.2    Expenses ................................................................................................. 50
    15.3    Governing Law ....................................................................................... 50
    15.4    Jurisdiction and Venue ........................................................................... 50
    15.5    Waiver of Jury Trial ............................................................................... 51
    15.6    Time of the Essence; Calculation of Time ............................................. 51
    15.7    Notices .................................................................................................... 51
    15.8    Entire Agreement; Conflicts ................................................................... 53
    15.9    Amendments and Waivers ...................................................................... 53
    15.10   Binding Effect; Assignment ................................................................... 53
    15.11   Counterparts ........................................................................................... 54
    15.12   Third-Party Beneficiaries ....................................................................... 54
    15.13   Severability ............................................................................................ 54
    15.14   DTPA ...................................................................................................... 54
    15.15   Headings; Mutuality ............................................................................... 54
    15.16   Removal of Name ................................................................................... 55
    15.17   Litigation Support .................................................................................. 55
    15.18   Further Assurances ................................................................................. 55
    15.19   Filings, Notices, and Certain Governmental Approvals ......................... 55
    15.20   Specific Performance ............................................................................. 56
    15.21   Non-Recourse Parties ............................................................................ 56

15.22    Liquidating Trustee ................................................................................................ 56
15.23    Purchasers Representative ...................................................................................... 56

## APPENDIX

| **APPENDIX:** | | **DESCRIPTION:** |
|---|---|---|
| Appendix A | — | Defined Terms |

## EXHIBITS

| **EXHIBITS:** | | **DESCRIPTION:** |
|---|---|---|
| Exhibit A-1 | — | Acquired Leases |
| Exhibit A-2 | — | Acquired Wells |
| Exhibit A-3 | — | Acquired Easements |
| Exhibit A-4 | — | Acquired Personal Property |
| Exhibit A-5 | — | Acquired Contracts |
| Exhibit B | — | Specified Excluded Assets |
| Exhibit C | — | Form of Assignment |
| Exhibit D-1 | — | Form of Purchaser Closing Certificate |
| Exhibit D-2 | — | Form of Seller Closing Certificate |
| Exhibit E | — | Form of Non-Foreign Affidavit |

## SCHEDULES

| **SCHEDULES:** | | **DESCRIPTION:** |
|---|---|---|
| Schedule 7.6 | — | Taxes |
| Schedule 7.7 | — | No Conflicts |
| Schedule 7.8 | — | Material Required Consents |
| Schedule 7.9 | — | Preferential Rights |
| Schedule 7.10 | — | Litigation |
| Schedule 7.11 | — | Legal Compliance |
| Schedule 7.12 | — | Environmental |
| Schedule 7.13 | — | Material Contracts |
| Schedule 7.14 | — | Current Commitments |
| Schedule 7.15 | — | Imbalances |
| Schedule 7.16 | — | Suspense Accounts |
| Schedule 7.17 | — | Leases |
| Schedule 7.20 | — | Wells and Equipment |
| Schedule 7.22 | — | Permits |
| Schedule 7.23 | — | Royalties |
| Schedule 7.24 | — | Bonds |
| Schedule 9.1 | — | Certain Operations |
| Schedule 9.1(a)(iii) | — | Insurance |
| Schedule 9.3 | — | Guarantees |
| Schedule 9.13(b) | — | Executory Contracts |
| Schedule 9.13(c)(i) | — | Assumed Executory Contracts |
| Schedule 9.13(c)(ii) | — | Excluded Executory Contracts |

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "***Agreement***"), dated August 16, 2023 (the "***Execution Date***"), is made by and between HB2 ORIGINATION, LLC, a Delaware limited liability company ("***HB2***"), and AGERON ENERGY II, LLC, a Delaware limited liability company ("***AEII***", and together with HB2, collectively "***Sellers***" and each a "***Seller***"), and SAN ISIDRO ENERGY COMPANY II, LLC, a Texas limited liability company ("***SIEC***"), AGERON HOLDINGS, LLC, a Texas limited liability company ("***Ageron***"), and NEEDMORE MINERALS, LLC, a Texas limited liability company ("***Needmore***" and together with SIEC and Ageron, "***Purchasers***" and each a "***Purchaser***"). Sellers and Purchasers are sometimes referred to herein collectively as the "***Parties***" and each individually as a "***Party***".

## RECITALS

WHEREAS, on July 5, 2023, Sellers commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"), styled *In re: Alpine Summit Energy Partners, Inc., et al.*, Case No. 23-90739 (DRJ) (the "***Bankruptcy Case***");

WHEREAS, Sellers own and desire to sell certain oil and gas interests and other assets and properties in exchange for the cash purchase price and other consideration to be paid by Purchasers to Sellers under the terms of, and subject to the conditions in, this Agreement;

WHEREAS, Purchasers desire to purchase such oil and gas interests and other assets and properties under the terms of, and subject to the conditions in, this Agreement;

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Acquired Assets pursuant to Sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, Sellers' authority to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court;

## AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the benefits to be derived by each Party hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINED TERMS; INTERPRETATION

*1.1* ***Defined Terms***.  Capitalized terms used in this Agreement that are not otherwise defined in this Agreement are defined in **Appendix A**.

*1.2* ***Interpretation***.  As used in this Agreement, except as otherwise indicated in this Agreement or as the context may otherwise require:

(a) the words "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import;

1

(b)        the word "or" is not exclusive, and the word "extent" in the phrase "to the extent" means the degree or proportion to which a subject or other thing extends, and such phrase shall not mean simply "if";

(c)        references to an "Article", "Section", "preamble", "recital", or any other subdivision, or to an "Appendix", "Exhibit", or "Schedule", are to an article, section, preamble, recital, or subdivision of this Agreement, or to an appendix, exhibit, or schedule to this Agreement, respectively;

(d)        the words "this Agreement", "hereby", "hereof", "herein", "hereunder", and comparable words refer to all of this Agreement, including the Appendix, Exhibits, and Schedules to this Agreement, and not to any particular Article, Section, preamble, recital, or other subdivision of this Agreement or Appendix, Exhibit, or Schedule to this Agreement;

(e)        any pronoun in masculine, feminine, or neuter form shall include each other gender;

(f)        any word in the singular form includes the plural and vice versa;

(g)        references to any agreement or other document are to such agreement or document as amended, modified, superseded, supplemented, and restated now or from time to time after the date of this Agreement;

(h)        references to any Law are references to such Law as amended, modified, supplemented, and restated now or from time to time after the date of this Agreement, and to any corresponding provisions of successor Laws, and, unless the context requires otherwise, any reference to any statute shall be deemed also to refer to all rules and regulations promulgated and Orders issued thereunder;

(i)        references to any Person include such Person's respective permitted successors and permitted assigns;

(j)        references to a "day" or number of "days" (without the explicit qualification of "Business") refer to a calendar day or number of calendar days; and

(k)        any financial or accounting term that is not otherwise provided or defined in this Agreement shall have the meaning given such term under GAAP.

## ARTICLE II
## PURCHASE AND SALE

**2.1     *Purchase and Sale of Assets.*** At the Closing, under the terms of, and subject to the conditions in this Agreement, Sellers shall sell and convey to each Purchaser, and each Purchaser shall purchase and receive from Sellers, free and clear of Liens (other than Permitted Encumbrances and Assumed Liabilities), all of each Seller's respective right, title, and interest in and to the Acquired Assets *pro rata* based on the allocation set out in Schedule 2.1 attached hereto.

**2.2     *Acquired Assets.*** The term "*Acquired Assets*" means, collectively, all of Sellers' respective right, title, and interest in and to the following, but excluding the Excluded Assets:

(a)        the oil, gas and mineral leases described in **Exhibit A-1** (the "*Acquired Leases*"), together with any and all other rights, titles, and interests of a Seller of any kind or character in and to the

Acquired Leases or in and to the lands covered or burdened thereby or unitized, pooled, or communitized therewith;

(b)       all unitization, pooling, and communitization agreements, declarations, and orders covering any part of the lands covered or burdened by the Acquired Leases (such lands as are covered by the Acquired Leases, together with all other lands pooled, unitized, or communitized under such agreements, declarations, and orders, are referred to herein, collectively, as the "***Lands***");

(c)       all wells (including all Hydrocarbon wells, water wells, disposal wells, injection wells, abandoned wells, and any other wells) and all associated lateral pipelines located on the Lands, whether producing or non-producing (the "***Acquired Wells***" and, together with the Acquired Leases, the "***Acquired Properties***"), including the wells listed on **Exhibit A-2**;

(d)       (i) all Hydrocarbons in, on, or under, or that may be produced from, the Lands on or after the Effective Time, (ii) all Hydrocarbon inventories from or attributable to the Lands in storage at the Effective Time, and (iii) all Production Imbalances and Pipeline Imbalances;

(e)       all Easements on or over the Lands to the extent used or held for use in connection with Operations on or applicable to any of the Acquired Properties (the "***Acquired Easements***"), including the Acquired Easements listed on **Exhibit A-3**;

(f)       to the extent transferable, all Permits that have been obtained, granted or issued in connection with the ownership or Operations on or applicable to any of the Acquired Assets;

(g)       all fee interests in surface real property and leasehold estates in surface real property, in each case, to the extent the same are used or held for use in connection with Operations on or applicable to any of the Acquired Properties (the "***Acquired Real Estate***");

(h)       all owned and leased Equipment and Operating Inventory used or held for use in connection with Operations on or applicable to the Acquired Properties (the "***Acquired Personal Property***"), including the Acquired Personal Property listed on **Exhibit A-4**;

(i)       all Hydrocarbon sales, purchase, gathering, and processing contracts, transportation contracts, operating agreements, balancing agreements, joint venture agreements, partnership agreements, farmout and farmin agreements, area of mutual interest agreements, surface use agreements, contribution agreements, and other contracts and agreements, in each case, to the extent the foregoing cover, are attributable to, or relate to any of the Acquired Assets or to Operations on or applicable to the Acquired Properties and which are binding on any Seller or any of the Acquired Assets to the extent listed on **Exhibit A-5** and including the Assumed Executory Contracts listed on **Schedule 9.13(c)(i)** (as such Exhibit or Schedule may be amended from time to time pursuant to **Section 9.13**) (the "***Acquired Contracts***"); *provided, however*, Acquired Contracts do not include any (i) Acquired Lease, Acquired Easement, Permit, or Acquired Real Estate; or (ii) contract or agreement to the extent constituting or relating to any Excluded Asset, including any Excluded Executory Contract;

(j)       (i) all accounts receivable attributable to the Acquired Assets, and (ii) all rights, claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counterclaims, cross-claims and defenses of any Seller, in the case of each of clause (i) and (ii), to the extent related to the Acquired Assets and arising or relating to events occurring from or after the Effective Time or relating to the Assumed Liabilities;

(k)     all Technical Data in Sellers' possession to the extent relating to the Acquired Properties (the "***Acquired Data***"); and

(l)     all Records to the extent relating to the Acquired Assets and the Assumed Liabilities; *provided*, *however*, (i) all employee files, and (ii) all other Records expressly constituting Excluded Assets, in each case, shall be excluded (such Records as described in this **Section 2.2(l)**, collectively, the "***Acquired Records***"); *provided further*, *however*, Sellers may retain a copies of all such Acquired Records.

    *2.3*    ***Excluded Assets.***  Notwithstanding **Section 2.2** or anything else to the contrary in this Agreement, the Acquired Assets shall not include, and there is excepted, reserved and excluded from the Contemplated Transactions, all of the following of any Seller and its Affiliates (the "***Excluded Assets***"):

(a)     corporate, financial, Income Tax, franchise tax, and legal data and records of a Seller and its Affiliates (other than title opinions and abstracts of title pertaining to the Acquired Assets), and all other information, records, and data that relate to a Seller's or any of its Affiliates' business generally or to businesses of a Seller or its Affiliates other than the exploration and production of Hydrocarbons and the Acquired Assets;

(b)     all accounts receivable and other rights to payment, refund, or indemnity accruing or attributable to any period before the Effective Time or to any Excluded Assets, including the right to any payments under any Acquired Leases (including any reduction to, rebate of, or earn-back with respect to bonus payments paid prior to the Effective Time) or otherwise with respect to any Royalties or the overpayment thereof, the full benefit of all Liens, security for such accounts, or rights to payment, and all rights, Claims, refunds, causes of action, or choses in action relating to the foregoing, except in each case with respect to Property and Production Taxes for which Purchasers are responsible under **Section 13.1**;

(c)     all production of Hydrocarbons from or attributable to the Acquired Properties with respect to any period before the Effective Time (other than Hydrocarbons in storage at the Effective Time and make-up Hydrocarbons with respect to Production Imbalances described in **Section 2.2(d)**), including (i) all proceeds attributable to any such pre-Effective Time production, and (ii) all rights, Claims, refunds, causes of action, or choses in action relating to such pre-Effective Time production or proceeds (including settlement of take-or-pay disputes);

(d)     except as contemplated in **Section 9.5** in respect of Casualty Losses, all insurance policies, and all Claims, payments, and proceeds under any such insurance policies, regardless of whether arising or relating to any period prior to, at, or after the Effective Time;

(e)     all Hedging Instruments of a Seller and its Affiliates, if any, and all rights and obligations under any such Hedging Instruments;

(f)     all bank accounts, cash, deposits, surety bonds, rights under any letters of credit, and collateral pledged to secure any Liability or obligation of a Seller or its Affiliates in respect of the Acquired Assets;

(g)     all rights and interests in any Intellectual Property;

(h)     (i) all interpretive data and analysis of Technical Data, and (ii) all studies related to reserve assessments and economic estimates and analyses;

(i)      all data, software, and records to the extent disclosure or transfer is prohibited or subjected to payment of a fee, penalty, or other consideration by any license agreement or other agreement with a Third Party, or by applicable Law, and for which no consent to transfer has been received or for which Purchasers have not agreed in writing to pay such fee, penalty, or other consideration, as applicable;

(j)      all information entitled to legal privilege, including attorney work product and attorney-client communications (excluding title opinions pertaining to the Acquired Properties), and all other information, records, and data to the extent relating to any of the Excluded Assets;

(k)      records relating to either (i) the auction, marketing, acquisition, or disposition (or proposed acquisition or disposition) of any of the Acquired Assets, including the existence, identity, and inquiries and proposals received from or made to, and records of negotiation with, any Person, and any economic analyses associated therewith, and all internal communications with and documents shared by and with legal counsel of a Seller and its Affiliates in connection with any of the foregoing, or (ii) any employees of a Seller or its Affiliates;

(l)      except to the extent related or attributable to the Assumed Liabilities, all proceeds from the settlement or disposition of any Claims, Proceedings, or disputes, all warranties and rights to indemnification, and all other rights, claims, refunds, causes of action, and choses in action, in each case, owed or paid to or in favor of a Seller or any of its Affiliates, in each case, (i) under the Transaction Documents, (ii) arising out of or relating to any Excluded Assets, or (iii)  to the extent related to the period prior to the Effective Time;

(m)      audit rights under operating agreements or other contracts or agreements to the extent attributable or relating to periods before the Effective Time, or to any Excluded Assets, and Purchasers will cooperate with Sellers to facilitate Sellers' exercise of such rights;

(n)      any Claims of any Seller or any Affiliate thereof for any credits, refunds of or loss carry forwards in respect of (i) Property and Production Taxes with respect to taxable periods or portions thereof ending on or prior to the Effective Time, (ii) Income Taxes or franchise Taxes, or (iii) Taxes attributable to any Excluded Assets;

(o)      all vehicles and all office furniture, office supplies, personal computers and associated peripherals, licensed software, and all radio (excluding SCADA equipment), cell phones and telephone equipment;

(p)      all overhead costs and expenses paid or payable by Third Party non-operators to any Seller, its Affiliates, or Operator pursuant to any applicable joint operating agreement with respect to periods of time prior to Closing;

(q)      all electronic communications, including email;

(r)      (i) all assets and properties specifically listed in **Exhibit B**, and (ii) any Excluded Executory Contracts listed on **Schedule 9.13(c)(ii)**, in each case, regardless of whether such assets and properties may be used or held for use in connection with the Acquired Assets;

(s)      (i) any and all rights, claims or causes of action by or in the right of a Seller against any current or former director or officer of a Seller, and (ii) any and all claims for relief of a Seller under chapter 5 of the Bankruptcy Code;

(t)      the Basic Documents, as that term is defined in that certain Amended and Restated Indenture dated as of September 12, 2022, between Alpine Summit Funding LLC, a Delaware limited liability company, and UMB Bank N.A., a national banking association, as indenture trustee and not in its individual capacity, as Paying Agent, and as Securities Intermediary; and

(u)      copies of the Acquired Records.

**2.4      Assumption of Liabilities.** At the Closing, Purchaser shall assume and agree to timely and fully pay, perform, and otherwise discharge, the Assumed Liabilities, under the terms of, and subject to the conditions in, this Agreement and the Sale Order.

**2.5      Effective Time**. Notwithstanding that the Closing may occur on another date and at another time, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities shall be effective as of the Effective Time.

# ARTICLE III
# PURCHASE PRICE

**3.1      Purchase Price.** Subject to the other terms and provisions of this Agreement, in addition to assumption by Purchasers of the Assumed Liabilities, the purchase price payable by Purchasers to Sellers for the Acquired Assets shall be an amount equal to the Purchase Price. The "**Purchase Price**" means an aggregate amount equal to: (a) Eighty Three Million Dollars ($83,000,000) (the "**Base Purchase Price**"), *plus or minus* (b) the net amount of the adjustments under **Section 3.3**. The adjustments under **Section 3.3** shall be preliminarily determined under **Section 3.4** pursuant to the Preliminary Settlement Statement and subject to final adjustment after the Closing under **Section 3.5** pursuant to the Final Settlement Statement.

**3.2      Deposit.** No later than one (1) Business Day following the Execution Date, Purchasers shall deposit, by wire transfer of immediately available funds in a segregated bank account designated by HB2 and established and maintained in accordance with and subject to the Bid Procedures Order, an amount in cash equal to ten percent (10%) of the Base Purchase Price (the "**Deposit**") as an earnest money deposit. The Deposit shall not accrue any interest. The Deposit is not refundable, except as expressly provided in **Section 12.2**. If the Closing occurs, then the Deposit shall be retained by Sellers and applied towards the Closing Amount under **Section 3.4(b)**. If the Closing does not occur, then the Deposit shall be retained or paid as provided in **Section 12.2**.

**3.3      Adjustments to Purchase Price.** All adjustments to the Purchase Price under this **Section 3.3** shall be without duplication of other adjustments under this **Section 3.3**:

(a)      Upward Adjustments. The Base Purchase Price shall be adjusted upward by the following:

(i)      the amount of all Property Expenses, Royalties, and other costs and expenses attributable to the Acquired Assets or the operation or ownership thereof during the period from and after the Effective Time that are paid by or on behalf of, but have not been reimbursed to, any Seller, its Affiliates, or Operator; including (A) rentals, shut-in payments, and other lease payments, (B) prepaid costs and expenses (including payment of insurance and bond premiums, surface use agreement fees, and software licensing fees, to the extent such payments are attributable to the period from and after the Effective Time), and (C) costs of acquiring necessary Easements;

(ii)      [Reserved];

6

(iii)     the amount of all Property and Production Taxes allocated to Purchasers under **Section 13.1** that are paid or otherwise economically borne by any Seller, its Affiliates, or Operator (net of any deductions, credits, reimbursements, and refunds attributable thereto that are realized by such Seller, its Affiliates, or Operator), excluding, for the avoidance of doubt, any Production Taxes that were withheld or deducted from, or otherwise netted against, the amount received by a Seller, its Affiliates, or Operator in connection with a transaction to which **Section 3.3(b)(iii)** applies, and therefore were taken into account in determining the proceeds received by a Seller, its Affiliates, or Operator for purposes of applying **Section 3.3(b)(iii)** with respect to such transaction;

(iv)     the amount of all income, revenues, and proceeds attributable to the Acquired Assets during the period prior to the Effective Time that are received by Purchasers or their Affiliates and not remitted or paid to Sellers, net of any applicable marketing fees and adjustments, Royalties, and Production Taxes in connection therewith that are deducted by purchasers of production or that otherwise are paid or borne by Purchasers or their Affiliates (excluding amounts held in suspense for the benefit of a Third Party);

(v)     an amount equal to the volume of all Hydrocarbons attributable to the Acquired Properties that, at the Effective Time, are in storage or within processing plants (excluding linefill and tank bottoms), *multiplied by* the applicable price paid or, if not yet sold, the applicable price for which the applicable production from the Acquired Properties was sold most recently prior to the Effective Time; and

(vi)     any other purchase price adjustment provided for elsewhere in this Agreement or otherwise agreed upon by Sellers and Purchasers.

(b)     Downward Adjustments. The Base Purchase Price shall be adjusted downward by the following:

(i)     the amount of all Property Expenses attributable to the Acquired Properties or the ownership or operation thereof during the period prior to the Effective Time that are incurred by or on behalf of any Seller and paid by, but have not been reimbursed to, Purchasers or their Affiliates;

(ii)     the amount of all (A) Property and Production Taxes allocated to Sellers under **Section 13.1** that are paid or otherwise economically borne by Purchasers or their Affiliates (net of any deductions, credits, reimbursements, and refunds attributable thereto that are realized by Purchasers or their Affiliates), excluding, for the avoidance of doubt, any Production Taxes that were withheld or deducted from, or otherwise netted against, the amount received by Purchasers or their Affiliates in connection with a transaction to which **Section 3.3(a)(iv)** applies, and therefore were taken into account in determining the proceeds received by Purchasers or their Affiliates for purposes of applying **Section 3.3(a)(iv)** with respect to such transaction, and (B) Seller Refund Obligations that are paid or otherwise economically borne by Purchasers or their Affiliates;

(iii)     other than any Excluded Assets, the amount of all income, revenues, and proceeds attributable to the Acquired Properties during the period from and after the Effective Time that are received by a Seller, its Affiliates, or Operator and not remitted or paid to Purchasers, net of any applicable marketing fees and adjustments, Royalties, and Production Taxes in connection therewith that are deducted by purchasers of production or that otherwise are paid or borne by a Seller, its Affiliates, or Operator (excluding amounts held in suspense for the benefit of a Third Party, and excluding any rebates of insurance premiums received as a result of termination of any Seller's, its Affiliates', or Operator's insurance policies (which are for Sellers' and/or Operator's account));

(iv)     an amount equal to all proceeds from sales of Hydrocarbons produced from the Acquired Wells that are payable to Third Party owners of working interests or Royalties, in each case, that were received, but not yet paid or caused to be paid to such Third Party owners, by Sellers, their Affiliates, or Operator as of the Closing Date (the "**Suspense Funds**");

(v)     to the extent such adjustment is required pursuant to **Section 5.6**, the Title Claim Value of any uncured Title Claims timely asserted thereunder after Closing;

(vi)     [Reserved];

(vii)     the amount of any Base Purchase Price adjustment required pursuant to **Section 9.5(b)**; and

(viii)     any other purchase price adjustment provided for elsewhere in this Agreement or otherwise agreed upon by Sellers and Purchasers.

(c)     <u>Imbalance Adjustments</u>. The Base Purchase Price shall be further adjusted upward or downward, as appropriate, by (i) the volume of Production Imbalances, *multiplied by* $2.97 per MCF (upward for underage and downward for overage); and (ii) the volume of any Pipeline Imbalances, *multiplied by* the then current monthly price applicable to deliveries to the applicable pipeline (upward for over-deliveries and downward for under-deliveries).

(d)     <u>Adjustment Methodology</u>. Except as otherwise expressly provided herein, for purposes of adjustments to the Purchase Price under this **Section 3.3** and allocating Property Expenses, revenues, and production, as applicable, including pursuant to **Section 9.6**:

(i)     all such adjustments shall be made on an Accrual Basis and otherwise in accordance with Sellers' ordinary course accounting practices;

(ii)     the determination of whether Property Expenses are "attributable to" the period before or from and after the Effective Time shall be based on when such Property Expenses are incurred, the timing of which incurrence shall be determined based on when the corresponding services are rendered, goods are delivered, or work is performed (and not when Property Expenses are due, owing, invoiced, or paid);

(iii)     if any pre-payment is made before the Effective Time for services, work, or goods performed or to be performed, or delivered or to be delivered, partly before and partly after the Effective Time, or solely after the Effective Time, then such pre-payment shall be prorated between Sellers, on the one hand, and Purchasers, on the other hand, based on the number of days in the applicable period falling before the Effective Time and the number of days in the applicable period falling at and after the Effective Time, with Sellers being responsible for the portion attributable to the period falling before the Effective Time and Purchasers being responsible for the portion attributable to the period falling at and after the Effective Time; and

(iv)     Hydrocarbons shall be deemed to be "produced from" and "attributable to" the Acquired Properties (A) in the case of liquid Hydrocarbons, when they pass through the inlet flange of the pipeline connecting into the storage facilities into which they are run or, if there are no such storage facilities, when they pass through the LACT meters or similar meters at the initial point of entry into the pipelines through which they are transported from the field, and (B) in the case of gaseous Hydrocarbons, when they pass through the delivery point sales meters on the pipelines through which they are transported.

HB2 shall utilize reasonable interpolative procedures to arrive at an allocation of production when exact meter readings or gauging and strapping data is not available.

As used herein, the terms "earned" and "incurred" shall be interpreted in accordance with GAAP and COPAS standards, as applicable. Where available, actual figures will be used for the adjustments to the Purchase Price at Closing, and where actual figures are not available, estimates will be used subject to final adjustments in accordance with **Section 3.5**. After Closing, each Party shall be entitled to participate in all joint interest audits and other audits of Property Expenses for which such Party is entirely or in part responsible under the terms of this **Section 3.3**.

(e)     Method of Payment. Unless otherwise agreed by the Parties, all payments under this Agreement will be made in Dollars, by bank wire transfer to the bank account or accounts designated in writing by the receiving Party, in immediately available funds, without setoff, withholding, or any deduction of any kind, including for any banking, transfer, or other costs or Liabilities.

**3.4     Preliminary Settlement Statement; Closing Amount.**

(a)     Preliminary Settlement Statement. Not later than 5:00 p.m. Houston, Texas time on the date that is five (5) Business Days prior to Closing, HB2 shall prepare and submit to Purchasers a draft settlement statement (the "***Preliminary Settlement Statement***") that shall set forth (i) the Base Purchase Price, (ii) estimates of the adjustments under **Section 3.3**, and (iii) the resulting Closing Amount and Closing Payment. HB2 may thereafter, until the Business Day prior to Closing, continue to update the Preliminary Settlement Statement after submission of the initial draft thereof to Purchasers. Within two (2) Business Days of receipt from HB2 of the initial draft of the Preliminary Settlement Statement, Purchasers will deliver to HB2 a written report containing all changes with the explanation therefor that Purchasers proposes to be made to the Preliminary Settlement Statement.  The Preliminary Settlement Statement, as agreed upon by HB2 and Purchasers, will be used to adjust the Base Purchase Price at Closing; *provided, however,* if HB2 and Purchasers do not agree upon an adjustment set forth in the Preliminary Settlement Statement, then the amount of such adjustment used to adjust the Purchase Price at Closing shall be the amount proposed by HB2 in good faith prior to Closing.

(b)     Closing Amount. The Base Purchase Price, as increased or decreased by the net amount of the estimated upward and downward adjustments under **Section 3.3**, as set forth in the Preliminary Settlement Statement, is referred to herein as the "***Closing Amount***". At the Closing, an amount equal to (i) the Closing Amount, *minus* (ii) the Deposit, shall be paid by Purchasers to Sellers by wire transfer of immediately available funds to the account or accounts designated in writing by HB2 to Purchasers (the "***Closing Payment***").

**3.5     Final Settlement Statement; Final Purchase Price.**

(a)     Final Settlement Statement. Not later than 5:00 p.m., Houston, Texas time on the later of (i) the date that is sixty (60) days following the Closing Date and (ii) if **Section 5.5** is applicable, five (5) Business Days following the date on which all Title Disputed Matters have been finally determined by the Title Expert (the "***Final Settlement Date***"), HB2, with the assistance and cooperation of Purchasers and Purchasers' Entity Representatives (including by means of access to such Acquired Records and other Purchasers information and records as HB2 reasonably deems necessary or appropriate), shall prepare and deliver to Purchasers a final settlement statement (the "***Final Settlement Statement***"). The Final Settlement Statement will take into account all final adjustments to the Base Purchase Price provided in this Agreement, including each adjustment under **Section 3.3** not finally determined or that was estimated or incorrectly determined at the Closing pursuant to the Preliminary Settlement Statement (and shall include the final Title Claim Value adjustments for any Title Claims, if any, as such adjustments have been finally

9

agreed upon by HB2 and Purchasers or determined by the Title Expert), and will set forth a reconciliation of the Closing Amount to the Final Purchase Price.

           (b)      <u>Objection Report</u>. As soon as practicable after receipt of HB2's proposed Final Settlement Statement, but in any case not later than 5:00 p.m., Houston, Texas time on the date that is ten (10) Business Days after receipt of HB2's proposed Final Settlement Statement (the "***Objection Date***"), Purchasers may deliver to HB2 a detailed written report (an "***Objection Report***") containing: (i) those particular items or amounts in HB2's proposed Final Settlement Statement as to which Purchasers object; (ii) the reasons, in reasonable detail, for each such objection, together with any supporting documentation available to Purchasers; and (iii) Purchasers' calculation of the Final Purchase Price. Any particular amounts or items contained or omitted in HB2's proposed Final Settlement Statement that are not specifically objected to by Purchasers in a proper and timely delivered Objection Report shall be deemed accepted by Purchasers and shall be final, binding, and conclusive on both Parties and not subject to dispute. If Purchasers do not deliver a proper Objection Report by the Objection Date, then HB2's proposed Final Settlement Statement and calculation of the Final Purchase Price shall be deemed final, binding, and conclusive on all Parties and not subject to dispute.

           (c)      <u>Negotiation Period</u>. If an Objection Report is properly and timely delivered by Purchasers, then Purchasers and HB2 shall negotiate in good faith during the five (5) Business Day period after such delivery (the "***Negotiation Period***") to reach an agreement on the disputed items or amounts to determine the Final Purchase Price. If HB2 and Purchasers agree as to the Final Purchase Price or any particular amount or item thereof that is specifically objected to in the Objection Report, then Purchasers and HB2 shall execute a written acknowledgement of such agreement, and the Final Purchase Price or any amounts or items thereof that are the subject of such agreement, as applicable, shall be deemed final, binding, and conclusive on all Parties and not subject to dispute.

           (d)      <u>Submission to Accounting Referee</u>. If Purchasers and HB2 are unable to agree on the Final Purchase Price and all such items or amounts by the expiration of the Negotiation Period, then any remaining dispute, controversy, or matters of difference relating to the Final Settlement Statement or the determination of the Final Purchase Price (collectively, "***Final Settlement Disputes***") shall be resolved by Grant Thornton LLP, or if such firm declines to act in such capacity, by another nationally recognized firm of independent accountants that does not have a material relationship with any Party and that is proposed by HB2 and reasonably acceptable to Purchasers (the "***Accounting Referee***"). To the extent necessary, HB2 and Purchasers shall act in good faith to agree promptly on the Accounting Referee and to execute such engagement letters and other documents as shall be necessary to engage the Accounting Referee within ten (10) Business Days after the expiration of the Negotiation Period. The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Sellers and fifty percent (50%) by Purchasers. Sellers, on the one hand, and Purchasers, on the other hand, shall bear their/its own legal fees and other costs of presenting their/its case.

           (e)      <u>Materials to Accounting Referee</u>. HB2 and Purchasers shall each present to the Accounting Referee, with a simultaneous copy to the other Party, a single written statement of its position on each Final Settlement Dispute, together with a copy of this Agreement, the Preliminary Settlement Statement used at Closing, HB2's draft Final Settlement Statement, Purchasers' Objection Report, and any supporting material that such Party desires to furnish, not later than fifteen (15) Business Days after appointment of the Accounting Referee. Each of Sellers and Purchasers shall not, and shall cause their respective Entity Representatives to not, attempt to communicate with the Accounting Referee with respect to any Final Settlement Dispute without providing the other Party the opportunity to jointly discuss or confer with the Accounting Referee with respect to each such Final Settlement Dispute.

(f)      Decisions of Accounting Referee. The Accounting Referee shall make its determination and provide to the Parties written findings within twenty (20) Business Days after it has received the materials under **Section 3.5(e)**. In making a determination, the Accounting Referee shall be bound by the terms of this Agreement and, without any additional or supplemental submittals by any Party (except as may be specifically requested by the Accounting Referee), may consider such other accounting and financial standards matters as in its opinion are necessary or appropriate to make a proper determination. The decision of the Accounting Referee shall be final, conclusive, binding, and non-appealable and shall be enforceable against any of the Parties in any court of competent jurisdiction, *provided that* the Accounting Referee (i) shall be limited to determining the specific Final Settlement Disputes submitted to it, (ii) shall set forth a calculation of the Final Purchase Price and any item or component thereof that was not finally determined during or before the Negotiation Period and a line-item comparison (showing increases and decreases) to the calculations contained in the Final Settlement Statement and the Objection Report, together with explanations of each variance, (iii) may not determine a Final Purchase Price that is more than the applicable amount in HB2's draft Final Settlement Statement or that is less than the applicable amount in Purchasers' Objection Report, and (iv) shall incorporate the final Title Claim Value adjustments for any Title Claims, if any, as such adjustments have been finally agreed upon by HB2 and Purchasers or determined by the Title Expert. THE ACCOUNTING REFEREE SHALL ACT AS AN EXPERT FOR THE LIMITED PURPOSE OF DETERMINING THE SPECIFIC FINAL SETTLEMENT STATEMENT MATTERS PRESENTED TO IT, SHALL NOT HAVE THE POWERS OF AN ARBITRATOR, SHALL BE LIMITED TO THE PROCEDURES SET FORTH IN THIS SECTION, MAY NOT HEAR OR DECIDE ANY MATTERS EXCEPT THE SPECIFIC FINAL SETTLEMENT STATEMENT MATTERS PRESENTED TO IT, AND MAY NOT AWARD DAMAGES, INTEREST, COSTS, ATTORNEY'S FEES, EXPENSES, OR PENALTIES TO ANY PARTY.

(g)      Final Determination Date. The final Purchase Price, as agreed upon by the Parties or finally determined by the Accounting Referee, as applicable, shall be deemed final, binding, and conclusive on both Parties and not subject to dispute (the "***Final Purchase Price***"). The date on which the Final Purchase Price shall be deemed to have been determined (the "***Final Determination Date***") shall be the earliest of: (i) the Objection Date, if Purchasers have not delivered an Objection Report by the Objection Date; (ii) the date during the Negotiation Period that Purchasers and HB2 have resolved all disputed amounts with respect to the Final Purchase Price, if all disputed amounts with respect to the Final Purchase Price are resolved during the Negotiation Period; and (iii) the date on which the Accounting Referee delivers its report as to the final determination of the Final Purchase Price, if submitted to the Accounting Referee.

(h)      Cooperation. HB2 and Purchasers shall, and shall cause their respective Entity Representatives and independent accountants to, cooperate and assist as reasonably requested by the Parties and the Accounting Referee in the preparation of the Final Settlement Statement and the calculation of the Final Purchase Price and in providing access and conducting reviews referred to in this **Section 3.5**, including, to the extent reasonably necessary, making available their respective books, records, work papers, and appropriate personnel.

(i)      Payment of Final Purchase Price. If the Final Purchase Price as finally determined under this **Section 3.5** is *more than* the Closing Amount, then Purchasers shall pay to Sellers, within five (5) Business Days after the Final Determination Date, the amount of such difference by wire transfer of immediately available funds to the accounts designated by Sellers. If the Final Purchase Price as finally determined under this **Section 3.5** is *less than* the Closing Amount, then (subject to the final sentence of this **Section 3.5(i)**) Sellers shall pay to Purchasers, within five (5) Business Days after the Final Determination Date, the amount of such difference by wire transfer of immediately available funds to an account or accounts designated by Purchasers. For clarity, thereafter there shall be no further adjustments

11

to the Purchase Price between the Parties under this Agreement, including for any Property Expenses or other cost or expenses.

**3.6** *Allocation of Purchase Price.* The Purchase Price shall be allocated among the Acquired Assets as set forth in **Exhibit A-1** and **Exhibit A-2**, and the portion of the Purchase Price allocated to each Acquired Asset, if any, is referred to herein as the "*Allocated Value*" of such Acquired Asset, and each Acquired Asset to which a separate value is not allocated has an Allocated Value of zero U.S. Dollars ($0.00). Such Allocated Values shall be used in calculating adjustments to the Purchase Price as provided herein.  Sellers and Purchasers further agree that for the purpose of making the requisite filings under Section 1060 of the Code, and the Treasury Regulations thereunder, the Purchase Price and any other items that are properly treated as consideration for U.S. federal income Tax purposes shall be allocated among the Acquired Assets in a manner consistent, to the extent permitted by applicable Law, with the Allocated Values, as set forth on Schedule 3.6 (the "*Tax Allocation*").  Sellers and Purchasers each agree to report, and to cause their respective Affiliates to report, the U.S. federal and applicable state and local income Tax consequences of the transactions contemplated herein, and in particular to report the information required by Section 1060(b) of the Code, and to jointly prepare Form 8594 (Asset Acquisition Statement under Section 1060 of the Code) as promptly as possible following the Closing Date and in a manner consistent with the Tax Allocation, as revised to take into account subsequent adjustments to the Purchase Price, including any adjustments pursuant to the Agreement to determine the Final Purchase Price, and shall not take any position inconsistent therewith upon examination of any Tax return, in any refund claim, in any litigation, investigation, or otherwise, in each case, unless required to do so by any Law after notice to and discussions with the other Party, or with such other Party's prior consent, not to be unreasonably withheld, conditioned or delayed; provided, however, that nothing contained herein shall prevent Purchasers or Sellers from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Tax Allocation, and neither Purchasers nor Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging the Tax Allocation.

## ARTICLE IV
## DUE DILIGENCE REVIEW; DISCLAIMERS

**4.1** *Due Diligence.*

(a) During the period from the Execution Date until five (5) Business Days prior to the Target Closing Date or the earlier termination of this Agreement, Sellers shall provide Purchasers and their Entity Representatives with reasonable access in accordance with this **Article IV** to the Acquired Assets of Sellers to permit Purchasers to perform a customary due diligence review of the Acquired Assets (the "*Due Diligence Review*"); provided, however, such Due Diligence Review and all such access shall be: (i) subject to the terms and conditions of this **Article IV**; (ii) conducted at Purchasers' sole risk, cost, and expense; and (iii) conducted during Sellers' and Operator's normal business hours and in a manner so as not to unreasonably interfere with the normal Operations of the Acquired Properties or the business of Sellers, their Affiliates, or Operator.

(b) Notwithstanding **Section 4.1(a)** or any other provision in this Agreement to the contrary, any obligation of Sellers under this Agreement to make any such Acquired Assets available to Purchasers shall be: (i) only to the extent that doing so does not violate any Law or any confidentiality or other obligation under any contract or agreement of a Seller, its Affiliates, or Operator to any Third Party (provided that Sellers, their Affiliates or Operator shall use commercially reasonable efforts to obtain such consents); and (ii) only to the extent such Acquired Records or other information are not protected by the attorney-client privilege, the work product doctrine, or other applicable privilege or any such privilege would be waived, voided, rendered voidable or destroyed by disclosure to Purchasers or any of their Entity

Representatives; *provided, that*, in the case of Acquired Records to which the foregoing subpart (ii) is applicable, the Parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Sellers (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Law or contract or be reasonably likely to cause such privilege to be undermined or waived with respect to such information and (B) could reasonably (in the good faith belief of the Sellers (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Entity Representatives of Purchasers could be provided access to such information.

(c)       During all periods that Purchaser or its Entity Representatives or environmental contractors are on the Acquired Properties or in a Seller's or its Affiliates' offices, Purchaser shall maintain, at its sole expense and with insurers reasonably satisfactory to HB2, policies of insurance of the types and in the amounts currently maintained by Ageron on the Execution Date.

(d)       Each Purchaser acknowledges that any entry into a Seller's or its Affiliates' offices or onto the Acquired Properties shall be at such Purchaser's sole risk and that none of the Seller Parties shall be liable in any way for any injury, loss, or damage arising out of such entry that may occur to any Purchaser Parties pursuant to this Agreement. **IN CONNECTION WITH THE GRANTING OF ACCESS TO THE ACQUIRED ASSETS, (I)** EACH **PURCHASER REPRESENTS AND WARRANTS TO SELLERS THAT SUCH PURCHASER AND EACH OF ITS ENTITY REPRESENTATIVES AND CONTRACTORS THAT CONDUCTS ANY ENVIRONMENTAL ASSESSMENT OR OTHERWISE ENTERS ONTO ANY OF THE ACQUIRED ASSETS OR A SELLER'S OR ITS AFFILIATES' OFFICES IS ADEQUATELY INSURED AND (II) EACH PURCHASER HEREBY WAIVES, RELEASES, AND AGREES TO DEFEND, INDEMNIFY, SAVE, AND HOLD HARMLESS THE SELLER PARTIES AND THE THIRD PARTY OPERATORS OF THE ACQUIRED PROPERTIES FROM AND AGAINST ANY AND ALL CLAIMS AND LOSSES TO THE EXTENT ARISING FROM OR IN ANY WAY RELATED TO THE ACCESS AFFORDED TO, OR ANY INVESTIGATIONS, ASSESSMENTS, OR OTHER DUE DILIGENCE REVIEW ACTIVITIES CONDUCTED BY, ANY PURCHASER PARTIES OR ANY OF THEIR CONTRACTORS OR OTHER REPRESENTATIVES, EVEN IF SUCH CLAIMS OR LOSSES ARISE OUT OF OR RESULT FROM, SOLELY OR IN PART, THE SOLE, ACTIVE, PASSIVE, CONCURRENT, OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OR VIOLATION OF LAW OF OR BY ANY SELLER PARTIES, EXCEPTING ONLY LIABILITIES ACTUALLY RESULTING FROM A SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND THEN ONLY TO THE EXTENT SUCH LIABILITIES ARE ACTUALLY CAUSED BY SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.** This **Section 4.1(d)** shall survive the Closing or the earlier termination of this Agreement indefinitely.

*4.2*       ***Access to Records.*** Subject to **Section 4.1**, during the period from the Execution Date until five (5) Business Days prior to the Target Closing Date or the earlier termination of this Agreement, Sellers shall make the Acquired Records available to Purchasers, at HB2's election, via the Data Room, an FTP site, or other electronic access for Purchasers to complete its Due Diligence Review.

*4.3*       ***Access to Acquired Properties.***

(a)       Subject to the terms and conditions of this **Article IV** and to the extent permitted at Law and under applicable contracts, during the period from the Execution Date until five (5) Business Days prior to the Target Closing Date or the earlier termination of this Agreement, (i) with respect to all Acquired Assets operated by Sellers, their Affiliates or Operator, HB2 shall allow Purchasers to conduct on-site visual inspections of such Acquired Assets and allow Purchasers to engage a qualified environmental contractor to conduct a Phase I Environmental Site Assessment in accordance with the ASTM International standards (an "***Environmental Assessment***") of such Acquired Assets, and (ii) with respect to all Acquired Assets not operated by Sellers, their Affiliates or Operator, HB2 shall use reasonable efforts (at no out-of-pocket cost, expense, or Liabilities to Sellers, their Affiliates, or Operator) to allow

Purchasers to conduct on-site visual inspections of such Acquired Assets and engage a qualified environmental contractor to conduct an Environmental Assessment of such Acquired Properties; provided, however, in connection with any such permitted on-site visual inspection or Environmental Assessment of an Acquired Property, (A) Purchasers shall notify HB2 in writing at least three (3) Business Days prior thereto and coordinate the conduct thereof with HB2's and Operator's Entity Representatives (and HB2 or its designee shall have the right to accompany Purchasers and their Entity Representatives and environmental contractor whenever on site at any Acquired Property), (B) Purchasers shall, and shall cause all of its Entity Representatives and environmental contractors to, comply with all applicable Laws and all of HB2's, Operator's, and any applicable Third Party operator's requirements, rules, and safety policies and procedures, (C) any contractor engaged to perform all or any portion of an Environmental Assessment shall execute and deliver to Sellers a confidentiality agreement in a form reasonably acceptable to HB2, and (D) if requested by HB2, and without limiting the confidentiality obligations of the Parties hereunder or in the Confidentiality Agreement, the Parties shall enter into a letter agreement memorializing the confidential and protected status of any such Environmental Assessment and protecting the confidentiality of any such Environmental Assessment.

(b)     Notwithstanding anything herein to the contrary, (i) Purchasers shall not have access to any Acquired Properties where Sellers do not have the authority to grant access (*provided that* Sellers shall use commercially reasonable efforts to obtain such consent at no out-of-pocket cost, expense, or Liabilities to Sellers, their Affiliates, or Operator), and (ii) if Purchasers reasonably determine it is necessary based on Purchasers' Environmental Assessment, Purchasers shall be entitled to request Sellers' consent to conduct further environmental testing, sampling or subsurface investigation which consent may be withheld or denied in Sellers' sole discretion and, absent such consent, Purchaser shall not be permitted to conduct any further testing, sampling or subsurface or other invasive investigation, including a Phase II environmental assessment.

(c)     Neither Sellers nor any other Seller Party shall be deemed, by any Seller Party's receipt of said documents or otherwise, to have made any representation or warranty, expressed, implied, or statutory, as to the condition of the Acquired Properties or to the accuracy of said documents or the information contained therein.

(d)     Upon completion of Purchasers' Due Diligence Review, Purchasers shall, at their sole cost and expense: (i) repair all damage done to the Acquired Properties in connection with Purchasers' due diligence; (ii) restore the Acquired Properties to at least the approximate same or better condition than they were prior to commencement of Purchasers' due diligence; and (iii) remove all equipment, tools, and other property brought onto the Acquired Properties in connection with Purchasers' due diligence. Any disturbance to the Acquired Properties (including the leasehold associated therewith) resulting from Purchasers' due diligence will be promptly corrected by Purchasers.

### 4.4     *Limitations and Disclaimers.*

(a)     Except for the express and specific representations set forth in **ARTICLE VII** and except for the Special Warranty, **(I) EACH PURCHASER ACKNOWLEDGES THAT NO SELLER AND NO OTHER SELLER PARTY HAS MADE, AND SELLERS HEREBY EXPRESSLY DISCLAIM AND NEGATE (ON THEIR BEHALF AND ON BEHALF OF THE OTHER SELLER PARTIES), AND EACH PURCHASER HEREBY EXPRESSLY WAIVES AND DISCLAIMS ANY RELIANCE ON, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, INCLUDING RELATING TO PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE QUALITY, QUANTITY, VOLUME, VALUE, RECOVERABILITY, OR DELIVERABILITY OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE ACQUIRED ASSETS, OR THE ACCURACY, COMPLETENESS, OR MATERIALITY OF ANY BACKGROUND MATERIALS,**

ACQUIRED RECORDS, OR OTHER RECORDS, INFORMATION, DATA, OR MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE OR HEREAFTER FURNISHED TO ANY PURCHASER PARTY BY OR ON BEHALF OF ANY SELLER PARTY, OR THE ENVIRONMENTAL OR OTHER CONDITION OF THE ACQUIRED ASSETS, AND (II) SELLERS EXPRESSLY DISCLAIM AND NEGATE (ON THEIR BEHALF AND ON BEHALF OF THE OTHER SELLER PARTIES), AND EACH PURCHASER HEREBY EXPRESSLY WAIVES, ANY AND ALL LIABILITY AND RESPONSIBILITY OF ANY SELLER PARTY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO PURCHASERS OR ANY PURCHASER PARTY (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY SUCH PERSON BY ANY SELLER OR ANY OTHER SELLER PARTY).

(b)    EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS SET FORTH IN ARTICLE VII AND EXCEPT FOR THE SPECIAL WARRANTY, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS EXPRESSLY DISCLAIM AND NEGATE (ON THEIR BEHALF AND ON BEHALF OF THE OTHER SELLER PARTIES), AND EACH PURCHASER HEREBY WAIVES AND DISCLAIMS ANY RELIANCE ON, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, AS TO ANY OF THE FOLLOWING: (I) THE CONTENTS, CHARACTER, ACCURACY, COMPLETENESS, OR MATERIALITY OF RECORDS, INFORMATION, DATA, OR OTHER MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE, OR HEREAFTER FURNISHED TO A PURCHASER OR ANY PURCHASER PARTY BY OR ON BEHALF OF ANY SELLER PARTY, INCLUDING ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS, OR STATEMENTS PREPARED BY ANY SELLER PARTY OR THIRD PARTY WITH RESPECT TO THE ACQUIRED ASSETS; (II) THE CONTENTS, CHARACTER, OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL, OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ACQUIRED ASSETS; (III) ANY ESTIMATES OF THE VALUE OF, OR FUTURE REVENUES GENERATED BY, OR COST ESTIMATES CONCERNING, THE ACQUIRED ASSETS; (IV) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE QUALITY, QUANTITY, VOLUME, VALUE, RECOVERABILITY, OR DELIVERABILITY OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE ACQUIRED ASSETS OR SELLERS' INTERESTS THEREIN; (V) TITLE TO ANY OF THE ACQUIRED ASSETS; (VI) MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, MARKETABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE ACQUIRED ASSETS; (VII) ANY RIGHTS OF PURCHASERS UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE; (VIII) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM DEFECTS, WHETHER KNOWN OR UNKNOWN; (IX) ANY IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW; (X) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT; (XI) THE NATURE OF, EXTENT OF, OR AMOUNT OF ANY FUTURE COSTS ASSOCIATED WITH, PLUGGING AND ABANDONMENT OBLIGATIONS; AND (XII) THE ENVIRONMENTAL OR OTHER CONDITION OF THE ACQUIRED ASSETS, INCLUDING ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF SUBSTANCES, WASTES, OR MATERIALS INTO THE ENVIRONMENT, THE PROTECTION OF THE ENVIRONMENT OR OF HUMAN HEALTH, SAFETY, OR NATURAL RESOURCES, OR THE AMOUNT OF ANY FUTURE COSTS ASSOCIATED WITH THE ASSUMED ENVIRONMENTAL LIABILITIES. IT IS THE EXPRESS INTENTION OF PURCHASERS AND SELLERS THAT, EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS SET FORTH IN ARTICLE VII AND THE SPECIAL WARRANTY, THE ACQUIRED ASSETS ARE BEING ACCEPTED BY EACH PURCHASER, "AS IS" AND "WHERE IS" AND WITH ALL FAULTS AND DEFECTS (KNOWN OR UNKNOWN, PATENT OR LATENT, DISCOVERABLE, OR UNDISCOVERABLE) AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR, AND PURCHASERS HAVE MADE ANY AND ALL SUCH INSPECTIONS AS PURCHASERS DEEM APPROPRIATE.

(c)    EACH PURCHASER ACKNOWLEDGES THAT THE ACQUIRED ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT, AND PRODUCTION OF HYDROCARBONS AND THAT (I) EQUIPMENT AND SITES INCLUDED IN THE ACQUIRED PROPERTIES MAY CONTAIN NATURALLY

15

OCCURRING RADIOACTIVE MATERIAL, RADON GAS AND ASBESTOS ("*NORM*") OR OTHER HAZARDOUS MATERIALS, (II) PHYSICAL CHANGES IN THE LAND, GROUNDWATER, OR SUBSURFACE INCLUDED IN, ON, OR UNDER THE ACQUIRED ASSETS MAY HAVE OCCURRED AS A RESULT OF ANY SUCH USES, AND (III) ADVERSE PHYSICAL CONDITIONS MAY BE PRESENT IN, ON, OR UNDER THE ACQUIRED ASSETS, INCLUDING THE PRESENCE OF UNKNOWN, ABANDONED, OR UNPRODUCTIVE OIL WELLS, GAS WELLS, EQUIPMENT, PITS, LANDFILLS, FLOWLINES, PIPELINES, WATER WELLS, INJECTION WELLS, AND SUMPS, WHICH MAY OR MAY NOT HAVE BEEN REVEALED BY SUCH PURCHASER'S INVESTIGATION. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS, AND EQUIPMENT AS SCALE OR IN OTHER FORMS. THE WELLS, PIPELINES, MATERIALS, AND EQUIPMENT LOCATED ON OR INCLUDED IN THE ACQUIRED ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS MATERIALS. NORM CONTAINING MATERIAL AND/OR OTHER WASTES OR HAZARDOUS MATERIALS MAY HAVE COME IN CONTACT WITH VARIOUS ENVIRONMENTAL MEDIA, INCLUDING AIR, WATER, SOILS, OR SEDIMENT. SPECIAL PROCEDURES MAY BE REQUIRED FOR THE ASSESSMENT, REMEDIATION, REMOVAL, TRANSPORTATION, OR DISPOSAL OF ENVIRONMENTAL MEDIA, WASTES, ASBESTOS, NORM, AND OTHER HAZARDOUS MATERIALS FROM THE ACQUIRED ASSETS.

(d)    SELLERS AND PURCHASERS AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>SECTION 4.4</u> ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE, OR ORDER.

### ARTICLE V
### TITLE MATTERS

*5.1    Defensible Title.*  The term "*Defensible Title*" means, with respect to the Target Depths of any Acquired Lease or Acquired Well that has an Allocated Value greater than zero, legal or beneficial title of Sellers', collectively, in and to such Acquired Lease or Acquired Well that, subject to and except for any Permitted Encumbrances:

(a)    as to the Target Depths of such an Acquired Lease or Acquired Well, entitles Sellers, collectively, to receive (i) in the case of an Acquired Lease, not less than the Net Revenue Interest set forth in **Exhibit A-1** in respect of Target Depths production of Hydrocarbons from such Acquired Lease, and (ii) in the case of an Acquired Well, not less than the Net Revenue Interest set forth in **Exhibit A-2** in respect of Target Depths production of Hydrocarbons through the wellbore of such Acquired Well; except, in each case of subparts (i) and (ii) of this **Section 5.1(a)**: (1) decreases resulting from the establishment after the Execution Date of units, or changes in existing units (or the participating areas therein), whether voluntary or by Order; (2) decreases resulting from the exercise or reversion after the Execution Date of non-consent rights under applicable operating agreements; (3) decreases resulting from the entry into pooling, spacing, proration, communitization, unitization, well tract designation, or similar agreements after the Execution Date; (4) decreases resulting from Operations after the Execution Date as permitted or required by the terms of this Agreement; (5) decreases resulting from rights of Third Parties to make up past underproduction or pipelines to make up past under deliveries; (6) decreases resulting from actions by (or undertaken at the request of) Purchasers; and (7) as otherwise set forth on **Exhibit A-1** or **Exhibit A-2**;

(b)    as to the Target Depths of such an Acquired Well, obligates Sellers, collectively, to bear not greater than the Working Interest set forth in **Exhibit A-2** for such Acquired Well; except: (i) increases in such Working Interest accompanied by at least a proportionate increase in the Net Revenue Interest for such Acquired Well; (ii) increases resulting from contribution requirements provided for under provisions similar to those contained in an operating agreement; (iii) increases resulting from the establishment after the Execution Date of units, or changes in existing units (or the participating areas therein), whether voluntary or by Order; (iv) increases resulting from the exercise or reversion after the

16

Execution Date of non-consent rights under applicable operating agreements; (v) increases resulting from the entry into pooling, spacing, proration, communitization, unitization, well tract designation, or similar agreements after the Execution Date; (vi) increases resulting from Operations after the Execution Date as permitted or required by the terms of this Agreement; (vii) increases resulting from actions by (or undertaken at the request of) Purchasers; and (viii) as otherwise set forth on **Exhibit A-2**;

(c)     as to such an Acquired Lease, entitles Sellers, collectively, to not less than the number of Net Acres set forth in **Exhibit A-1** for such Acquired Lease in and to the Target Depths of such Acquired Lease; and

(d)     is free and clear of any and all Liens.

**5.2     Permitted Encumbrances.**  The term "**Permitted Encumbrance**" means, with respect to any Acquired Asset, any one or more of the following:

(a)     any Royalties, back-in interests, reversionary interests, and other burdens if the net cumulative effect of the foregoing does not operate to (i) reduce the Net Revenue Interest with respect to the Target Depths of an Acquired Lease or Acquired Well below the Net Revenue Interest set forth in **Exhibit A-1** or **Exhibit A-2**, as applicable; (ii) increase the Working Interest with respect to the Target Depths of an Acquired Well above that set forth in **Exhibit A-2** without at least a proportionate increase in the Net Revenue Interest with respect to such Acquired Well; or (iii) operate to reduce the Net Acres in and to the Target Depths of an Acquired Lease to less than the Net Acres set forth in **Exhibit A-1**;

(b)     Liens for Property and Production Taxes not yet due or not yet delinquent, or, if delinquent, that are being contested in good faith in the Ordinary Course of Business;

(c)     materialmens', mechanics', repairmen's, employees', contractors', operators', or other similar Liens arising in the Ordinary Course of Business or incidental to the operation of the Acquired Assets not yet delinquent, or, if delinquent, payment is being withheld as provided by Law or their validity or amount is being contested in good faith in the Ordinary Course of Business;

(d)     all (i) Customary Post-Closing Consents, (ii) Applicable Preferential Rights, and (iii) rights or interests acquired by Third Parties in connection with a Casualty Loss;

(e)     to the extent not triggered as of Closing, any and all rights of reassignment upon the surrender or expiration of any Acquired Lease;

(f)     (i) the Acquired Leases, Acquired Contracts, and Acquired Easements, and the terms and conditions thereof and (to the extent securing amounts not yet due or, if due, being contested in good faith in the Ordinary Course of Business) Liens arising thereunder, and (ii) this Agreement and the other Transaction Documents and the terms and conditions hereof and thereof;

(g)     Easements and other rights with respect to surface Operations, on, over, or in respect of any of the Acquired Assets or any restriction on access thereto, in each case, unless the same were granted by a Seller or its Affiliates and materially impair or prevent the use or operation of the Acquired Properties as currently used or operated;

(h)     (i) all applicable Laws, Orders (including the Sale Order), and Permits; and (ii) all rights reserved to or vested in any Governmental Authority: (A) to control or regulate any Acquired Asset in any manner, (B) by the terms of any right, power, franchise, grant, license, or permit, or by any provision of Law, to terminate such right, power, franchise, grant, license, or permit or to purchase, condemn,

17

expropriate, or recapture or to designate a purchaser of any of the Acquired Assets, (C) to use such property in a manner which would not reasonably be expected to materially impair or prevent the use or operation of such property for the purposes for which it is currently used or operated, or (D) to enforce any obligations or duties owed to any Governmental Authority with respect to any franchise, grant, license, or permit;

(i)     Liens arising under leases, rights-of-way, easements, operating agreements, unitization and pooling agreements, and production sales contracts securing amounts not yet due, or, if due, being contested in good faith in the Ordinary Course of Business;

(j)     defects arising out of the lack of a survey or metes and bounds description, unless a survey is expressly required by applicable Law;

(k)     Liens released at or before the Closing or otherwise discharged or rendered ineffective by the Sale Order;

(l)     defects or irregularities resulting from the failure to record releases of liens, production payments, or mortgages that have expired on their own terms or the enforcement of which are barred by applicable statute of limitations;

(m)     Liens created under deeds of trust, mortgages, and similar instruments by the lessor under an oil and gas lease covering the lessor's surface and/or mineral interests in the land covered thereby, or by the grantor under an Easement;

(n)     as to any Acquired Property held by production, defects as a consequence of the alleged failure to conduct operations, cessation of production, insufficient production, or failure to report production or report production timely over any period;

(o)     any defect that affects only which Person has the right to receive royalty payments (rather than the amount of such royalty) and that does not affect the validity of the underlying Acquired Property;

(p)     defects as are accepted by the purchasers of production from the Acquired Assets in paying the proceeds of such production without suspense, subject only to customary division order warranties and indemnities in favor of such production purchaser;

(q)     permits, easements, pooling agreements or authorizations, unit designations, or production or drilling units not yet obtained, formed, or created, so long as the same are not required in connection with the ownership or operation of the Acquired Properties as currently owned and operated;

(r)     the terms or provisions of any pooling, communitization, unitization, or similar provision in an Acquired Lease or the absence of such a provision in an Acquired Lease, and the absence of any lease amendment or other consent by any royalty interest or mineral interest holder authorizing the pooling of any leasehold interest, royalty interest, or mineral interest;

(s)     any limitations (including drilling and operating limitations) imposed on the Acquired Assets by reason of the rights of subsurface owners or operators in a common property (including the rights of coal, utility and timber owners);

(t)     defects based solely on a lack of information in Sellers' and their Affiliates' files, lack of Third Party records, or the unavailability of information from regulatory agencies;

(u)     Liens, irregularities, defects, or loss of title affecting ownership interests in either formations or depths other than the applicable Target Depths;

(v)     Liabilities, Claims, Proceedings, and other matters (i) described or referenced in **Exhibit A-1** or **Exhibit A-2**, or (ii) described or referenced in **Schedule 7.10** or any other Schedule (without giving effect to any amendments thereto made pursuant to **Section 9.12**);

(w)     such Title Claims as Purchasers may have waived, whether in writing or pursuant to the express terms of **Article V**; and

(x)     all other Liens, contracts, agreements, instruments, Orders, Proceedings, Permits, Liabilities, defects, and irregularities affecting the Acquired Assets that are discharged or otherwise rendered ineffective by the Sale Order.

5.3     ***Title Claim.***  The term "***Title Claim***" means a breach of the Special Warranty. Notwithstanding the foregoing, no Permitted Encumbrance shall be considered a Title Claim.

5.4     ***Title Claim Value.***  The term "***Title Claim Value***" means, with respect to an uncured Title Claim affecting an Acquired Lease or Acquired Well, the reduction in such Acquired Property's Allocated Value caused by such Title Claim, taking into account the nature of such Title Claim, the likelihood that such Title Claim actually will result in a Claim against or loss of title, and any subsequent cure of such Title Claim by Sellers; *provided*, *however*, that:

(a)     the aggregate amount of Title Claim Values attributable to all Title Claims affecting the applicable Acquired Property shall not exceed the Allocated Value of such Acquired Property;

(b)     the Title Claim Value shall not exceed the cost to cure the related Title Claim (if the cost to cure is reasonably determinable);

(c)     subject to the foregoing, if a Title Claim is a Lien which is undisputed and liquidated in amount, the Title Claim Value shall be the amount necessary to be paid to remove the Lien from the applicable Acquired Property;

(d)     if a Title Claim affects the applicable Acquired Property for less than its full productive life, the Title Claim Value shall be reduced to take into account the applicable time period only, using generally accepted engineering analysis and present value calculations;

(e)     if the Title Claim affects less than all of the Target Depths for the applicable Acquired Property, then the Title Claim Value shall be reduced to take into account the affected Target Depths only;

(f)     in determining the Title Claim Value of any individual Title Claim, such Title Claim Value shall be without duplication of any other Title Claim Value calculated hereunder with respect to such Acquired Property based on or arising out of the same underlying objections to title; and

(g)     subject to **Sections 5.4(a)** through **5.4(f)** above, if a Title Claim as to any Acquired Property represents:

(i)     a negative discrepancy between the actual Net Revenue Interest for the Target Depths of such Acquired Lease or Acquired Well and the "Net Revenue Interest" percentage stated in **Exhibit A-1** or **Exhibit A-2**, as applicable, for such Acquired Lease or Acquired Well (and there is a

proportionate decrease in the Working Interest for the Target Depths of such Acquired Lease or Acquired Well from the Working Interest stated in **Exhibit A-1** or **Exhibit A-2**, as applicable, for such Acquired Lease or Acquired Well), then the Title Claim Value shall be equal to the product of (A) the Allocated Value of such Acquired Lease or Acquired Well, *multiplied* by (B) a fraction, the numerator of which is (1) the Net Revenue Interest stated in **Exhibit A-1** or **Exhibit A-2**, as applicable for such Acquired Lease or Acquired Well, *minus* the actual Net Revenue Interest for the Target Depths of such Acquired Lease or Acquired Well to which Sellers, collectively, are entitled after giving effect to such Title Claim, and the denominator of which is (2) the Net Revenue Interest stated in **Exhibit A-1** or **Exhibit A-2**, as applicable for such Acquired Lease or Acquired Well;

(ii)    a negative discrepancy between the actual number of Net Acres as to the Target Depths of any Acquired Lease and the "Net Acres" stated in **Exhibit A-1** for such Acquired Lease, then the Title Claim Value shall be equal to the product of (A) the Allocated Value of such Acquired Lease, *multiplied* by (B) a fraction, the numerator of which is (1) the number of Net Acres stated in **Exhibit A-1** for such Acquired Lease, *minus* the actual number of Net Acres in the Target Depths of such Acquired Lease to which Sellers, collectively, are entitled after giving effect to such Title Claim, and the denominator of which is (2) the number of Net Acres stated in **Exhibit A-1** for such Acquired Lease; or

(iii)    if the Title Claim represents an obligation, Lien upon or other defect in title to the applicable Acquired Property of a type not described above, then the Title Claim Value shall be determined by taking into account the Allocated Value of the applicable Acquired Property, the portion of the applicable Acquired Property affected by the Title Claim, the legal effect of the Title Claim, the potential economic effect of the Title Claim over the life of the applicable Acquired Property, and such other reasonable factors as are necessary to make a proper evaluation.

**5.5    *Dispute Resolution*.** With respect to any Title Claim asserted by Purchasers in accordance with **Section 5.6(b)** at any time after Closing and prior to 5:00 p.m. Houston, Texas time on the Title Claims Date, Purchasers and HB2 shall attempt in good faith to agree on the existence and associated Title Claim Value of each such Title Claim or Sellers' cure thereof; *provided that*, if Sellers and Purchasers are unable to agree on the existence, waiver, cure or Title Claim Value of any such Title Claim prior to the date that is five (5) Business Days after the Title Claims Date ("***Title Disputed Matters***"), then all such Title Disputed Matters shall be consolidated and resolved by a single Title Expert under the following dispute resolution procedures:

(a)    HB2 and Purchasers shall act in good faith to promptly execute such engagement letters and other documents as shall be necessary to engage, within ten (10) Business Days after the Title Claims Date, one (1) mutually agreed upon title attorney with not less than ten (10) years' experience in oil and gas title issues in the State(s) where the Acquired Properties which are the subject of the Title Disputed Matters are located and having not worked as an employee or outside counsel for any Party or its Affiliates during the five (5) year period preceding such selection (the "***Title Expert***"). If HB2 and Purchasers are unable to agree on the Title Expert within such ten (10) Business Day period, then HB2 and Purchasers will each select one such title attorney (with each such Party representative meeting the same criteria as set forth above for the Title Expert) within five (5) Business Days thereafter, and the Party representatives so selected will mutually appoint the Title Expert (which Title Expert so appointed shall meet the same criteria as set forth above) within ten (10) Business Days after the two Party representatives are selected, and the Title Expert so appointed by the two Party representatives will resolve such matter without further involvement of the two Party representatives. The fees and expenses of the Title Expert shall be paid fifty percent (50%) by Sellers and fifty percent (50%) by Purchasers. Sellers, on the one hand, and Purchasers, on the other hand, shall bear their/its own legal fees and other costs of presenting their/its case.

(b)      HB2 and Purchasers shall each present to the Title Expert, with a simultaneous copy to the other Party, a single written statement of its position on each Title Disputed Matter, together with a copy of this Agreement, Purchasers' notice(s) of Title Claims, and any supporting material that such Party desires to furnish, not later than ten (10) Business Days after appointment of the Title Expert. Purchasers shall have the burden of establishing the existence, Title Claim Value, and (if applicable) the insufficiency of curative, with respect to all Title Disputed Matters. Each of Sellers and Purchasers shall not, and shall cause their respective Entity Representatives to not, attempt to communicate with the Title Expert with respect to any Title Disputed Matters without providing the other Party the opportunity to jointly discuss or confer with the Title Expert with respect to such Title Disputed Matters.

(c)      The Title Expert shall make his or her determination and provide to the Parties written findings within fifteen (15) Business Days after he/she has received the materials under **Section 5.5(b)**. In making a determination, the Title Expert shall be bound by the terms of this Agreement and, without any additional or supplemental submittals by any Party (except as may be specifically requested by the Title Expert), may consider available legal and industry matters (to the extent such matters are consistent with the terms of this Agreement) as in his/her opinion are necessary or appropriate to make a proper determination. The decision of the Title Expert shall be final, conclusive, binding, and non-appealable and shall be limited to awarding only HB2's position or Purchasers' position with respect to each Title Disputed Matter, *provided that* the Title Expert may not award Purchasers any greater Title Claim Values than the Title Claim Values asserted by Purchasers in their applicable Title Claim notice(s). The Title Expert shall make a separate determination with respect to each Title Disputed Matter. The written finding of the Title Expert shall only set forth the Title Expert's decision with respect to each applicable Title Disputed Matter and not the Title Expert's rationale for the decision. THE TITLE EXPERT SHALL ACT AS AN EXPERT FOR THE LIMITED PURPOSE OF DETERMINING THE SPECIFIC TITLE DISPUTED MATTER PRESENTED TO HIM/HER, SHALL NOT HAVE THE POWERS OF AN ARBITRATOR, SHALL BE LIMITED TO THE PROCEDURES SET FORTH IN THIS SECTION, MAY NOT HEAR OR DECIDE ANY MATTERS EXCEPT THE SPECIFIC TITLE DISPUTED MATTER PRESENTED TO HIM/HER, AND MAY NOT AWARD DAMAGES, INTEREST, COSTS, ATTORNEY'S FEES, EXPENSES, OR PENALTIES TO ANY PARTY.

(d)      If any Title Disputed Matters are submitted to the Title Expert pursuant to this **Section 5.5**, then the final Title Claim Value adjustment (if any), as determined by agreement of the Parties and/or by the Title Expert as provided in this **Section 5.5**, shall be included in the final settlement under **Section 3.5** and reflected in any payment to be made pursuant to **Section 3.5(i)**.

    5.6    *Special Warranty of Title in the Assignment.*

(a)      The Assignment delivered at Closing will contain a special warranty of title, effective as of Closing, whereby Sellers shall warrant Defensible Title to Sellers' collective interest in the Acquired Properties unto Purchasers against every Person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Sellers, but not otherwise, subject to and except for the Permitted Encumbrances (the "***Special Warranty***"). The Special Warranty shall be subject to the further limitations and provisions of this **Article V**.

(b)      If Purchasers intend to assert a Title Claim, then Purchasers must furnish HB2, not later than 5:00 p.m. Houston, Texas time on the date that is forty-five (45) days following the Closing Date (the "***Title Claims Date***"), a notice setting forth in reasonable detail any matters which Purchasers intend to assert as a Title Claim, including at a minimum: (i) a description of the Title Claim and Acquired Properties affected thereby; (ii) a description of the basis for the assertion of the Title Claim; (iii) a good faith estimate of the Title Claim Value of such Title Claim with a calculation thereof; (iv) a description of any curative actions Purchasers reasonably anticipate are required to cure such Title Claim; and (v) documentation sufficient to affirmatively establish the existence and basis of such Title Claim and

Purchasers' estimate of the associated Title Claim Value. HB2 shall have a reasonable opportunity, but not the obligation, on behalf of Sellers, to cure any alleged breach of the Special Warranty on or before the date that is fifteen (15) days after the Title Claims Date ("***Cure Deadline***"). Purchasers shall be deemed to have waived all breaches of the Special Warranty for which HB2 has not received from Purchasers on or before 5:00 p.m. Houston, Texas time on the Title Claims Date a valid notice that satisfies the requirements set forth herein. If Sellers fail to cure the Title Claims by the Cure Deadline, then the Purchase Price shall be adjusted downward by the Title Claim Values of the uncured Title Claims in connection with the determination and payment of the Final Purchase Price pursuant to **Section 3.5(i)**.

 *5.7   Changes in Prices; Well Events.* Notwithstanding anything to the contrary in this Agreement, Purchasers shall assume all risk of Loss with respect to: (a) changes in commodity or product prices and any other market factors or conditions, including factors relating to the COVID-19 pandemic, Orders issued by Governmental Authorities, or other unforeseeable events; (b) production declines or any adverse change in the production characteristics or downhole condition of an Acquired Well, including any Acquired Well watering out or experiencing a collapse in the casing or sand infiltration; and (c) depreciation of any Acquired Assets that constitute personal property through ordinary wear and tear, and none of the foregoing shall constitute Title Claims or otherwise give rise to any Claims by Purchasers before, on, or after the Closing.

 *5.8   Exclusive Remedy.* NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR IN ANY OTHER TRANSACTION DOCUMENT, THE RIGHTS UNDER THIS **ARTICLE V** IN RESPECT OF THE SPECIAL WARRANTY AND UNDER **ARTICLE XII** CONSTITUTE THE ENTIRE AND EXCLUSIVE RIGHT AND REMEDY OF PURCHASERS AGAINST ANY SELLER PARTY WITH RESPECT TO ANY TITLE CLAIM OR OTHER TITLE MATTERS OR DEFICIENCIES IN TITLE WITH RESPECT TO THE ACQUIRED ASSETS (COLLECTIVELY, "***TITLE MATTERS***"). IN THIS REGARD AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR IN ANY OTHER TRANSACTION DOCUMENT, IF A TITLE CLAIM OR OTHER TITLE MATTER CONSTITUTES, OR RESULTS FROM ANY MATTER OR CIRCUMSTANCE WHICH CONSTITUTES, A BREACH OF ANY REPRESENTATION OR WARRANTY OF A SELLER SET FORTH IN THIS AGREEMENT OR IN ANY OTHER TRANSACTION DOCUMENT (OTHER THAN THE SPECIAL WARRANTY), THEN PURCHASERS SHALL ONLY BE ENTITLED TO ASSERT SUCH MATTER AS A TITLE CLAIM AS AND TO THE EXTENT PERMITTED BY THIS **ARTICLE V**, AND SHALL BE PRECLUDED FROM ASSERTING SUCH MATTER AS THE BASIS OF THE BREACH OF ANY SUCH REPRESENTATION OR WARRANTY. OTHER THAN THE SPECIAL WARRANTY, PURCHASERS (ON BEHALF OF THEMSELVES, THE OTHER PURCHASER PARTIES, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS) HEREBY RELEASE, DISCHARGE, AND WAIVE ANY AND ALL CLAIMS AND LOSSES, AND ALL RIGHTS AND REMEDIES WHETHER ARISING AT LAW (WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE) OR PURSUANT TO ANY OTHER LEGAL THEORY, KNOWN OR UNKNOWN, AND WHETHER NOW EXISTING OR ARISING IN THE FUTURE, CONTINGENT, OR OTHERWISE, AGAINST ANY OF THE SELLER PARTIES RELATING TO ANY TITLE MATTERS, IN EACH CASE, **EVEN IF SUCH CLAIMS OR LOSSES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), STRICT LIABILITY, OR OTHER LEGAL FAULT OF ANY SELLER PARTIES.**

## ARTICLE VI
## ENVIRONMENTAL MATTERS

 *6.1   Exclusive Remedy*. EACH PURCHASER ACKNOWLEDGES THAT THE ACQUIRED ASSETS HAVE BEEN USED TO EXPLORE FOR, DEVELOP, AND PRODUCE HYDROCARBONS, AND THAT THERE (I) MAY HAVE BEEN RELEASES OF WASTES, CRUDE OIL, CONDENSATE, PRODUCED WATER, OR OTHER MATERIALS, INCLUDING HAZARDOUS MATERIALS, ABOVE, IN, ON, OR UNDER THE ACQUIRED ASSETS AND (II) MAY EXIST OTHER CONDITIONS THAT MAY CONSTITUTE AN ASSUMED ENVIRONMENTAL LIABILITY, ENVIRONMENTAL DEFECT, ENVIRONMENTAL CONDITION OR RESULT IN LIABILITIES OR REMEDIATION UNDER ENVIRONMENTAL LAWS. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN

THIS AGREEMENT OR IN ANY OTHER TRANSACTION DOCUMENT, THE RIGHTS OF PURCHASERS UNDER **SECTION 12.1** WITH RESPECT TO A BREACH OF SELLERS' REPRESENTATIONS AND WARRANTIES UNDER **SECTION 7.12** (TO THE EXTENT APPLICABLE) CONSTITUTES THE ENTIRE AND EXCLUSIVE RIGHT AND REMEDY OF PURCHASERS AGAINST ANY SELLER PARTY WITH RESPECT TO ANY ENVIRONMENTAL DEFECTS, ENVIRONMENTAL CONDITIONS OR OTHER CONDITIONS, EVENTS, CIRCUMSTANCES, ACTS, OR OMISSIONS OF, OR RELATING TO, THE ENVIRONMENT, ANY ENVIRONMENTAL LAWS, ANY HAZARDOUS MATERIALS, ANY RELEASES, THE PROTECTION OF THE ENVIRONMENT OR HEALTH, OR ANY ASSUMED ENVIRONMENTAL LIABILITIES (COLLECTIVELY, "*ENVIRONMENTAL MATTERS*"). OTHER THAN ANY RIGHTS OF PURCHASERS UNDER **SECTION 12.1** WITH RESPECT TO A BREACH OF SELLERS' REPRESENTATIONS AND WARRANTIES UNDER **SECTION 7.12** (TO THE EXTENT APPLICABLE), EACH PURCHASER (ON BEHALF OF ITSELF, THE OTHER PURCHASER PARTIES, AND ITS AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS) HEREBY RELEASES, DISCHARGES, AND WAIVES ANY AND ALL CLAIMS AND LOSSES, AND ALL RIGHTS AND REMEDIES WHETHER ARISING AT LAW (WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE) OR PURSUANT TO ANY OTHER LEGAL THEORY, KNOWN OR UNKNOWN, AND WHETHER NOW EXISTING OR ARISING IN THE FUTURE, CONTINGENT, OR OTHERWISE, AGAINST ANY OF THE SELLER PARTIES RELATING TO ANY ENVIRONMENTAL MATTERS, IN EACH CASE, EVEN IF SUCH CLAIMS OR LOSSES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), STRICT LIABILITY, OR OTHER LEGAL FAULT OF ANY SELLER PARTIES.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Purchasers, as of the Execution Date and the Closing Date or such other date as may be expressly provided below in this **Article VII**, as follows:

**7.1** *Organization, Existence, and Qualification.* Each Seller is a limited liability company duly formed, validly existing, and in good standing under the Laws of the State of Delaware. Subject to entry of the Sale Order, each Seller has all requisite power and authority to own and operate its property (including its interests in the Acquired Assets) and to carry on its business as now conducted by such Seller. Each Seller is duly licensed or qualified to do business, and is in good standing, in the State of Texas. Each Seller is duly licensed or qualified to do business, and is in good standing, in all other jurisdictions in which it carries on business or owns assets and such qualification is required by Law, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

**7.2** *Authority, Approval, and Enforceability.* Each Seller has, subject to entry of the Sale Order, full power and authority to enter into and perform this Agreement and the Transaction Documents to which it is a party and the transactions contemplated herein and therein. Subject to entry of the Sale Order, the execution, delivery, and performance by each Seller of this Agreement have been duly and validly authorized and approved by all necessary action on the part of such Seller. Subject to entry of the Sale Order, this Agreement is, and the Transaction Documents to which such Seller is a party when executed and delivered by such Seller will be, the valid and binding obligation of such Seller and enforceable against such Seller in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium, and similar Laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law).

**7.3** *Bankruptcy.* Except for the Bankruptcy Case, there are no other bankruptcy, reorganization, or receivership Proceedings pending against Sellers.

**7.4**     *Brokers' Fees.* Neither Seller nor any of its Affiliates has incurred any liability, contingent or otherwise, for brokers', finders', or similar fees in respect of the Contemplated Transactions for which Purchasers or their Affiliates will have any responsibility whatsoever.

**7.5**     *Foreign Person.* No Seller is a "foreign person" within the meaning of Section 1445 of the Code.

**7.6**     *Taxes.* Except as set forth in **Schedule 7.6**, (a) all Property and Production Taxes that have become due and payable by Sellers have been timely and properly paid in all material respects, (b) subject to valid extensions, all Tax Returns with respect to Property and Production Taxes that are required to be filed by Sellers have been duly and timely filed and all such Tax Returns are correct and complete in all material respects, (c) there are no audits, investigations, or Proceedings pending or, to Seller's Knowledge, Threatened against Sellers before any Governmental Authority relating to the payment of any Property and Production Taxes, (d) there are no liens for unpaid Taxes on any of the Acquired Assets (other than statutory liens for Taxes that are not yet due and payable), (e) there is not currently in effect any extension or waiver of any statute of limitations of any jurisdiction regarding the assessment or collection of any material Property and Production Taxes, (f) to Sellers' Knowledge, the Acquired Assets do not consist of material property or obligations, including uncashed checks, that is currently required to be escheated or reported as unclaimed property to any state or municipality under any applicable escheatment or unclaimed property laws, and (g) none of the Acquired Assets is subject to any tax partnership agreement or is otherwise required to be treated as held in an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code for U.S. federal income tax purposes (other than HB2 which is itself classified as a partnership for U.S. federal income tax purposes). Nᴏᴛᴡɪᴛʜsᴛᴀɴᴅɪɴɢ ᴀɴʏᴛʜɪɴɢ ᴛᴏ ᴛʜᴇ ᴄᴏɴᴛʀᴀʀʏ ʜᴇʀᴇɪɴ, ᴛʜᴇ ʀᴇᴘʀᴇsᴇɴᴛᴀᴛɪᴏɴs ɪɴ ᴛʜɪs **Sᴇᴄᴛɪᴏɴ 7.6** ᴀʀᴇ ᴛʜᴇ sᴏʟᴇ ᴀɴᴅ ᴇxᴄʟᴜsɪᴠᴇ ʀᴇᴘʀᴇsᴇɴᴛᴀᴛɪᴏɴs ᴀɴᴅ ᴡᴀʀʀᴀɴᴛɪᴇs ᴏғ Sᴇʟʟᴇʀs ɪɴ ᴛʜᴇ Tʀᴀɴsᴀᴄᴛɪᴏɴ Dᴏᴄᴜᴍᴇɴᴛs ʀᴇɢᴀʀᴅɪɴɢ ᴛᴀx ᴍᴀᴛᴛᴇʀs.

**7.7**     *No Conflicts.* Except as set forth in **Schedule 7.7**, subject to requisite Bankruptcy Court approval and entry of the Sale Order and assuming the receipt of all applicable consents and approvals from Third Parties (including any notices, filings, and consents required in connection with the Bankruptcy Case) and the waiver of, or compliance with, all Preferential Rights and any maintenance of uniform interest provision under any joint operating agreements constituting an Acquired Contract, in each case, applicable to the Contemplated Transactions, and the execution, delivery, and performance by a Seller of this Agreement and the consummation of the Contemplated Transactions will not (a) conflict with or result in a breach of any provision of the Organizational Documents of Seller, except as would not have a Material Adverse Effect, (b) result in a default or the creation of any Lien or give rise to any right of termination, cancellation, or acceleration under any of the terms or provisions of any note, bond, mortgage, indenture, or other similar instrument to which a Seller is a party or by which a Seller or the Acquired Assets may be bound, (c) violate any Law or Order applicable to a Seller or any of the Acquired Assets, or (d) result in the imposition or creation of any Lien upon any of the Acquired Assets other than a Permitted Encumbrance.

**7.8**     *Material Required Consents.* Except as set forth in **Schedule 7.8**, there are no Material Required Consents to which the Acquired Assets are subject that are applicable in connection with the transfer and conveyance of the Acquired Assets to Purchasers under this Agreement.

**7.9**     *Preferential Rights.* Except as set forth in **Schedule 7.9**, there are no Preferential Rights to which the Acquired Assets are subject that are or will be triggered in connection with the transfer and conveyance of the Acquired Assets to Purchasers under this Agreement.

**7.10**     *Litigation.* Except for or in connection with the Bankruptcy Case (including any adversary Proceedings or contested motions commenced in connection therewith) and except as set forth in

**Schedule 7.10** or with respect to any Tax matters or Environmental Matters, there are no Proceedings pending or, to Seller's Knowledge, Threatened by or before any Governmental Authority against Sellers (a) with respect to the Acquired Assets that, if adversely determined, would reasonably be expected to result in liability to Third Parties in excess of $100,000, or (b) which are reasonably likely to materially impair or delay a Seller's ability to perform its obligations hereunder, or (c) which, to Seller's Knowledge, would be reasonably expected to materially and adversely affect or materially impair Purchasers' ability to own or operate the Acquired Assets after Closing.

    *7.11    Legal Compliance.* Except as set forth in **Schedule 7.11** or with respect to any Tax matters or Environmental Matters, (a) with respect to each Acquired Asset, at all times during Sellers' ownership thereof, such Acquired Asset was operated in material compliance with all applicable Laws (other than with respect to Taxes and Environmental Laws), and (b) none of Sellers, their Affiliates, or Operator have received any written notice from any Governmental Authority alleging a material violation of applicable Laws (other than Taxes and Environmental Laws) relating to Sellers' and/or Operator's ownership or operation of the Acquired Assets, in the case of each of **clause (a)** and **(b)** above, excluding any violations that have been resolved to the satisfaction of all applicable Governmental Authorities and for which there are no outstanding obligations or Liabilities.

    *7.12    Environmental.* Except as set forth in **Schedule 7.12**, (a) there are no Proceedings pending or, to Seller's Knowledge, Threatened by or before any Governmental Authority against any Seller, its Affiliates or Operator or with respect to the Acquired Assets alleging a violation of, or Liability arising under, Environmental Laws based upon the ownership or operation of any of the Acquired Assets, (b) neither Sellers, their Affiliates nor Operator have received any written notices from any Person, in each case, alleging a material violation of, or material Liability arising under, Environmental Laws based upon the ownership or operation of any of the Acquired Assets, excluding any violations or Liabilities that have been fully resolved, and (c) Seller has neither entered into, nor is it (nor is any Acquired Asset) subject to, any agreements, consents, orders, decrees, judgments, licenses, or environmental Permit conditions, or other binding written directives from any Governmental Authority specific to Sellers or the Acquired Assets that relate to the future use of any Acquired Asset and that require remediation or other changes in the present operation of the Acquired Assets. **NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, (A) THE REPRESENTATIONS IN THIS SECTION 7.12 ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLERS IN THE TRANSACTION DOCUMENTS REGARDING ENVIRONMENTAL MATTERS AND (B) AS PROVIDED IN SECTION 6.1, THE SOLE AND EXCLUSIVE REMEDIES OF PURCHASER FOR ANY BREACH OF THIS SECTION 7.12 SHALL BE PURSUANT TO THE PROVISIONS OF (AS APPLICABLE) SECTION 12.1(D).**

    *7.13    Material Contracts.*

        (a)    **Schedule 7.13** lists all Acquired Contracts of the type described below as of the Execution Date (Acquired Contracts of the types described below, collectively, the "***Material Contracts***"):

            (i)    any Acquired Contract that can reasonably be expected to result in aggregate payments by Sellers of more than $100,000 (net to Sellers' collective interest) during the current or any subsequent fiscal year (based solely on the terms thereof and current volumes, without regard to any expected increase in volumes or revenues);

            (ii)    any Acquired Contract that can reasonably be expected to result in aggregate revenues to Sellers of more than $100,000 (net to Sellers' collective interest) during the current or any subsequent fiscal year (based solely on the terms thereof and current volumes, without regard to any expected increase in volumes or revenues);

(iii)     any Acquired Contract that constitutes a lease under which a Seller is the lessor or the lessee of real or personal property which lease (A) cannot be terminated by Sellers without penalty upon ninety (90) days or less notice and (B) involves an annual base rental of more than $250,000 (net to Sellers' collective interest);

(iv)     any material Acquired Contract that is a Hydrocarbon purchase and sale, gathering, transportation, or processing agreement and that is not terminable without penalty upon ninety (90) days or less notice;

(v)     any material Acquired Contract that is an operating agreement, joint operating agreement, farmout agreement, participation agreement, exploration agreement, or development agreement, in each case, that will be binding on the Acquired Assets or Purchasers after Closing;

(vi)     any Acquired Contract between a Seller, on the one hand, and any Affiliate of a Seller or Operator, on the other hand, or any other Acquired Contract between the Sellers, in each case, that will be binding on the Acquired Assets or Purchasers after Closing; and

(vii)     any Acquired Contract that (A) contains or constitutes an existing area of mutual interest agreement or (B) includes non-competition restrictions on Sellers or other similar restrictions on Sellers doing business.

(b)     Subject to Orders of the Bankruptcy Court in the Bankruptcy Case (including entry of the Sale Order) and the payment of all Cure Costs, except for the Bankruptcy Case and except as set forth in **Schedule 7.13**, (i) each Material Contract is a valid and binding agreement of Sellers or any Affiliate of Sellers that is a party thereto, in full force and effect in all material respects, and (ii) there exists no material breach, default or non-compliance under any Material Contract by Seller, Operator, or, to Seller's Knowledge, any other Person, in each case, which default will not be discharged, cured or otherwise rendered ineffective by the Sale Order and/or the payment of all applicable Cure Costs.  Prior to the Execution Date, Sellers have provided Buyers with true, correct and complete copies of all Material Contracts (together with any amendments, restatements or other written modifications thereto).

*7.14*     *Current Commitments.* **Schedule 7.14** sets forth, as of the Execution Date, each approved Third Party authority for expenditure or other binding capital commitment ("*AFE*") (a) that is binding on any of the Acquired Properties, (b) requires, individually, an expenditure in excess of $100,000 (net to Sellers' interest, collectively), and (c) for which all of the activities anticipated in such AFE have not been completed prior to the Execution Date. Purchasers acknowledge that the amounts shown on **Schedule 7.14** with respect to any operations or projects are estimates only and Sellers make no representation or warranty concerning the actual costs of the operations or activities to which such AFEs relate.

*7.15*     *Imbalances.* Except as set forth in **Schedule 7.15**, there are no material Production Imbalances or Pipeline Imbalances as of the date(s) set forth in **Schedule 7.15**.

*7.16*     *Suspense Accounts.* Except as set forth in **Schedule 7.16**, there are no material Third-Party funds held in suspense by a Seller or Operator with respect to production of Hydrocarbons from any of the Acquired Assets as of the date(s) set forth in **Schedule 7.16**.

*7.17*     *Leases.* Subject to Orders of the Bankruptcy Court in the Bankruptcy Case (including entry of the Sale Order) and the payment of all Cure Costs, except as set forth in **Schedule 7.17**, for amounts owing in respect of pre-petition Claims that have not been paid due to the effects of the Bankruptcy Code and the Bankruptcy Case, or breaches or amounts not paid as a result of the acts or omissions of Third Parties, to Sellers' Knowledge, (a) Sellers' and Operator, as applicable, have timely and properly paid all

material accrued bonuses and delay rentals with respect to Sellers' interest in the Acquired Leases, in each case, in accordance with the Acquired Leases and applicable Law; and (b) Sellers are not in material breach of, or material default under, the terms of any Acquired Leases.

**7.18    [Reserved].**

**7.19    Non-Consent Operations.**  Except as set forth on **Exhibit A-1** or **Exhibit A-2**, Sellers have not elected not to participate in any operation or activity proposed with respect to the Acquired Assets which could result in Sellers' interest in such Acquired Assets becoming subject to a penalty or forfeiture as a result of such election not to participate in such operation or activity.

**7.20    Wells and Equipment.**  Except as set forth on **Schedule 7.20**:

(a)    all Acquired Wells have been drilled and completed at legal locations and in material compliance with the limits permitted by all applicable Acquired Leases, Acquired Contracts, and pooling or unit agreements;

(b)    no Acquired Well is subject to penalties on allowables on or after the Effective Time because of any overproduction or any other violation of Laws; and there are no Acquired Wells that are neither in use for purposes of production or injection located on the Acquired Assets that (i) Sellers are currently obligated by any applicable Laws or Acquired Contract to currently plug, dismantle or abandon, or (ii) have been plugged, dismantled, or abandoned in a manner that does not comply in all material respects with applicable Laws; and

(c)    all currently producing Acquired Wells and Acquired Personal Property are in an operable state of repair adequate to maintain normal operations in accordance with Sellers' past practices, ordinary wear and tear excepted and do not contain junk, fish, or other obstructions which material impair operations on or with respect to the Acquired Wells as currently owned and operated by Sellers or Operator.

**7.21    Casualty Loss and Condemnation.**  To Sellers' Knowledge, since the Effective Time until the Execution Date, (a) there has not occurred a material Casualty Loss to or affecting any Acquired Assets owned or operated by such Sellers, whether or not covered by insurance, and (b) there are no condemnation or similar proceedings pending or Threatened against any of the Acquired Assets.

**7.22    Permits.**  Except as set forth on **Schedule 7.22**: (a) Sellers have acquired all Permits from appropriate Governmental Authorities required to own the Acquired Assets and conduct present Operations on the Assets in compliance with all applicable Laws as currently conducted; (b) all Permits are in full force and effect and no action, Claim or Proceeding is pending, nor to the Knowledge of Sellers, Threatened, to suspend, revoke or terminate any such Permit or declare any such Permit invalid; (c) Sellers are in compliance in all material respects with all such Permits; and (d) there are no material violations of any such Permit that would (or would with notice or lapse of time) result in the termination of such Permit.

**7.23    Royalties.**  Except as set forth on **Schedule 7.23**, all (a) royalties (including landowner's royalties, overriding royalties and nonparticipating royalties), rents, rentals, shut-in royalties, production payments, net profits interests, production proceeds and other royalties or similar burdens measured with respect to Hydrocarbon production attributable to Third Party interests in the Acquired Leases, and (b) revenues owed to Third Party working interest owners with respect to Hydrocarbon production from the Acquired Wells (including for purposes of clauses (a) and (b), any Seller Refund Obligations), that have become due and payable by Sellers or Operator have been calculated in compliance with applicable Law and the instruments and contracts creating such burdens and have been properly and timely paid other than

27

(i) funds held in suspense by a Seller or Operator in accordance with applicable Law and (ii) such mispayments as have been fully and finally resolved or corrected.

**7.24    Insurance; Bonds.**  **Schedule 7.24** sets forth all bonds, letters of credit, credit support, security or similar financial agreements posted by Sellers or Operator with respect to the Acquired Assets that would be required to be replaced by Purchasers at or after Closing, other than those Guarantees posted with Governmental Authorities that are required to be posted by all operators of oil and gas assets in the jurisdictions where the Acquired Assets are located in the Ordinary Course of Business, including statewide performance bonds required by the rules and regulations of the Texas Railroad Commission.

**7.25    [Reserved.].**

**7.26    Certain Limitations; Schedules.** Any representation of a Seller in this **ARTICLE VII** that relates to Acquired Assets as to which none of Sellers, their Affiliates, or Operator is the operator is limited to the Knowledge of Sellers. Inclusion of a matter on a schedule attached hereto with respect to a representation or warranty that addresses matters being material or having a Material Adverse Effect shall not be deemed to establish any materiality standard and shall not be deemed an indication that such matter is material or does, or may, have a Material Adverse Effect. Likewise, the inclusion of a matter on a Schedule to this Agreement in relation to a representation or warranty shall not be deemed an admission of liability or an indication that such matter necessarily would, or may, breach such representation or warranty absent its inclusion on such Schedule. Matters may be set forth on a Schedule for information purposes only, do not necessarily include other matters of a similar nature and shall not expand the scope of the representations and warranties set forth in this Agreement. Any matter set forth in any Schedule shall be deemed to be disclosed for each other Schedule to the extent it is reasonably apparent that such disclosure is applicable to such other Schedule.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Each Purchaser represents and warrants to Sellers, as of the Execution Date and the Closing Date or such other date as may be expressly provided below in this **Article VIII**, as follows:

**8.1    Organization, Existence, and Qualification.** Such Purchaser is an entity duly formed, validly existing, and in good standing under the Laws of the State of its formation. Subject to entry of the Sale Order, such Purchaser has all requisite power and authority to own and operate its property and to carry on its business as now conducted. Such Purchaser is duly licensed or qualified to do business, and is in good standing, in the State of Texas. Such Purchaser is duly licensed or qualified to do business, and is in good standing, in each other jurisdiction in which it carries on business or owns assets and such qualification is required by Law, except where the failure to be so qualified would not have a material adverse effect upon the ability of such Purchaser to consummate the transactions contemplated by this Agreement.

**8.2    Authority, Approval, and Enforceability.** Such Purchaser has, subject to entry of the Sale Order, full power and authority to enter into and perform this Agreement and the Transaction Documents to which it is a party and the transactions contemplated herein and therein. Subject to entry of the Sale Order, the execution, delivery, and performance by such Purchaser of this Agreement have been duly and validly authorized and approved by all necessary action on the part of such Purchaser. Subject to entry of the Sale Order, this Agreement is, and the Transaction Documents to which such Purchaser is a party when executed and delivered by such Purchaser will be, the valid and binding obligation of such Purchaser and enforceable against such Purchaser in accordance with their respective terms, subject to the effects of

bankruptcy, insolvency, reorganization, moratorium, and similar Laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law).

**8.3      Bankruptcy.** There are no bankruptcy, reorganization, or receivership Proceedings pending against such Purchaser.

**8.4      Brokers' Fees.** Neither such Purchaser nor any of its Affiliates has incurred any liability, contingent or otherwise, for brokers', finders', or similar fees in respect of the Contemplated Transactions for which any Seller or its Affiliates will have any responsibility whatsoever.

**8.5      No Conflicts.** Subject to requisite Bankruptcy Court approval and entry of the Sale Order and assuming receipt of all consents and approvals from Third Parties applicable to the Contemplated Transactions (including any notices, filings, and consents required in connection with the Bankruptcy Case), and except as would not have a material adverse effect upon the ability of such Purchaser to consummate the Contemplated Transactions or perform its obligations hereunder, the execution, delivery, and performance by such Purchaser of this Agreement and the consummation of the Contemplated Transactions will not (a) conflict with or result in a breach of any provision of the Organizational Documents of such Purchaser, (b) result in a default or the creation of any Lien or give rise to any right of termination, cancellation, or acceleration under any of the terms or provisions of any note, bond, mortgage, indenture, or other similar instrument to which such Purchaser is a party or by which Purchaser or any of its assets may be bound, or (c) violate any Law or Order applicable to such Purchaser or any of its assets.

**8.6      Consents.** Except for Customary Post-Closing Consents and entry of the Sale Order, there are no consents or approvals of any Third Party that such Purchaser is required to obtain in connection with the transfer of the Acquired Assets from Sellers to Purchaser or the consummation of the Contemplated Transactions by such Purchaser.

**8.7      Litigation.** There are no Proceedings pending or, to such Purchaser's Knowledge, Threatened by or before any Governmental Authority against such Purchaser which are reasonably likely to materially impair or delay such Purchaser's ability to perform its obligations hereunder.

**8.8      Financing.** As of both the Execution Date and the Closing, such Purchaser has and will have sufficient cash or other committed sources of funds with which to pay the Purchase Price, consummate the Contemplated Transactions, and timely perform its obligations under this Agreement and the Transaction Documents. Such Purchaser acknowledges that the failure to have sufficient funds shall in no event be a condition to the performance of its obligations hereunder, and in no event shall such Purchaser's inability or failure to timely perform its obligations hereunder be excused by failure to receive funds from any source.

**8.9      Regulatory.** Such Purchaser is qualified to own, and Ageron Energy, LLC is qualified to assume operatorship of, the Acquired Assets in all jurisdictions where the Acquired Assets are located, and the consummation of the Contemplated Transactions will not cause such Purchaser to be disqualified as such an owner or Ageron Energy, LLC to be disqualified as operator or to exceed any acreage limitations imposed by Law. To the extent required by any applicable Laws, Purchaser shall, as of the Closing Date, (a) hold all Permits, lease bonds, and any other surety or similar requirements as may be required by, and in accordance with, all applicable Laws governing the ownership and operation of the Acquired Assets and (b) have filed any and all required reports necessary for such ownership and operation with all Governmental Authorities having jurisdiction over such ownership and operation.

**8.10    Independent Evaluation.** Such Purchaser is sophisticated in the evaluation, purchase, ownership, and operation of oil and gas properties and related facilities, and has retained and taken advice

concerning the Acquired Assets, the Assumed Liabilities, and the Contemplated Transactions from attorneys, advisors, and consultants that are knowledgeable about the oil and gas business and the Laws applicable to the Acquired Assets, the Assumed Liabilities, and the Contemplated Transactions. Such Purchaser has been afforded a reasonable and appropriate opportunity to (a) inspect the Acquired Assets, (b) visit the offices of Sellers, and (c) review and examine the Data Room (and the contents therein), the Acquired Data, the Acquired Records, and the other documents and materials requested by such Purchaser or its authorized representatives or advisors with respect to the Acquired Assets and Assumed Liabilities (the materials referenced in this clause (c), collectively, the "Background Materials"). Such Purchaser (i) has made all such reviews and inspections of the Acquired Assets and Background Materials as such Purchaser has deemed necessary or appropriate to enter into this Agreement, and (ii) has or will have made as of Closing all such reviews and inspections of the Acquired Assets and Background Materials as such Purchaser deems necessary or appropriate to consummate the Contemplated Transactions. In making its decision to enter into this Agreement and consummate the Contemplated Transactions, such Purchaser has relied solely on the terms of this Agreement and its own independent investigation and evaluation of the Acquired Assets and the advice of its own legal, Tax, economic, environmental, engineering, geological, and geophysical advisors, and not on any comments, statements, projections, or other material made or given by any Entity Representative or consultant of any Seller, Operator, or any of their respective Affiliates. Except as expressly provided in this Agreement, the Seller Parties shall not have any Liability to such Purchaser or any other Purchaser Party arising out of or resulting from any authorized or unauthorized use, disclosure, or reliance on the Background Materials or other information and data relating to the Acquired Assets or the Assumed Liabilities provided by or on behalf of any Seller or any other Seller Party.

**8.11** *Securities Matters*. Each Purchaser has such knowledge, sophistication, and experience in business and financial matters and in the ownership and operation of oil and gas properties and assets that such Purchaser is capable of evaluating the merits and risks of the acquisition of the Acquired Assets, and has so evaluated the merits and risks of such acquisition. Each Purchaser is able to bear the economic risk of its acquisition of the Acquired Assets, and is able to afford a complete loss of such investment. Each **PURCHASER UNDERSTANDS AND ACKNOWLEDGES THAT NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY FEDERAL, STATE, OR FOREIGN AGENCY HAS PASSED UPON THE ACQUIRED ASSETS OR MADE ANY FINDING OR DETERMINATION AS TO THE FAIRNESS OF AN INVESTMENT IN THE ACQUIRED ASSETS OR THE ACCURACY OR ADEQUACY OF THE DISCLOSURES MADE TO PURCHASERS, AND, EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE XII, EACH PURCHASER WAIVES ITS RIGHT OF RESCISSION AND IS NOT ENTITLED TO CANCEL, TERMINATE, OR REVOKE THIS AGREEMENT FOR ANY REASON.**

## ARTICLE IX
## CERTAIN COVENANTS AND AGREEMENTS

**9.1** *Conduct of Business prior to Closing.*

(a) <u>Operational Covenants</u>. Except for any operation or action that is (1) described in **Schedule 9.1** or undertaken pursuant to any AFE described in **Schedule 7.14**, (2) required pursuant to the terms of any Acquired Lease or Acquired Contract, pursuant to applicable Law (including the Bankruptcy Code), or to respond to an Order or request of any Governmental Authority (including any Order of the Bankruptcy Court), (3) reasonably appropriate in the event of an emergency to protect life, property, or the environment, and/or (4) otherwise expressly contemplated by this Agreement or consented to in writing by Purchasers (which consent shall not be unreasonably delayed, withheld or conditioned), Sellers shall, from and after the Execution Date until Closing:

(i) subject to interruptions resulting from force majeure, mechanical breakdown, and planned maintenance, use commercially reasonable efforts, taking into account each

Seller's status as a debtor-in-possession in the Bankruptcy Case, to operate or cause to be operated the Acquired Assets in the Ordinary Course of Business and in material compliance with all applicable Laws and the terms of all Acquired Leases and Acquired Contracts;

(ii)    maintain, or cause to be maintained, the books of account and records relating to the Acquired Assets in the usual, regular, and ordinary manner and in accordance with the usual accounting practices of Sellers;

(iii)    maintain insurance coverage not less than the coverage provided by the insurance policies, together with the types and levels of coverage provided therein, listed on **Schedule 9.1(a)(iii)**;

(iv)    not (A) enter into an Acquired Contract that, if entered into prior to the execution of this Agreement, would have been required to be listed on **Schedule 7.13**, or extend any Material Contract, in each case, other than Acquired Contracts for the sale, exchange, transportation, gathering, treating, or processing of Hydrocarbons terminable by Sellers without penalty on notice of sixty (60) days or less, or (B) terminate (unless the term thereof expires pursuant to the provisions existing therein) or materially amend the terms of any Material Contract, except Material Contracts terminable by Sellers without penalty on notice of sixty (60) days or less;

(v)    not terminate (unless the term thereof expires pursuant to the provisions existing therein), materially amend, or surrender any Acquired Lease or any material rights thereunder; and

(vi)    not abandon, transfer, sell, mortgage, pledge, hypothecate, dispose of, or abandon any material portion of the Acquired Assets other than (A) the sale and/or disposal of Hydrocarbons in the Ordinary Course of Business, (B) sales of equipment that is no longer necessary in the operation of the Acquired Assets or for which replacement equipment has been obtained, or (C) as required by applicable Law or Order.

(b)    AFEs. With respect to any AFE received by a Seller after the Execution Date and prior to Closing that is estimated to cost in excess of $100,000 (net to Sellers' collective interest), HB2 shall forward a copy of such AFE to Purchasers as soon as is reasonably practicable and thereafter the Parties shall consult with each other regarding whether or not Sellers, as applicable, should elect to participate in such operation. Purchasers agree that it will timely respond to any written request for consent pursuant to this **Section 9.1(b)**.

(c)    Requests for Approval. Requests for approval of any action restricted by this **Section 9.1** shall be delivered to any of the following Entity Representatives of Purchasers, each of whom shall have full authority to grant or deny such requests for approval on behalf of Purchasers:

Paul Dirks                                            Greg LaMantia

Purchasers' approval of any action restricted by this **Section 9.1** shall not be unreasonably withheld, delayed, or conditioned and shall be considered granted in full within five (5) Business Days (unless a shorter time is reasonably required by the circumstances and such shorter time is specified in HB2's notice) of HB2's notice to Purchasers requesting such consent, unless Purchasers notify HB2 to the contrary during that period.

(d)    Other Working Interest Owners. Purchasers acknowledge that Sellers own undivided partial interests in certain of the properties comprising the Acquired Assets, and Purchasers agree

that the acts or omissions of any Third Party working interest owner or operator (other than Operator) shall not constitute a breach of the provisions of this **Section 9.1**, nor shall any action required by a vote of working interest owners constitute such a breach so long as Sellers, as applicable, have voted their interests in a manner that complies with the provisions of this **Section 9.1**.

9.2     *Successor Operator.* Purchasers acknowledge that they desire Ageron Energy, LLC to succeed HB2 or Operator as operator of those Acquired Assets or portions thereof that HB2 or Operator may, as of the Closing, operate. Purchasers further acknowledge and agree that Sellers cannot and do not covenant or warrant that Ageron Energy, LLC or any Purchaser or Affiliate of Purchasers shall become successor operator of such Acquired Assets or portions thereof. Sellers and Purchasers agree however that, as to the Acquired Assets that HB2 or Operator operates, prior to Closing they shall use their commercially reasonable efforts (at no out-of-pocket cost to Sellers, Operator, or any of their respective Affiliates) to have Ageron Energy, LLC designated, to the extent legally possible and permitted under any applicable joint operating agreements, as successor operator of such Acquired Assets effective as of the Closing, and Ageron Energy, LLC hereby consents and agrees to accept such designation and the responsibilities and Liabilities as the operator of such Acquired Assets.

9.3     *Governmental Bonds; Guarantees.* Purchasers acknowledge that none of the bonds, letters of credit, guarantees, and other forms of financial assurance, if any, posted by any Seller, Operator, or any of their respective Affiliates with Governmental Authorities and/or other Third Parties relating to any of the Acquired Assets are transferable to Purchasers. Prior to the Closing Date, Purchasers shall deliver to HB2 evidence of Purchasers or their Affiliates having posted all bonds, letters of credit, credit support, and other security with all applicable Governmental Authorities and other Third Parties (meeting the requirements of such authorities and Third Parties) that (a) were put in place by any Seller, Operator, or any of their respective Affiliates relating to any of the Acquired Assets, including those set forth on **Schedule 9.3**; (b) are otherwise required under the terms of any Acquired Assets, and/or (c) are otherwise required for Purchasers or their Affiliates to own and, where applicable, operate, the Acquired Assets (collectively the "***Guarantees***"). Without limiting the foregoing, Purchasers shall cooperate with Sellers in order to cause Sellers, Operator, and their respective Affiliates, as applicable, to be released as of the Closing Date from all such Guarantees and, if required by the counterparty to any Guarantee, Purchasers shall provide, effective as of the Closing Date, substitute arrangements of Purchasers or their Affiliates covering all periods covered by the Guarantees, such substitute arrangements to be equivalent or better in terms of type of security and creditworthiness of the party providing the security as compared to the Guarantees. If any counterparty to any such Guarantee does not release any Seller, Operator, and/or any of their respective Affiliates, as applicable, then, from and after Closing, each Purchaser shall indemnify, severally and not jointly and severally, Sellers, Operator, and their respective Affiliates, as applicable, against all amounts incurred by any Seller, Operator, and/or any of their respective Affiliates under such Guarantee (and all costs incurred in connection with such Guarantee). Notwithstanding anything to the contrary contained in this Agreement, any cash placed in escrow by any Seller, Operator, and/or any of their respective Affiliates pursuant to the Guarantees must be returned to Sellers, and shall be an Excluded Asset.

9.4     *Material Required Consents and Preferential Rights.*

(a)     With respect to each Material Required Consent set forth on **Schedule 7.8** that is under (i) an Assumed Executory Contract for which no notice of potential assumption or Cure Costs was delivered pursuant to section 365 of the Bankruptcy Code or (ii) an Acquired Lease, within five (5) Business Days after the conclusion of the Auction (and, with respect to each Material Required Consent that is not set forth on **Schedule 7.8** but is discovered by any Party after the Auction and before the Closing, reasonably promptly after the discovery thereof), HB2 shall send to the holder of each such Material Required Consent a notice in material compliance with the contractual provisions applicable to such

Material Required Consent seeking such holder's consent to the Contemplated Transactions. HB2 and Purchasers will thereafter use their commercially reasonable efforts (at no material out-of-pocket cost or expense to any Party) to obtain such Material Required Consents.

(b)     If, as of the Closing Date, a holder of a Material Required Consent set forth on **Schedule 7.8** that is an Acquired Lease (or that is not set forth on **Schedule 7.8** but that is discovered by any Party after the Auction and before the Closing) has not yet delivered such Material Required Consent, the time for granting such consent has not expired, and the Bankruptcy Court has not entered an Order approving the assumption and assignment of the affected Acquired Asset to Purchasers pursuant to this Agreement without obtaining such Material Required Consent, then the Acquired Asset covered by that Material Required Consent shall not be conveyed to Purchasers at Closing but shall still be considered part of the Acquired Assets in accordance with the provisions of this **Section 9.4**, the Base Purchase Price will not be reduced as a result of such non-conveyance at Closing, adjustments to the Purchase Price will still be made pursuant to **Section 3.3** with respect to such Acquired Asset, and HB2 and Purchasers shall continue after Closing to use commercially reasonable efforts (at no material out-of-pocket costs or expenses to either Party) to obtain such Material Required Consent. If Acquired Assets have not been conveyed to Purchasers at the Closing due to a failure to obtain a Material Required Consent, and if such Material Required Consent (i) has been received or deemed received pursuant to the terms of the underlying agreement or instrument on or before the Final Settlement Date (or the Bankruptcy Court enters an Order on or before the Final Settlement Date providing that such Material Required Consent is not required to consummate the sale of the affected Acquired Assets to the Purchasers and such Acquired Asset can be acquired by the Purchasers free and clear of such Material Required Consent) or (ii) has not yet been received or deemed received on or before the Final Settlement Date, then, in each such case, (A) HB2 shall so notify Purchasers, and (B) within ten (10) Business Days after Purchasers' receipt of such notice, Sellers shall assign and convey to Purchasers, and Purchasers shall accept, such Acquired Assets pursuant to the terms of this Agreement and an instrument in substantially the same form as the Assignment. As between Purchasers, on the one hand, and Sellers, on the other hand, with respect to any Acquired Asset for which a Material Required Consent has not been obtained by the Closing and for which the Bankruptcy Court has not entered an Order approving the assumption and assignment of the affected Acquired Asset to Purchasers pursuant to this Agreement without obtaining such Material Required Consent, (1) Sellers, as applicable, shall hold such Acquired Asset after Closing as nominee for Purchasers, effective as of the Effective Time until the Acquired Asset has been assigned pursuant to this **Section 9.4(b)**, (2) Purchasers shall pay any and all costs, expenses, and Liabilities associated with that Acquired Asset (other than any cost, expense, or Liability required to be paid by Sellers pursuant to the express terms of any other provision of this Agreement), and (C) Sellers shall pay and/or cause to be paid, as applicable, to Purchasers any revenues received by Sellers that are associated with such Acquired Asset for time periods from the Effective Time until the Acquired Asset has been assigned pursuant to this **Section 9.4(b)**.

(c)     With respect to each Preferential Right set forth on **Schedule 7.9**, to the extent the Acquired Assets affected thereby cannot be sold to Purchasers free and clear of such Preferential Right after giving effect to the Sale Order and all applicable Law, including Section 363(f), 363(m), 365(c)(1), 365(f)(1), and 1123 of the Bankruptcy Code (each, an "*Applicable Preferential Right*"), within five (5) Business Days after the conclusion of the Auction, Sellers shall send to the holder of each such Applicable Preferential Right a notice in compliance with the contractual provisions applicable to such Applicable Preferential Right. If, prior to Closing, a holder of an Applicable Preferential Right has notified a Seller that it elects to exercise its Applicable Preferential Right and purchase the Acquired Assets (or portions thereof) to which its Applicable Preferential Right applies and the Bankruptcy Court has not entered an Order approving the assignment of the affected Acquired Asset to Purchasers pursuant to this Agreement free and clear of such Applicable Preferential Right, then the Acquired Assets subject to such Applicable Preferential Right shall be excluded from the Acquired Assets to be assigned to Purchasers at the Closing (but only to the extent of the portions of such Acquired Assets affected by the Applicable Preferential Right,

and subject to the remaining provisions of this **Section 9.4(c)**), and the Base Purchase Price shall be reduced by the Allocated Value, if any, of the Acquired Assets (or portions thereof) so excluded. Sellers shall be entitled to all proceeds paid by any Person exercising an Applicable Preferential Right prior to Closing. If such holder of such Applicable Preferential Right thereafter fails to consummate the purchase of the Acquired Assets covered by such Applicable Preferential Right on or before the end of time required under such Applicable Preferential Right for closing such sale and Sellers are permitted to transfer such Acquired Assets (or portions thereof) to Purchasers pursuant to the terms of such Applicable Preferential Right or otherwise to an Order of the Bankruptcy Court, then (i) Sellers shall so notify Purchasers, (ii) within ten (10) Business Days after Purchasers' receipt of such notice, Purchasers shall purchase and accept from Sellers such Acquired Assets pursuant to the terms of this Agreement and for the Allocated Value of such Acquired Assets, subject to adjustments in accordance with **Section 3.3**, and (iii) Sellers shall assign to Purchasers such Acquired Assets pursuant to an instrument in substantially the same form as the Assignment. If, as of the Closing Date, an Applicable Preferential Right has (A) expired without exercise, (B) been waived, (C) not been exercised or waived and the time for exercising such Preferential Right has not expired, or (D) the Bankruptcy Court has entered an Order approving the assignment of the affected Acquired Asset to Purchasers pursuant to this Agreement free and clear of such Applicable Preferential Right, then, in each case, the Acquired Assets covered by that Applicable Preferential Right shall be sold and transferred to Purchasers at Closing subject to the rights of the Applicable Preferential Right holder, if any, and no adjustment to the Purchase Price will be made in respect of such Applicable Preferential Right and, in the event the holder of such Applicable Preferential Right thereafter exercises such Preferential Right, Purchasers will comply with all of the terms thereof, will convey the applicable Acquired Assets (or portions thereof) to the holder of the Applicable Preferential Right, and will be entitled to all proceeds paid by such holder with respect thereto.

(d)     Notwithstanding anything herein to the contrary, the provisions of **Section 9.4(b)** and **Section 9.4(c)** shall only apply with respect to those Acquired Assets that (i) are subject to an un-obtained Material Required Consent applicable to the Contemplated Transactions and/or an Applicable Preferential Right, as applicable, and (ii) cannot be acquired by the Purchasers free and clear of such Material Required Consent or Applicable Preferential Right (including Liabilities resulting from a failure to have actually obtained any such Material Required Consent or complied with such Applicable Preferential Right) pursuant to the Sale Order or applicable Law, including the Bankruptcy Code. Notwithstanding anything herein to the contrary, nothing in this **Section 9.4** or elsewhere in this Agreement shall prohibit or prevent a Seller from ceasing operations or winding up its affairs following Closing.

*9.5     Casualty Loss.* If, after the Execution Date but prior to the Closing Date, a Casualty Loss occurs with respect to a portion of the Acquired Assets, then, notwithstanding such Casualty Loss, this Agreement shall remain in full force and effect and (a) if the costs and expenses to repair the Acquired Assets affected by such Casualty Loss do not exceed $500,000, then Purchasers will nevertheless be required to Close, there shall be no reduction of the Base Purchase Price in respect of such Casualty Loss, and upon Closing, Purchasers shall be entitled to all rights of Sellers, if any, to insurance proceeds under insurance policies issued by Third Parties, to condemnation awards, and to other claims against Third Parties with respect to the Casualty Loss, and (b) if the costs and expenses to repair the Acquired Assets affected by such Casualty Loss exceed $500,000, then Purchasers will nevertheless be required to Close, there shall be a reduction of the Base Purchase Price in respect of such Casualty Loss (however, in respect of any Acquired Property, such adjustment shall not exceed the Allocated Value thereof), and upon Closing, Sellers shall retain all rights to insurance proceeds under insurance policies issued by Third Parties, to condemnation awards, and to other claims against Third Parties with respect to the Casualty Loss. Until Closing (or if no Closing occurs, termination of this Agreement), each Seller shall maintain insurance coverage it currently has in effect with respect to the Acquired Properties.

**9.6**      **Revenues.** Sellers shall be entitled to all amounts earned from the sale of Hydrocarbons produced prior to the Effective Time from or attributable to the Acquired Properties and, from and after Closing, Purchasers shall be entitled to all amounts earned from the sale of Hydrocarbons produced on or after the Effective Time from or attributable to the Acquired Properties, in each case, net of (a) Royalties, (b) Production Taxes, and (c) gathering, transportation, processing, and other costs, in each case, that are deducted by the purchaser of production. After the Closing, to the extent not accounted for in the Final Settlement Statement, any revenues received by a Seller applicable to any post-Effective Time production of Hydrocarbons from the Acquired Properties shall be paid by such Seller (or such Seller shall otherwise cause such payment to be made) to Purchasers within thirty (30) days after receipt of such revenues, and any revenues received by Purchasers applicable to any pre-Effective Time production of Hydrocarbons from the Acquired Properties shall be paid by Purchasers to Sellers within thirty (30) days after receipt of such revenues. Payments under this **Section 9.6** shall be grossed up to take into account any netting or set-offs by the purchaser of any such production against obligations of the recipient of such revenues that are not related to the purchase of such production. Payments under this **Section 9.6** shall not constitute an adjustment to any portion of the Purchase Price. Adjustments to the Purchase Price after the Closing shall be made only under **Section 3.5**. Notwithstanding anything herein to the contrary, nothing in this **Section 9.6** or elsewhere in this Agreement shall prohibit or prevent a Seller from ceasing operations or winding up its affairs following Closing.

**9.7**      **Suspense Accounts.** At the Closing, without duplication of any adjustment pursuant to **Section 3.3(b)(iv)**, HB2 shall transfer or shall cause to be transferred to Purchasers any and all suspense accounts maintained by HB2 or Operator for monies payable to Third Party owners of working interests or Royalties in respect of past production of Hydrocarbons from the Acquired Wells. At the Closing, Purchasers shall assume full and complete Liability and responsibility for maintaining and administering all such suspense accounts (for which Purchasers received a downward adjustment of the Purchase Price), for the proper handling and payment of all revenues held in suspense and attributable to production from the Acquired Properties (including the Suspense Funds), and for compliance with all applicable unclaimed property Laws (the "***Assumed Suspense Liabilities***").

**9.8**      **Confidentiality, Non-Interference; Non-Solicitation.** Each Purchaser acknowledges that, pursuant to its access to the Acquired Records, Acquired Assets, and other information, each Purchaser will become privy to confidential and other information of Sellers and their Affiliates, and agrees that such information and the terms and provisions of this Agreement shall be held confidential by such Purchaser and its Entity Representatives in accordance with the terms of the Confidentiality Agreement. The Confidentiality Agreement shall remain in full force and effect in accordance with its terms; *provided, however,* if Closing should occur, then the Confidentiality Agreement shall terminate save and except as to the following (as to all of which the Confidentiality Agreement shall extend and remain in full force and effect following Closing until the expiration or termination thereof): (a) information related to the Excluded Assets, (b) information related to assets other than the Acquired Assets, (c) the terms of this Agreement, (d) Section 10 thereof ("*Non-Interference*"), but solely with respect to those Subject Lands (as defined therein) that are not Lands (as defined herein), and (e) Section 12 thereof ("*Non-Solicitation*").

**9.9**      **Public Announcements.** Neither Sellers nor Purchasers shall make any press release or other public announcements concerning the transaction contemplated by this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld. If either Sellers or Purchasers desire to make a public announcement, then such Party shall first give the other such Party forty-eight (48) hours written notification of its or their desire to make such a public announcement. The written notification shall include (a) a request for consent to make the announcement and (b) a written draft of the text of such public announcement. Nothing contained herein shall prohibit any Party from issuing or making a public announcement or statement (or require the consent of the other party) if such Party deems it necessary to do so in order to comply with any applicable Law, or any applicable rules, regulations, or

Orders of any Governmental Authority having jurisdiction, or with disclosure requirements of applicable securities Laws, regulations promulgated thereunder, the Securities and Exchange Commission, or any applicable stock exchanges, *provided that* such Party provides the other Parties with a written draft of the text of such public announcement prior to issuing or making such public announcement. Nothing in this **Section 9.9** shall prohibit either Party from making any filings or public statements in the Bankruptcy Case that it determines are necessary or advisable to consummation of the Contemplated Transactions, *provided, however,* that to the extent practicable, any Party making such a filing will provide the other Party with a draft of any such filing forty-eight (48) hours prior to making such filing.

       *9.10*    *Record Retention.* After the Closing Date, Purchasers shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all Acquired Records included in and otherwise related to the Acquired Assets for periods prior to the Closing and shall preserve such Acquired Records until the later of (i) such period as shall be consistent with Purchasers' records retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy Proceedings relating to the Bankruptcy Case or (iv) in the case of Acquired Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any Acquired Records in electronic form to the extent reasonably available. Purchasers acknowledge that Sellers have the right to retain originals or copies of all of Acquired Records included in or related to the Acquired Assets for periods prior to the Closing.

       *9.11*    *Commercially Reasonable Efforts.*

       (a)    Subject to the terms and conditions of this Agreement, applicable Law, the Bankruptcy Code and any Orders of the Bankruptcy Court, Sellers, on the one hand, and Purchasers, on the other hand, shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent to closing the Contemplated Transactions to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary consents and approvals from any Governmental Authority and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement. Purchasers and Sellers shall not, and shall cause their respective Affiliates not to, take any action that would reasonably be expected to adversely affect the approval of any Governmental Authority of any of the filings referred to in this **Section 9.11(a)**. Notwithstanding anything to the contrary provided herein, neither Party nor any of their respective Affiliates shall be required (i) to hold separate (including by trust or otherwise) or divest any of its businesses, product lines or assets, or any of the Acquired Assets, (ii) to agree to any limitation on the operation or conduct of its business, (iii) to waive any of the conditions to this Agreement set forth in **Article X**, or (iv) except as otherwise expressly provided herein, to enter into any settlement, consent decree, stipulation or agreement with any Governmental Authority in connection with the Contemplated Transaction or pay any fees or expenses (other than de minimis amounts) to Third Parties.

       (b)    Subject to the terms and conditions of this Agreement, applicable Law, the Bankruptcy Code and any Orders of the Bankruptcy Court, Sellers, on the one hand, and Purchasers, on the other hand, (i) shall promptly inform each other of any material communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any material filing,

notification or request for approval related thereto, and (ii) shall permit the other to review in advance any proposed material written communication or filing submitted to any such Governmental Authority in response thereto. Subject to the terms and conditions of this Agreement, applicable Law, the Bankruptcy Code and any Orders of the Bankruptcy Court, in addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any material filings, investigation or other material inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party reasonably consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the extent reasonably practicable.  Subject to any restrictions under applicable Laws, the Bankruptcy Code and any Orders of the Bankruptcy Court, each of the Sellers, on the one hand, and Purchasers, on the other hand, shall furnish the other with copies of all material filings and written communications between it and its Affiliates and their respective Entity Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval.

**9.12    *Amendment of Schedules*.** Purchasers agree that, with respect to the representations and warranties of Sellers contained in this Agreement, Sellers shall have the continuing right (but not the obligation) until the date that is three (3) Business Days prior to Closing to create new, or correct, supplement, or amend existing, Schedules to their representations and warranties with respect to any matters hereafter arising or discovered which, if existing or known at the Execution Date or thereafter, would have been required to be set forth or described in such Schedules. For purposes of determining whether the conditions set forth in **Section 10.3** have been fulfilled, the Schedules to Sellers' representations and warranties contained in this Agreement shall be deemed to include only that information contained therein on the Execution Date and shall be deemed to exclude all information contained in any such new Schedule or addition, supplement, or amendment to an existing Schedule delivered by Sellers after execution of this Agreement and at or prior to Closing.

**9.13    *Executory Contracts and Cure Costs*.**

(a)     Subject to the terms and conditions of this **Section 9.13**, at the Closing (or, if the applicable Acquired Contract is not assigned to Purchasers at Closing pursuant to the terms of **Section 9.4**, then at the time of the assignment of such Acquired Contract to Purchasers), Purchasers shall pay in cash, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Acquired Contracts (including any Assumed Executory Contract) (the "***Cure Costs***").  For the avoidance of doubt, the payment of any Cure Costs called for by this Agreement shall be made by Purchasers in cash (at Closing, except as otherwise provided above in this **Section 9.13**) and shall be in addition to the Purchase Price, but in no event shall Purchasers be required to make any payment of (i) Cure Costs for, and shall not assume any Liabilities with respect to, any contract or agreement that is not an Acquired Contract, or (ii) Cure Costs with respect to the assumption and assignment of any Acquired Lease. For the avoidance of doubt, Sellers shall bear any Cure Costs with respect to any Acquired Lease.

(b)     **Schedule 9.13(b)** sets forth a list of all executory contracts, agreements, obligations and undertakings that, to Seller's Knowledge, cover, are attributable to, or relate to any of the Acquired Assets or to the Operations on or applicable to the Acquired Properties and which are binding on any Seller, its Affiliates, or any of the Acquired Assets, but excluding Acquired Leases, Acquired Easements, Permits, and Acquired Real Estate (each, an "***Executory Contract***") and Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such Executory Contract (and if no

Cure Cost is estimated to be payable in respect of any particular Executory Contract, the amount of such Cure Cost designated for such Executory Contract shall be "$0.00"). Sellers shall have the continuing right (but not the obligation) until the Closing to correct, supplement, or amend **Schedule 9.13(b)** with respect to any additional Executory Contracts or change in Cure Costs that Sellers identify and notify Purchasers of pursuant to **Section 9.13(f)**.

(c)     Subject to Purchasers' rights under **Section 9.13(d)** below to subsequently amend such designations: (i) **Schedule 9.13(c)(i)** sets forth the Executory Contracts to be assumed by Sellers and assigned to Purchasers at the Closing (the "***Assumed Executory Contracts***"), which shall be Acquired Contracts, subject to the remaining provisions of this **Section 9.13** and the terms of **Section 2.2** and **Section 2.3**, and (ii) **Schedule 9.13(c)(ii)** sets forth the Executory Contracts to be excluded from the Contemplated Transactions and not assigned to Purchasers at the Closing (the "***Excluded Executory Contracts***"), which Excluded Executory Contracts shall be Excluded Assets, subject to the remaining provisions of this **Section 9.13**. Sellers shall provide sufficient notice under the Bankruptcy Code and local rules of the Bankruptcy Court to all non-Seller counterparties to the Assumed Executory Contracts of their intention to assume and assign and Purchasers' intention to assume the applicable Assumed Executory Contract, which notice will include a schedule of Cure Costs.

(d)     Subject to **Section 9.13(f)**, at any time prior to 5:00 p.m., Houston, Texas time, on the date that is two (2) Business Days prior to the Auction (the "***Designation Deadline***"), Purchasers shall have the right, which may be exercised in Purchasers' sole discretion, to provide written notice (each, a "***Contract Notice***") to HB2 of Purchasers' election to designate any Executory Contract: (i) that Purchasers previously designated as an Assumed Executory Contract as instead an Excluded Executory Contract, and upon such designation such Executory Contract shall constitute an Excluded Executory Contract and shall cease to constitute an Assumed Executory Contract; or (ii) that Purchasers previously designated as an Excluded Executory Contract as instead an Assumed Executory Contract and upon such designation such Executory Contract shall constitute an Assumed Executory Contract.

(e)     If, at any time after the Designation Deadline, the Cure Costs fixed by the Bankruptcy Court for any Executory Contract then designated as an Assumed Executory Contract are (i) greater than the amount set forth on the initial schedule of Cure Costs filed by Sellers with the Bankruptcy Court on August 1, 2023 and (ii) are not consented to by Purchasers, then Purchasers shall be permitted, no later than 5:00 p.m., Houston, Texas time, on the date that is the earlier of: (x) two (2) Business Days after entry of the Order by the Bankruptcy Court setting such Cure Costs, and (y) two (2) Business Days prior to the Closing, to provide Sellers a Contract Notice of Purchasers' election to revoke its designation of such Executory Contract as an Assumed Executory Contract and thereupon such Executory Contract shall be an Excluded Executory Contract and Excluded Asset.

(f)     In the event that a Seller identifies (whether before or after the Designation Deadline) any additional Executory Contracts that were not previously identified as such, HB2 shall promptly notify Purchasers of (i) such additional Executory Contracts and (ii) Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such Executory Contract.  Purchasers shall designate each such additional Executory Contract described in the immediately preceding sentence as an Assumed Executory Contract or Excluded Executory Contract pursuant to this **Section 9.13**, notwithstanding the passage of the Designation Deadline, no later than 5:00 p.m., Houston, Texas time, on the date that is the later of: (x) two (2) Business Days after Purchasers receive notice of such additional Executory Contract, and (y) two (2) Business Days prior to the Auction.

(g)     The Parties shall amend **Exhibit A-5**, **Schedule 9.13(c)(i)**, and **Schedule 9.13(c)(ii)** to reflect changes made pursuant to this **Section 9.13**.

(h)     If Purchasers exercise their rights in this **Section 9.13** to designate an Executory Contract as an Excluded Executory Contract, there shall be no reduction in the Purchase Price as a result of such designation or change in designation.

(i)     With respect to each Acquired Contract (including any Assumed Executory Contract), Acquired Lease, and Acquired Easement, Purchasers shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Purchasers of each such Acquired Contract (including any Assumed Executory Contract), Acquired Lease, and Acquired Easement. Purchasers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Acquired Contracts (including any Assumed Executory Contracts), Acquired Leases, and Acquired Easements, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information, and other documents or information for filing with the Bankruptcy Court and making Purchasers' Entity Representatives available to testify before the Bankruptcy Court.

### 9.14    *Bankruptcy Court Approval.*

(a)     Sellers and Purchasers acknowledge that this Agreement, the sale of the Acquired Assets, and the assumption and assignment of the Acquired Contracts and Acquired Leases are subject to Bankruptcy Court approval. Sellers and Purchasers acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Acquired Assets, and that such demonstration shall include giving notice of the Contemplated Transactions to creditors and other interested parties pursuant to the Bid Procedures Order, and (ii) Purchasers must provide adequate assurance of future performance as required by the Bankruptcy Code under the to-be-assigned Acquired Leases and Acquired Contracts.

(b)     Until the conclusion of the Auction, Sellers are permitted, in accordance with the Bid Procedures Order, to cause their respective Entity Representatives to initiate contact with, or solicit or encourage the submission of any inquiries, proposals, bids, or offers by, any Person (in addition to Purchaser) with respect to any Competing Transaction.

(c)     Sellers shall file the Stalking Horse Notice and, if Purchasers are the Successful Bidders, then following conclusion of the Auction, pursue the entry of the Sale Order. Sellers shall comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules in connection with obtaining approval of the Stalking Horse Notice and, after conclusion of the Auction, the Sale Order. Sellers shall reasonably consult with Purchasers concerning the Stalking Horse Notice, the Sale Order, any other Orders of the Bankruptcy Court relating to the Contemplated Transactions, and the bankruptcy Proceedings in connection therewith.

(d)     Sellers acknowledge and agree that Purchasers have expended considerable time and expense in connection with this Agreement, and the negotiation thereof, and the identification and quantification of assets to be included in the Acquired Assets. In consideration therefor, and in accordance with the Bid Procedures Order, Sellers agree to designate Purchasers as the "Stalking Horse Bidder" for the Acquired Assets and to provide Purchasers, to the extent provided herein, with the Break-Up Fee and Expense Reimbursements and to timely file and serve the Stalking Horse Notice (as defined in the Bid Procedures Order) and each of Sellers and Purchasers will use commercially reasonable efforts to defend against any objection that may be filed with respect to the Stalking Horse Notice.  Sellers further agree that the Sale Motion shall include a request from Sellers that the Bankruptcy Court approve the Break-Up Fee and Expense Reimbursement as allowed superpriority administrative expense claims against Sellers' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other

administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code and equal in priority to claims arising under the DIP Order and shall be secured by Liens equal in priority to the DIP Liens granted under the DIP Order.

(e)     Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan they submit to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Contemplated Transactions.

(f)     Sellers and Purchasers agree that, in the event that Purchasers are not the Successful Bidders at the Auction, if and only if Purchasers submit the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid as determined by Sellers in accordance with the Bid Procedures and Sellers give Purchasers written notice of such determination, then Purchasers will be the Back-Up Bidders. In such event, Purchasers will be required to keep their bid to consummate the Contemplated Transactions on the terms and conditions set forth in this Agreement (as may be amended with both Parties' written consent prior to or at the Auction) open and irrevocable until the closing of the sale of the Acquired Assets to the Successful Bidder. If the Successful Bid with the Successful Bidder is terminated prior to closing thereof, Purchasers will be deemed to be the Successful Bidders and will consummate the Contemplated Transactions on the terms and conditions set forth in this Agreement (as the same may be amended with both Parties' written consent prior to or at the Auction).

(g)     In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Sellers shall promptly notify Purchasers of such appeal or stay request and shall promptly provide to Purchasers a copy of the related notice of appeal or Order of stay. Sellers shall also provide Purchasers with written notice of any motion or application filed in connection with any appeal from either of such Orders.

(h)     From and after the Execution Date and prior to the Closing or the earlier termination of this Agreement in accordance with **Section 12.1**, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification, or staying of the Bid Procedures Order, the Sale Order, or this Agreement. If Purchasers are the Successful Bidders, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification, or staying of the Sale Order or this Agreement.

(i)     Provided Purchasers are selected as the Successful Bidders in respect of the Acquired Assets at the Auction, Sellers shall seek entry of the Sale Order and any other necessary Orders to consummate the Contemplated Transactions by the Bankruptcy Court as soon as reasonably practicable following the conclusion of the Auction in accordance with the terms and conditions hereof. Purchasers and Sellers understand and agree that the transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court. Purchasers agree that they will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order. In the event the entry of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal. Purchasers agree that they shall promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchasers of the Acquired Contracts (including any Assumed Executory Contract) and Acquired Leases, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchasers under this

Agreement and demonstrating that Purchasers are "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(j)     Notwithstanding anything herein to the contrary, nothing in this Agreement, including this **Section 9.14**, will require any director or officer of any Seller Party to violate their fiduciary duties to such Seller Party. No action or inaction on the part of any director or officer of any Seller Party that such director or officer reasonably believes is required by their fiduciary duties to such Seller Party shall be limited or precluded by this Agreement.

**9.15     Bankruptcy Court Filings**. From and after the Execution Date and until the Closing or earlier termination of this Agreement, to the extent reasonably practicable under the circumstances, Sellers shall use commercially reasonable efforts to: (i) provide Purchasers with drafts of any and all pleadings and proposed Orders to be filed or submitted in connection with this Agreement and the Contemplated Transactions, and (ii) make reasonable efforts to consult and cooperate with Purchasers regarding any discovery taken in connection with seeking entry of the Sale Order (including any depositions). Notwithstanding the foregoing, Sellers' inadvertent failure to comply with this **Section 9.15** (or failure to comply with this **Section 9.15** due to emergency circumstances) shall not constitute a breach of this Agreement, *provided that* upon discovery of such failure (or the termination of any emergency circumstance that prompted such failure), Sellers shall use commercially reasonable efforts to remedy the failure to comply with this **Section 9.15**.

**9.16     Commitment Letters**. At or prior to the execution of this Agreement, Purchasers have delivered to Sellers true, complete, and fully-executed copies of the debt and/or equity commitment letters by and among Purchasers and their corresponding lenders and including all exhibits, schedules, annexes and amendments to such agreements in effect as of such date of delivery (the "***Commitment Letters***"), pursuant to which and subject to the terms and conditions thereof each of the parties thereto (other than Purchasers), has severally agreed and committed to provide to Purchasers the equity and/or debt financing set forth therein ("***Financing***"). As of the Closing Date, the Commitment Letters shall have not been amended, restated, or otherwise modified or waived subsequent to the date of delivery to Sellers and the respective commitments contained in the Commitment Letters shall have not been withdrawn, modified, or rescinded in any respect. There shall be no conditions precedent to the funding of the full amount of the Financing, other than as expressly set forth in the Commitment Letters. There shall be no other agreements, side letters, or arrangements that would permit the parties to the Commitment Letters to reduce the amount of the Financing or that would otherwise affect the availability of the Financing. The Commitment Letters provide Purchasers with binding financial commitments that, when funded at Closing, will provide it with sufficient funds to pay the Purchase Price and to pay any other amounts required to be paid by it in connection with the consummation of the Contemplated Transactions. On or before the Closing Date, Purchasers shall take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable to consummate and obtain the Financing on the terms and conditions described in the Commitment Letters. Purchasers acknowledge and agree that the consummation of, and the receipt of proceeds from, any Financing is not a condition to Purchasers' obligations hereunder.

**9.17     Bulk Sales**. Purchasers and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Purchasers.

### ARTICLE X
### CONDITIONS TO CLOSING

**10.1     Mutual Conditions to Closing.** The obligations of each Party to consummate the transactions provided for herein are subject, at the option of such Party, to the satisfaction on or prior to

Closing of each of the following conditions (each of which may be waived by such Party (on its behalf) in its sole discretion):

(a)    Changes in Laws; Orders. No Governmental Authority shall have enacted, issued, promulgated, or deemed applicable any Law, and no preliminary or permanent injunction or other Order will have been issued (and remain in force) by any Governmental Authority, in each case, that has the effect of permanently enjoining, making illegal, or otherwise prohibiting or preventing the consummation of the Contemplated Transactions.

(b)    Governmental Approvals. All material consents and approvals of any Governmental Authority required for the transfer of the Acquired Assets from Sellers to Purchasers as contemplated under this Agreement (except Customary Post-Closing Consents and any other consents required by the terms of any Acquired Asset), shall have been granted.

(c)    Sale Order. The Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not be stayed, reversed, or vacated.

**10.2    Sellers' Conditions to Closing.** The obligations of Sellers to consummate the transactions provided for herein are subject, at the option of Sellers, to the satisfaction on or prior to Closing of each of the following conditions (each of which may be waived by Sellers in their sole discretion):

(a)    Representations and Warranties. Each of the representations and warranties of Purchasers contained herein (i) that are qualified by the term "material" or contain terms such as "material adverse change", "material adverse effect", or other terms of similar import or effect (whether or not capitalized) shall be true and correct as of the Closing Date as though such representations and warranties were made at such time (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date), and (ii) that are not so qualified shall be true and correct in all material respects as of the Closing Date as though such representations and warranties were made at such time (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date).

(b)    Performance. Purchasers will have performed or complied, in all material respects, with all obligations, agreements, and covenants contained in this Agreement as to which performance or compliance by Purchasers are required prior to or on the Closing Date.

(c)    Closing Deliverables. Purchasers shall be ready, willing, and able to deliver to Sellers at the Closing the documents and items required to be delivered by Purchasers under **Section 11.2**.

**10.3    Purchaser's Conditions to Closing.** The obligations of Purchasers to consummate the transactions provided for herein are subject, at the option of Purchasers, to the satisfaction on or prior to Closing of each of the following conditions (each of which may be waived by Purchasers in their sole discretion):

(a)    Representations and Warranties. Except for any and all breaches and inaccuracies resulting from or based upon matters of which a Purchaser has Knowledge as of the Execution Date, each of the representations and warranties of Sellers contained herein (i) that are qualified by the term "material" or contain terms such as "material adverse change", "material adverse effect", or other terms of similar import or effect (whether or not capitalized) shall be true and correct as of the Closing Date as though such representations and warranties were made at such time (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date), and (ii) that are not so qualified shall be true and correct in all material respects as of the Closing Date as though such

representations and warranties were made at such time (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date); *provided*, *however*, in the event of a breach of or inaccuracy in the representations and warranties of a Seller set forth in this Agreement, the condition set forth in this **Section 10.3(a)** shall be deemed satisfied unless the effect of all breaches of or inaccuracies in Sellers' representations and warranties (excluding breaches or inaccuracies resulting from or based upon matters of which a Purchaser has Knowledge as of the Execution Date) taken together results in a Material Adverse Effect;

(b)     Performance. Sellers will have performed or complied, in all material respects, with all obligations, agreements, and covenants contained in this Agreement as to which performance or compliance by Sellers is required prior to or on the Closing Date.

(c)     Closing Deliverables. Sellers shall be ready, willing, and able to deliver (or, as applicable, cause to be delivered) to Purchasers at the Closing the documents and items required to be delivered by Sellers under **Section 11.2**.

(d)     Sale Order. The Sale Order: (i) shall have become final and non-appealable, (ii) shall not have been reversed, stayed, vacated, and as to which the time to appeal or seek certiorari or move for a vacate, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the Order was appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order, and (iii) shall not have been amended, supplemented or otherwise modified without the consent of Purchasers (which consent shall not be unreasonably withheld, conditioned, or delayed).

**ARTICLE XI**
**CLOSING**

*11.1     Date of Closing.* Subject to the conditions set forth in this Agreement, the purchase and sale of the Acquired Assets pursuant to this Agreement (the "*Closing*") shall be conducted electronically (by email or other electronic means) to the extent reasonably possible, but if necessary shall be held at the offices of Porter Hedges, LLP, counsel to Sellers, located at 1000 Main Street, Suite 3600, Houston, Texas 77002, or at such other location as the Parties mutually agree in writing, at 10:00 a.m. Houston, Texas time on the later of (a) two (2) Business Days after the satisfaction or waiver of the conditions to Closing in **Article X**, or (b) any other date mutually agreed to by the Parties. The date Closing actually occurs shall be the "*Closing Date*".

*11.2     Closing Obligations.* At Closing, the following documents shall be delivered and the following events shall occur, the execution of each document and the occurrence of each event being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

(a)     Assignment. Sellers and Purchasers shall duly execute, acknowledge, and deliver the Assignment in sufficient counterparts to facilitate recording in the applicable counties where the Acquired Assets are located.

(b)     Additional Assignments and Assumptions; Official Forms. Sellers and Purchasers shall duly execute, acknowledge, and deliver such other assignments, assumptions, bills of sale, or deeds necessary to transfer the Acquired Assets to Purchasers and for Purchasers to assume the Assumed Liabilities, including any conveyances on official forms of relevant Governmental Authorities and related

documentation necessary to transfer the Acquired Assets to Purchasers, and for Purchasers to assume the Assumed Liabilities in accordance with this Agreement and the requirements of Law.

(c) <u>Preliminary Settlement Statement</u>. Sellers and Purchasers shall duly execute and deliver the Preliminary Settlement Statement.

(d) <u>Closing Payment</u>. Purchasers shall deliver the Closing Payment to Sellers by wire transfer of immediately available funds as provided in **Section 3.4(b)**.

(e) <u>Cure Costs</u>. Purchasers shall pay to Sellers the Cure Costs for which Purchasers are responsible under **Section 9.13** by wire transfer of immediately available funds to an account or accounts designated in writing by HB2 to Purchasers.

(f) <u>Letters in Lieu</u>. On forms supplied by Sellers and reasonably acceptable to Purchasers, Sellers and Purchasers shall duly execute and deliver letters in lieu of transfer orders directing all purchasers of production to make payment to Purchasers of the proceeds attributable to production from the Acquired Properties from and after the Effective Time.

(g) <u>Releases</u>. Sellers shall deliver to Purchasers required releases in recordable form of any mortgage, deed of trust, or security agreement securing Indebtedness created by any Seller that encumbers any of the Acquired Assets.

(h) <u>Change of Operator Forms</u>. Sellers shall (or, as applicable, shall cause Operator to), and Purchasers shall, duly execute federal and state change of operator forms with respect to those Acquired Assets that are to be operated by Purchasers after the Closing.

(i) <u>Closing Certificates</u>. Each Purchaser shall deliver to Sellers a certificate duly executed by an officer of such Purchaser substantially in the form of **Exhibit D-1** as to the satisfaction of the closing conditions set forth in **Sections 10.2(a)** and **10.2(b)**, and Sellers shall deliver to Purchasers a certificate duly executed by an officer of each Seller substantially in the form of **Exhibit D-2** as to the satisfaction of the closing conditions set forth in **Sections 10.3(a)** and **10.3(b)**.

(j) <u>Non-Foreign Affidavit</u>. Each Seller shall deliver to Purchasers an affidavit of non-foreign status substantially in the form of **Exhibit E**.

(k) <u>Other Deliveries</u>. Sellers and Purchasers shall execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, any other agreements, instruments, and documents that are required by other terms of this Agreement to be executed, acknowledged, and/or delivered at or by Closing.

*11.3* *Records.* In addition to the obligations set forth under **Section 11.2** above, no later than ten (10) days following the Closing Date, Sellers shall make the Acquired Records in Sellers' or its Affiliates' possession (in the format currently maintained by Sellers) available to Purchasers for pickup from HB2's offices during normal business hours. Sellers may retain copies of the Acquired Records.

*11.4* *Risk of Loss.* As of the consummation of the Closing, beneficial ownership and the risk of loss of the Acquired Assets will pass from Sellers to Purchasers effective from and after the Effective Time.

**ARTICLE XII**
**TERMINATION**

    *12.1*    **Termination**. This Agreement and the transactions contemplated herein may be terminated at any time prior to Closing:

        (a)      by the mutual written agreement of the Parties;

        (b)      by Sellers, if Purchasers fail to pay timely the Deposit as required by **Section 3.2**;

        (c)      by Sellers, if a Purchaser has materially breached this Agreement and such breach causes any of the conditions to Closing set forth in **Section 10.2** not to be satisfied (or, if prior to Closing, is of such a magnitude or effect that it will not be possible for such condition to be satisfied); *provided, however*, in the case of a breach that is capable of being cured, other than and excluding any Willful Breach by a Purchaser, Purchasers shall have until 5:00 p.m. Houston, Texas time on the earlier of the Outside Date and the date that is ten (10) Business Days following receipt of notice thereof to cure such breach, and termination under this **Section 12.1(c)** shall not become effective unless Purchasers fail to cure such breach prior to the end of such period;

        (d)      by Purchaser, if a Seller has materially breached this Agreement and such breach causes any of the conditions to Closing set forth in **Section 10.3** not to be satisfied (or, if prior to Closing, is of such a magnitude or effect that it will not be possible for such condition to be satisfied); *provided, however*, in the case of a breach that is capable of being cured, other than and excluding any Willful Breach by a Seller, Sellers shall have until 5:00 p.m. Houston, Texas time on the earlier of the Outside Date and the date that is ten (10) Business Days following receipt of notice thereof to cure such breach, and termination under this **Section 12.1(d)** shall not become effective unless Sellers fail to cure such breach prior to the end of such period;

        (e)      by either Sellers or Purchasers, if the Closing has not occurred on or before 5:00 p.m. Houston, Texas time on October 18, 2023 (the "*Outside Date*");

        (f)      by either Sellers or Purchasers, if (i) the Bankruptcy Court shall enter an order approving a Competing Transaction and (ii) (A) Purchasers are not designated as the Back-Up Bidder or (B) Purchasers are designated as the Back-Up Bidder and such Competing Transaction is consummated;

        (g)      by Purchasers, upon the appointment of a trustee or examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code;

        (h)      by either Sellers or Purchasers, if the Bankruptcy Court entered an Order dismissing, or converting to a case under Chapter 7 of the Bankruptcy Code, the Bankruptcy Case, where such order was not requested, encouraged or supported by such Party seeking to terminate this Agreement pursuant to this **Section 12.1(h)**;

        (i)      by Purchasers, if the Bidding Procedures Order or the Sale Order is revoked or rescinded, or modified or amended in any respect, without the consent of Purchasers (which consent shall not be unreasonably withheld, conditioned, or delayed), and the Order revoking, rescinding or modifying the Bidding Procedures Order or the Sale Order shall not have been reversed or vacated within fourteen (14) days after the entry thereof; or

(j)      by either Sellers or Purchasers, if Sellers withdraw or seek authority to withdraw the Sale Motion at any time after the filing thereof, or announce any standalone plan of reorganization or liquidation, in each case with respect to the Acquired Assets;

*provided*, *however*, neither Sellers nor Purchasers (the "***Precluded Party***") shall have the right to terminate this Agreement (i) pursuant to **Section 12.1(c)** or **Section 12.1(d)**, if such Party is at such time in material breach of any of its representations, warranties, covenants, or agreements contained in this Agreement, or (ii) pursuant to **Section 12.1(e)**, if the other Party (A) is at such time not in material breach of any of its representations, warranties, covenants, or agreements contained in this Agreement, (B) is at such time entitled to terminate this Agreement pursuant to **Section 12.1(c)** or **Section 12.1(d)**, as applicable, and (C) has elected to so terminate this Agreement by delivering written notice thereof to the Precluded Party on or prior to the date on which the Precluded Party first notifies in writing of its intent to terminate pursuant to **Section 12.1(e)**.

**12.2     Effect of Termination**. In the event of termination, written notice thereof will be given to the other Party specifying the provision pursuant to which such termination is made. If this Agreement is terminated pursuant to any provision of **Section 12.1**, then, except as provided in this **Section 12.2** and except for the provisions of **Article I**, **Section 4.1(d)**, **Section 4.3(d)**, **Section 9.8**, **Section 12.2**, **Section 12.3**, **Section 14.6**, and **Article XV** (other than **Sections 15.2(b)**, **15.16**, **15.17**, **15.18**, and **15.19**), this Agreement shall forthwith become void and of no further force or effect and the Parties shall have no liability or obligation hereunder and Sellers shall thereafter be free to market, negotiate with and sell the Acquired Assets to any Third Party.  The Parties hereby agree as follows:

(a)      In the event that this Agreement is terminated by Purchasers or Sellers, for any reason pursuant to **Section 12.1**, other than termination pursuant to **Section 12.1(a)**, **Section 12.1(b)**, or **Section 12.1(c)**, in consideration for Purchasers having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Purchasers, in accordance with the terms hereof, the amount of the reasonable and documented expenses of Purchasers incurred in connection with the transactions contemplated hereby up to an aggregate amount of $500,000 (the "***Expense Reimbursement***"). The Expense Reimbursement shall be paid on the third Business Day following the date of such termination by wire transfer(s) in immediately available funds to one or more bank accounts of Purchasers (or any of its Affiliates) designated in writing by Purchasers to Sellers.

(b)      In addition to any payments that may be due pursuant to **Section 12.2(a)**, if this Agreement is terminated by either Sellers or Purchasers pursuant to **Section 12.1(f)** or **Section 12.1(j)**, Sellers shall, within three (3) Business Days of consummation of a Competing Transaction, pay to Purchasers the Break-Up Fee, such payment of the Break-Up Fee to be made by wire transfer(s) in immediately available funds to one or more bank accounts of Purchasers (or any of its Affiliates) designated in writing by Purchasers to Sellers.

(c)      The Parties acknowledge and agree that (A) the Parties have expressly negotiated the provisions of this **Section 12.2** and the payment of the Break-Up Fee and the Expense Reimbursement are integral parts of this Agreement, (B) in the absence of Sellers' obligations to make these payments, Purchasers would not have entered into this Agreement, and (C) the Break-Up Fee and the Expense Reimbursement shall constitute allowed superpriority administrative expense Claims pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code.

(d)      Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the entire Break-Up Fee and the Expense Reimbursement payable by Sellers pursuant to this Agreement.

(e)      The obligations of Sellers to pay the Break-Up Fee or the Expense Reimbursement shall survive the termination of this Agreement in accordance with **Section 12.1**.

(f)      If Sellers are entitled to terminate this Agreement pursuant to **Section 12.1(b)**, then Sellers may immediately terminate this Agreement and pursue any other Claim, right, or remedy against Purchasers available at Law or in equity, including a claim for damages.

(g)      Return of Deposit.

(i)      If this Agreement is terminated by Sellers pursuant to **Section 12.1(c)**, then Sellers shall have the right, as their sole and exclusive remedy and in lieu of all other damages, to terminate this Agreement pursuant to **Section 12.1(c)** and, in connection therewith, retain the Deposit as liquidated damages (and not as a penalty), free and clear of any claims thereon by Purchasers.

(ii)      If this Agreement is terminated for any reason other than as set forth in **Section 12.1(b)** or **Section 12.1(c)**, then Purchasers shall have no liability or obligation hereunder as a result of such termination, and the Deposit shall be returned to Purchasers via wire transfer of immediately available funds within three (3) Business Days of the date that this Agreement is terminated.

(iii)      **THE PARTIES ACKNOWLEDGE THAT THE EXTENT OF DAMAGES TO SELLERS OCCASIONED BY SUCH DEFAULT, FAILURE, INABILITY, OR REFUSAL BY PURCHASERS WOULD BE IMPOSSIBLE OR EXTREMELY IMPRACTICAL TO ASCERTAIN AND THAT THE AMOUNT OF THE DEPOSIT IS A FAIR AND REASONABLE ESTIMATE OF SUCH DAMAGES UNDER THE CIRCUMSTANCES.**

*12.3    Return of Documentation and Confidentiality.*   In addition to any obligations under the Confidentiality Agreement, upon termination of this Agreement, Purchasers shall promptly return or destroy (and provide written certification of such destruction) to HB2 all title, engineering, geological and geophysical data, environmental assessments and/or reports, maps, documents, and other information furnished by any Seller Party to any Purchaser Party or prepared by or on behalf of Purchasers in connection with their due diligence investigation of the Acquired Assets and the Purchaser Parties shall not retain any copies, extracts, or other reproductions in whole or in part of such documents and information. An officer of each Purchaser shall certify, on behalf of such Purchaser (and not in his or her individual capacity), such Purchaser's compliance with this **Section 12.3** to HB2 in writing.

## ARTICLE XIII
## TAX MATTERS

*13.1    Property and Production Taxes.*

(a)      Sellers shall be allocated and bear all Property and Production Taxes attributable to (i) any Tax period ending prior to the Effective Time and (ii) the portion of any Straddle Period ending immediately prior to the Effective Time.  Purchasers shall be allocated and bear all Property and Production Taxes attributable to (A) any Tax period beginning at or after the Effective Time and (B) the portion of any Straddle Period beginning at the Effective Time.

(b)      For purposes of determining the allocations described in **Section 13.1(a)**, (i) Property Taxes that are ad valorem, property, or other similar Property Taxes imposed on a periodic basis

and that are not based upon or related to sales or receipts or imposed on a transactional basis, shall be allocated based on the number of days in the Straddle Period that occurred before the Effective Time (in the case of Sellers) and on or after the Effective Time (in the case of Purchasers), (ii) Production Taxes that are based on actual production or severance, and any other similar Taxes applicable to Hydrocarbons produced from or attributable to the Acquired Assets, shall be allocated to the period in which the severance or production giving rise to such Production Taxes occurred, and (iii) Property and Production Taxes that are based upon or related to sales or receipts or imposed on a transactional basis (excluding Property and Production Taxes described in **clauses (i)** or **(ii)** of this **Section 13.1(b))**, shall be allocated to the period in which the transaction giving rise to such Property and Production Taxes occurred.

(c)     If the actual amount of a Property Tax or Production Tax is not determinable at the time an adjustment to the Base Purchase Price is to be made with respect to such Property Tax or Production Tax pursuant to **Section 3.3**, then (i) Sellers and Purchasers shall utilize the most recent information available in estimating the amount of such Property Tax or Production Tax for purposes of such adjustment and (ii) subsequent payment(s) will be made from Sellers to Purchasers or from Purchasers to Sellers, as applicable, thereafter (pursuant to **Section 3.5(i)** or **Section 14.1**) following determination of the actual amount of such Property Tax or Production Tax, so as to cause each of Sellers, on the one hand, and Purchasers, on the other hand, to bear the amount of such Property Tax or Production Tax that is allocable to it under this **Section 13.1**.

*13.2     Tax Reports and Returns.* Purchasers shall timely file all Tax Returns with respect to Property and Production Taxes and pay all Property and Production Taxes with respect to such Tax Returns for any Tax period that begins before the Effective Time or any Straddle Period (in each case, to the extent such Tax Returns are required to be filed after Closing). Each Seller shall promptly forward to Purchasers any reports or documents received by such Seller or its Affiliates after the Closing that relate to such Tax Returns, and provide any information in such Sellers' or its Affiliates possession or control that is necessary for Purchasers to file any such Tax Returns in accordance with this **Section 13.2**. Notwithstanding anything herein to the contrary, nothing in this **ARTICLE XIII** or elsewhere in this Agreement shall prohibit or prevent a Seller from ceasing operations or winding up its affairs following Closing.

*13.3     Transfer Taxes.* To the extent not eliminated pursuant to the application of Section 1146(a) and 1146(c) of the Bankruptcy Code, the Purchase Price excludes, and Purchasers shall be liable for the entire amount of any sales, use, excise, stock, stamp, documentary, filing, recording, registration, authorization, and similar Taxes, fees, transfer fees, and charges incurred or required to be paid by any of the Seller Parties or Purchaser Parties in connection with the Contemplated Transactions ("*Transfer Taxes*"). If required by applicable Law and to the extent not eliminated pursuant to the application of Section 1146(a) and 1146(c) of the Bankruptcy Code, Sellers will charge and collect any applicable sales Tax unless Purchasers provide a valid exemption or direct pay certificate. Purchasers and Sellers shall cooperate with one another in the preparation of any necessary Tax Returns and other related documentation with respect to such Transfer Taxes (including any exemption certificates and forms as each may request to establish an exemption from (or otherwise reduce) or make a report with respect to Transfer Taxes).

**ARTICLE XIV**
**ASSUMPTION; SURVIVAL**

*14.1     Assumption by Purchasers.* Upon the terms and conditions of this Agreement and the Sale Order, effective from and after Closing, each Purchaser assumes and hereby agrees to fulfill, perform, pay, and discharge (or cause to be fulfilled, performed, paid, and discharged) its *pro-rata* share of all Assumed Liabilities; *provided, however*, (x) such Purchaser does not assume, and the Assumed Liabilities do not include, the Specified Excluded Liabilities; and (y) such Purchaser's assumption of the Assumed Liabilities shall not in any way enlarge the rights of Third Parties relating thereto. Notwithstanding any provision in

48

this Agreement to the contrary, no Purchaser shall assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Specified Excluded Liabilities

**14.2     *No Third-Party Claims.*** Except as set forth in **Section 9.3**, any claim under this Agreement by any current or former Purchaser Party or Seller Party must be brought and administered by the applicable Party to this Agreement. Except as set forth in **Section 9.3**, no Person other than Sellers and Purchaser shall have any rights against Purchaser or any Seller under the terms of this Agreement except as may be exercised on its behalf by a Seller or a Purchaser.

**14.3     *Exclusive Remedy.*** Except for the remedies specified in **Section 15.20** and the Special Warranty (which, from and after Closing, are the Parties' sole and exclusive remedies against the other with respect to the Contemplated Transactions), effective as of the Closing, each Purchaser and each Seller hereby waives any other Claims or remedies that such Party may have against the other Party or their Affiliates, whether in law or equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein, (ii) the Acquired Assets, (iii) the Assumed Liabilities, or (iv) the Contemplated Transactions. The Parties acknowledge and agree that if this Agreement is terminated for any reason, the provisions of **Section 12.2** shall be the sole and exclusive remedies of the Parties for any breach of the representations, warranties, covenants or agreements contained herein occurring prior to such termination. No Party or Person is asserting the accuracy, completeness, or truth of any representation and warranty set forth in this Agreement; rather the Parties have agreed that should any representation or warranty of any Party prove inaccurate, incomplete, or untrue, the other Party shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies, or causes of action (whether in Law or in equity or whether in contract or in tort or otherwise) are permitted to any Party hereto as a result of the failure, breach, inaccuracy, incompleteness, or untruth of any such representation and warranty. No Party shall attempt to void the effect of any release set forth in this Agreement made by such Party by later arguing that at the time of the release it did not fully appreciate the extent of any Losses so released.

**14.4     *Survival***.

(a)     Except for the Special Warranty, all representations and warranties of the Parties contained in this Agreement or in any other Transaction Document shall, in each case, expire and terminate at the Closing.

(b)     All covenants and agreements of the Sellers contained in this Agreement shall (i) with respect to each such covenant and agreement required to be complied with or performed at or prior to the Closing, expire and terminate at the Closing, and (ii) with respect to each such covenant and agreement required to be complied with or performed after the Closing, survive the Closing and expire and terminate on the earlier of (A) such time as such covenant or agreement has been fully performed or (B) 5:00 p.m., Houston, Texas time on the Final Determination Date or, if Sellers are an owing Party under **Section 3.5(i)**, then at such time as Sellers have paid such amounts to Purchasers. All covenants and agreements of the Purchasers contained in this Agreement shall survive the Closing and remain in full force and effect until fully performed.

(c)     Notwithstanding anything to the contrary, nothing in this **Section 14.4** or elsewhere in this Agreement shall prohibit or prevent a Seller from ceasing operations or winding up its affairs following Closing.

**14.5     *Waiver of Right to Rescission***. Each Seller and each Purchaser acknowledge that, following Closing, specific performance or the payment of money, as limited by the terms of this Agreement, shall be adequate compensation for breach of the Special Warranty or any representation,

49

warranty, covenant, or agreement contained herein or for any other claim arising in connection with or with respect to the Contemplated Transactions. As such, following Closing, Purchasers and Sellers each waive any right to rescind this Agreement or any of the Contemplated Transactions.

**14.6    *Non-Compensatory Damages.*** NONE OF THE PURCHASER PARTIES NOR SELLER PARTIES SHALL BE ENTITLED UNDER THIS AGREEMENT OR ANY TRANSACTION DOCUMENT TO RECOVER FROM ANY SELLER OR PURCHASER, OR THEIR RESPECTIVE AFFILIATES, ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, REMOTE OR SPECULATIVE DAMAGES, OR DAMAGES FOR LOST PROFITS OF ANY KIND (COLLECTIVELY, "***NON-COMPENSATORY DAMAGES***") ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS, EXCEPT TO THE EXTENT ANY SUCH PARTY SUFFERS SUCH DAMAGES (INCLUDING COSTS OF DEFENSE AND REASONABLE ATTORNEY'S FEES INCURRED IN CONNECTION WITH DEFENDING OF SUCH DAMAGES) TO A THIRD PARTY, WHICH DAMAGES (INCLUDING COSTS OF DEFENSE AND REASONABLE ATTORNEY'S FEES INCURRED IN CONNECTION WITH DEFENDING AGAINST SUCH DAMAGES) SHALL NOT BE EXCLUDED BY THIS PROVISION AS TO RECOVERY HEREUNDER. SUBJECT TO THE PRECEDING SENTENCE, PURCHASERS, ON BEHALF OF EACH OF THE PURCHASER PARTIES, AND SELLERS, ON BEHALF OF EACH OF THE SELLER PARTIES, WAIVE ANY RIGHT TO RECOVER ANY NON-COMPENSATORY DAMAGES ARISING IN CONNECTION WITH OR WITH RESPECT TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

## ARTICLE XV
## MISCELLANEOUS

**15.1    *Legal Fees.*** If either Sellers or Purchasers institute a Proceeding against the other such Party relating to the provisions of this Agreement, the Party(ies) to such Proceeding which does not prevail will reimburse the prevailing Party(ies) therein (regardless of whether the prevailing Party(ies) is the plaintiff or the defendant in such Proceeding) for the reasonable expenses of attorneys' fees and disbursements incurred by the prevailing Party(ies). The applicable Governmental Authority shall be empowered to designate the prevailing Party for purposes of this **Section 15.1**.

**15.2    *Expenses.***

(a)    Except as otherwise specifically provided, all fees, costs, and expenses incurred by Sellers or Purchasers in negotiating this Agreement or in consummating the Contemplated Transactions shall be paid by the Person incurring the same, including, legal and accounting fees, costs, and expenses.

(b)    All required documentary, filing, and recording fees and expenses in connection with the filing and recording of the assignments, conveyances, or other instruments required to convey title to the Acquired Assets to Purchasers (including the Assignment) shall be borne by Purchasers.

**15.3    *Governing Law.*** Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all Claims or causes of action (whether in contract, tort, or based on any other legal theory) that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution, or performance of this Agreement (including any claim or cause of action based upon, arising out of, or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by and construed in accordance with the internal laws of the State of Texas applicable to agreements made and to be performed entirely within such State, without regard to any choice-of-law or conflicts-of-law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas.

**15.4    *Jurisdiction and Venue.*** EXCEPT AS OTHERWISE PROVIDED IN **SECTION 3.5** OR **SECTION 5.5**, ANY PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE OTHER

TRANSACTION DOCUMENTS, THE INTERPRETATION OF THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS, OR THE ENFORCEMENT OF ANY PROVISION OF THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS (WHETHER IN LAW, EQUITY, OR OTHER THEORY) SHALL BE BROUGHT OR OTHERWISE COMMENCED IN THE BANKRUPTCY COURT; PROVIDED THAT, IF THE BANKRUPTCY CASE IS CLOSED AND HAS NOT BEEN REOPENED AT THE REQUEST OF A PARTY, SUCH PROCEEDING SHALL BE BROUGHT OR OTHERWISE COMMENCED IN ANY STATE COURT OR THE UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS. EACH PARTY CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS (AND THE APPELLATE COURTS THEREOF) AND AGREES NOT TO COMMENCE ANY SUCH PROCEEDING EXCEPT IN SUCH COURTS. EACH PARTY AGREES NOT TO ASSERT (BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE), AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES IN ANY SUCH PROCEEDING COMMENCED IN SUCH COURT, ANY OBJECTION OR CLAIM THAT SUCH PARTY IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SUCH COURT OR THAT SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. IF SUCH COURTS REFUSE TO EXERCISE JURISDICTION HEREUNDER, THEN THE PARTIES AGREE THAT SUCH JURISDICTION SHALL BE PROPER IN ANY COURT IN WHICH JURISDICTION MAY BE OBTAINED. EACH PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS BY DELIVERY OF THE COPY OF THE PROCESS PURSUANT TO THE NOTICE PROVISIONS SET FORTH IN SECTION 15.7 WITH THE SAME FORCE AND EFFECT AS IF SUCH SERVICE HAD BEEN MADE WITHIN THE STATE OF TEXAS.

**15.5    *Waiver of Jury Trial.*** EACH PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ITS RIGHT TO A JURY TRIAL IN ANY LAWSUIT, ACTION, OR PROCEEDING BETWEEN OR AMONG THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

**15.6    *Time of the Essence; Calculation of Time.*** Time is of the essence in this Agreement. If the date specified in this Agreement for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date that is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day that is a Business Day.

**15.7    *Notices.***

(a)    <u>Addresses</u>. All notices under this Agreement (other than those permitted or required under **Section 9.1(c)**) shall be in writing and shall be delivered either personally, by internationally recognized overnight courier, by electronic mail, or by registered or certified mail (return-receipt requested and postage prepaid), in any such case to the other Party at its addresses set forth below:

| | |
|---|---|
| <u>If to Sellers</u>: | c/o HB2 Origination, LLC<br>3322 west end Avenue, Suite 450<br>Nashville, TN 37203<br>Attention:  Chrystie Holmstrom<br>Email: cholmstrom@alpsummit.com |
| <u>With a copy to</u>: | Huron Consulting Services LLC<br>1166 Avenue of the Americas, Suite 300<br>New York, NY 10036<br>Attention:  Ryan Bouley<br>Email: rbouley@hcg.com |
| With a copy to: | Porter Hedges LLP |

|                                              |                                                        |
|----------------------------------------------|--------------------------------------------------------|
| (which shall not<br>constitute notice)       | 1000 Main Street, 36th Floor<br>Houston, Texas 77002<br>Attention: Jeremy A. Mouton; Eric M. English<br>E-mail: jmouton@porterhedges.com;<br>eenglish@porterhedges.com |
| If to SIEC:                                  | San Isidro Energy Company II, LLC<br>400 FM 534<br>Sandia, Texas 78383<br>Attention:  Paul Dirks<br>Email: pdirks@towersoftexas.com |
| With a copy to:<br>(which shall not<br>constitute notice) | Akin Gump Strauss Hauer & Feld LLP<br>2300 N. Field Street, Suite 1800<br>Dallas, Texas 75201<br>Attention: Wesley P. Williams; Sarah Schultz<br>Email:  WilliamsW@akingump.com;<br>sschultz@akingump.com |
| If to Ageron:                                | Ageron Holdings, LLC<br>1250 NE Loop 410 s-500<br>San Antonio, Texas 78209<br>Attention:  Bruce C. Gates<br>Email: bcgates@ageronllc.com |
| If to Needmore:                              | Needmore Minerals, LLC<br>3900 N. McColl Road<br>McAllen, Texas 78501<br>Attention:  Greg LaMantia<br>Email: Greg.lamantia@lnfdist.com |

(b)      When Notice Received. Any such notice shall be deemed to have been delivered and received: (i) in the case of personal delivery, on the date of actual receipt by the applicable individual designated if such receipt occurs before 5:00 p.m. Houston, Texas time on a Business Day (otherwise on the next Business Day after such receipt); (ii) in the case of electronic transmission, on the date affirmative electronic confirmation of receipt from the receiving Party has been received by the transmitting Party if such confirmation of receipt is received before 5:00 p.m. Houston, Texas time on a Business Day (otherwise on the next Business Day after such confirmation is received), *provided* that an automated response from the email account or server of the receiving Party shall not constitute an affirmative confirmation of receipt; (iii) in the case of an internationally recognized overnight courier, on the date of actual receipt by the applicable individual designated if such receipt occurs before 5:00 p.m. Houston, Texas time on a Business Day (otherwise on the next Business Day after such receipt); and (iv) in the case of mailing by registered or certified mail (return-receipt requested), on the date of actual receipt by the applicable individual designated if such receipt occurs before 5:00 p.m. Houston, Texas time on a Business Day (otherwise on the next Business Day after such receipt).

(c)      Change of Address. A Party may change its notice address by notice to the other Party in accordance with this **Section 15.7**.

### 15.8     *Entire Agreement; Conflicts.*

(a)     <u>Entire Agreement</u>. This Agreement (including the Appendix, Exhibits, and Schedules), the Confidentiality Agreement, and (when executed) the other Transaction Documents contain the entire agreement and understanding between the Parties with respect to the subject matter hereof and thereof, and all prior and contemporaneous negotiations, understandings, and agreements between the Parties on the matters contained herein and therein are expressly merged into and superseded by this Agreement, the Confidentiality Agreement, and (when executed) the other Transaction Documents. The provisions of this Agreement, the Confidentiality Agreement, and (when executed) the other Transaction Documents may not be explained, supplemented, or qualified through evidence of trade usage or a prior course of dealings. No Party shall be liable or bound to any other Party in any manner by any representations, warranties, covenants, or agreements relating to such subject matter except as specifically set forth in this Agreement, the Confidentiality Agreement, and (when executed) the other Transaction Documents.

(b)     <u>Conflicts</u>. In the event of a conflict between the terms and provisions of this Agreement and the terms and provisions of any exhibit hereto or any Transaction Document, the terms and provisions of this Agreement shall govern and control; *provided*, *however*, the inclusion in any of the exhibits hereto or any Transaction Document of terms and provisions not addressed in this Agreement shall not be deemed a conflict, and all such additional provisions shall be given full force and effect, subject to the provisions of this **Section 15.8(b)**.

### 15.9     *Amendments and Waivers.*

(a)     <u>Amendments</u>. This Agreement may not be amended except by a written agreement of the Parties that is identified as an amendment to this Agreement.

(b)     <u>Waivers; Rights Cumulative</u>. Except for waivers specifically provided for in this Agreement, rights under this Agreement may not be waived except by an instrument in writing signed by the Party to be charged with the waiver. No waiver of, or consent to a change in, or modification of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in, or modification of other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided. The rights of each Seller and Purchaser under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

### 15.10     *Binding Effect; Assignment.*

(a)     <u>Binding Effect</u>. This Agreement shall be binding upon the Parties and their respective successors and permitted assigns, and shall inure to the benefit of the Parties and their respective successors and permitted assigns. In the event that a Purchaser sells, transfers, conveys, assigns, grants, or otherwise disposes of all or any part of the Acquired Assets, then (i) each such sale, transfer, conveyance, assignment, or other disposition shall be made expressly subject to this Agreement and each instrument of conveyance delivered in connection therewith shall explicitly state such and (ii) the assignee shall expressly assume all obligations of such Purchaser arising hereunder to the extent related to the Acquired Assets so assigned. To the extent that such assignee assumes all such obligations from such Purchaser, any such sale, transfer, conveyance, assignment, or other disposition of the Acquired Assets shall relieve such Purchaser from its obligations under this Agreement, whether arising before or after the date of such sale, transfer, conveyance, assignment, or other disposition.

(b)      Assignments Prohibited. Subject to **Section 15.10(a)**, no Party may assign this Agreement or any of its rights or interests under this Agreement, or delegate any of its obligations under this Agreement, without the prior written consent of the other Party, which consent may be withheld in such other Party's sole and absolute discretion, and any attempt to do so shall be void. In the event the other Party consents to any such assignment, such assignment shall not relieve the assigning Party of any obligations and responsibilities hereunder.

*15.11    Counterparts.* This Agreement may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by electronic image scan transmission in .pdf shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by electronic image scan transmission in .pdf shall be deemed to be their original signatures for all purposes.

*15.12    Third-Party Beneficiaries.* This Agreement confers certain indirect rights and remedies upon the Seller Parties and the Purchaser Parties, as applicable, as set forth in **Section 4.1(d)** and **Section 9.3**, each of which is, subject to the terms of **Section 14.2**, an express and intended indirect third-party beneficiary of such Section and Article, *however*, no other Person (other than the Parties and their respective successors and permitted assigns) has any rights or remedies under this Agreement or is an intended beneficiary of any provision of this Agreement. Notwithstanding the foregoing: (a) the Parties reserve the right to amend, modify, terminate, supplement, or waive any provision of this Agreement or this entire Agreement without the consent or approval of the other Seller Parties or the other Purchaser Parties; and (b) no Party hereunder shall have any direct liability to any permitted third party beneficiary, nor shall any permitted third party beneficiary have any right to exercise any rights hereunder for such third-party beneficiary's benefit except to the extent such rights are brought, exercised, and administered by a Party hereto in accordance with **Section 14.2**.

*15.13    Severability.* If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any Seller or Purchaser. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible. The invalidity or unenforceability of any provision of this Agreement in any jurisdiction or with respect to any event or circumstance shall not affect the validity or enforceability of such provision in any other jurisdiction or with respect to any other event or circumstance, nor shall the invalidity or unenforceability of any provision of this Agreement with respect to any Person affect the validity or enforceability of such provision with respect to any other Person.

*15.14    DTPA.* Each Purchaser certifies that it is not a "consumer" within the meaning of the Texas Business and Commerce Code, as amended and any similar Laws related to the protection of consumers applicable in any other jurisdictions (the "***DTPA***"). Each Purchaser covenants, for itself and for and on behalf of any successor or assignee, that, if the DTPA is applicable to this Agreement, AFTER CONSULTATION WITH ATTORNEYS OF SUCH PURCHASER'S OWN SELECTION, SUCH PURCHASER HEREBY VOLUNTARILY WAIVES AND RELEASES ALL OF PURCHASER'S RIGHTS AND REMEDIES UNDER THE DTPA AS APPLICABLE TO SELLERS AND SELLERS' SUCCESSORS AND ASSIGNS.

*15.15    Headings; Mutuality.* The headings and captions herein are inserted for convenience of reference only and are not intended to govern, limit, or aid in the construction of any term or provision

hereof. The rights and obligations of each Party shall be determined pursuant to this Agreement. Each Seller and Purchaser has had the opportunity to exercise business discretion in relation to the negotiation of the details and terms of the transaction contemplated hereby. This Agreement is the result of arm's length negotiations from equal bargaining positions. It is the intention of the Parties that every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Party (notwithstanding any rule of Law requiring an agreement to be strictly construed against the drafting Party) and no consideration shall be given or presumption made, on the basis of who drafted this Agreement or any particular provision thereof, it being understood that the Parties to this Agreement are sophisticated and have had adequate opportunity and means to exercise business discretion in relation to the negotiation of the details of the transaction contemplated hereby and retain counsel to represent their interests and to otherwise negotiate the provisions of this Agreement.

*15.16   Removal of Name.* As promptly as practicable, but in any case within sixty (60) days after the Closing Date, Purchasers shall eliminate any reference to the names "*Alpine*", "*Alpine Summit*", "*HB2*", "*HB2 Origination*", "*Ageron*", "*Ironroc*", and any variations, extensions, or combinations of such names from the Acquired Assets, and shall have no right to use any logos, trade names, trademarks, service marks, and other marks belonging to any Seller, Operator, or any of their respective Affiliates.

*15.17   Litigation Support.* For so long as any Party actively is contesting or defending against any Claim or Proceeding brought by or against any Third Party in connection with (a) this Agreement or the Contemplated Transactions or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction, on or before the Closing Date relating to the Acquired Assets, the other Party shall reasonably cooperate with the contesting or defending Party and its counsel in the contest or defense at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is entitled to indemnification for the foregoing under **Section 4.1(d)** or **Section 9.3**).

*15.18   Further Assurances.* From time to time after the Closing, Sellers shall execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, to Purchasers, and Purchasers shall execute, acknowledge, and deliver, and cause to be executed, acknowledged, and delivered to Sellers, such further documents and instruments, and take such other and further actions, as may be reasonably requested by each such Party in order to convey and deliver the Acquired Assets to Purchasers, to accomplish the orderly transfer of the Acquired Assets and operation thereof to Purchasers in the manner contemplated by this Agreement, to more effectively assure to Sellers the full assumption by Purchasers of, and release of Sellers from, the Assumed Liabilities, and to otherwise fully accomplish the Contemplated Transactions, in each case, subject to the terms and conditions in this Agreement. Notwithstanding anything herein to the contrary, nothing in this **Section 15.18** shall prohibit or prevent a Seller from ceasing operations or winding up its affairs following Closing.

*15.19   Filings, Notices, and Certain Governmental Approvals.* Promptly after Closing, Purchasers shall (a) record all assignments of Acquired Assets executed at Closing in the records of the applicable Governmental Authorities, (b) if applicable, send notices to vendors supplying goods and services for the Acquired Assets and to the operator of such Acquired Assets of the assignment of such Acquired Assets to Purchasers, (c) actively pursue the unconditional approval of all applicable Governmental Authorities and other Persons of the assignment of the Acquired Assets to Purchasers, and (d) actively pursue all other consents and approvals that may be required in connection with the assignment of the Acquired Assets to Purchasers and the assumption of the Assumed Liabilities by Purchasers, that, in each case, shall not have been obtained prior to Closing. Each Purchaser obligates itself to take any and all action required by any Governmental Authority in order to obtain such unconditional approval, including the posting of any and all bonds or other security that may be required in excess of its existing lease, pipeline, or area-wide bond.

**15.20   Specific Performance.**  After Closing, in the event of any actual or threatened breach of any of the covenants under this Agreement required to be performed by a Party after the Closing, the Party who is or is to be thereby aggrieved shall retain any right at law or in equity to seek specific performance and injunctive relief with respect to a breach or threatened breach of such covenants.  Any requirements for the securing or posting of any bond with respect to such a remedy are waived by the Parties.

**15.21   Non-Recourse Parties**. Notwithstanding anything to the contrary that may be expressed or implied in this Agreement or any other Transaction Document, each Purchaser, on behalf of its Affiliates and its and their Entity Representatives, and each Seller, on behalf of its Affiliates and its and their Entity Representatives, covenants, agrees, and acknowledges that no Person other than Sellers (and their successors or assignees, as applicable) and Purchasers (and their successors or assignees, as applicable) has any obligation hereunder and that, neither any Purchaser, its Affiliates, or its or their Entity Representatives nor any Seller, its Affiliates, or its or their Entity Representatives, as applicable, have any right of recovery under this Agreement or any other Transaction Document against, and no personal liability under this Agreement or any Transaction Document shall attach to, any of Sellers' or Purchasers' former, current, or future equity holders, controlling persons, directors, officers, employees, general or limited partners, members, managers, Affiliates, or agents, any Persons who have provided or do provide debt financing or equity financing, investments, contributions, issuances, or placements in connection with any debt or equity financing, including any Persons named in any debt commitment letters, joinder agreements, indentures or credit agreements, contribution agreements, equity purchase agreements, or similar agreements entered into in connection therewith or relating thereto, or any former, current, or future equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, Affiliate, or agent of any of the foregoing (collectively, each of the foregoing, but not including Sellers or Purchasers, a "**Non-Recourse Party**"), through a Purchaser or a Seller, as applicable, or otherwise, whether by or through attempted piercing of the corporate, limited partnership, or limited liability company veil, by or through a claim by or on behalf of any Purchaser or any Seller, as applicable, against any Non-Recourse Party, by the enforcement of any assessment, or by any legal or equitable proceeding, by virtue of any applicable Law, whether in contract, tort or otherwise. For the avoidance of doubt, Operator is a Non-Recourse Party of Sellers for all purposes of this Agreement and any other Transaction Document.

**15.22   Liquidating Trustee**. If at any time Sellers liquidate or otherwise have a trustee or other representative appointed by the Bankruptcy Court, then such trustee or other representative shall be entitled to exercise the rights of Sellers under this Agreement.

**15.23   Purchasers Representative**. For purposes of this Agreement, Purchasers, without any further action, shall be deemed to have appointed, and do hereby irrevocably appoint, SIEC as their representative and as their attorney-in-fact for and on behalf of Purchasers (both individually and collectively) with the power and authority to bind Purchasers with respect to the exercise of any decision, right, consent, election, or other action that any Purchaser is required or permitted to make or take under the terms of this Agreement, including any amendment hereof (the "**Purchaser Delegated Matters**"), and Sellers shall be fully protected in relying on and may conclusively rely on the decisions of SIEC without any investigation or inquiry, in its capacity as representative of Purchasers, with respect to all Purchaser Delegated Matters and Sellers shall have no Liability to the Purchasers with respect to such reliance.  For the avoidance of doubt, notwithstanding anything to the contrary contained herein, Purchasers will be treated as a single party for purposes of any notice, election, exercise of a right, consent or similar action to be made by Purchasers under this Agreement.

*[Signature page follows.]*

IN WITNESS WHEREOF, each Seller has executed this Agreement as of the Execution Date.

**SELLERS:**

**HB2 Origination, LLC**

By: _____
Name:   Bill Wicker
Title:    Chief Investment Officer

**Ageron Energy II, LLC**

By: _____
Name:   Bill Wicker
Title:    Chief Investment Officer

IN WITNESS WHEREOF, Purchasers has executed this Agreement as of the Execution Date.

**PURCHASERS:**

**San Isidro Energy Company II, LLC**

By: _____
Name:  Blackstone Dilworth
Title:   Manager

**Ageron Holdings, LLC**

By: _____
Name:  Bruce C. Gates
Title:   Managing Member

**Needmore Minerals, LLC**

By: _____
Name:  Greg LaMantia
Title:   Manager

IN WITNESS WHEREOF, Purchasers has executed this Agreement as of the Execution Date.

**PURCHASERS:**

**San Isidro Energy Company II, LLC**

By: _____
Name:  Blackstone Dilworth
Title:   Manager

**Ageron Holdings, LLC**

By: _____
Name:  Bruce C. Gates
Title:   Managing Member

**Needmore Minerals, LLC**

By: _____
Name:  Greg LaMantia
Title:   Manager

IN WITNESS WHEREOF, Purchasers has executed this Agreement as of the Execution Date.

**PURCHASERS:**

**San Isidro Energy Company II, LLC**

By:    _____

Name:  Blackstone Dilworth

Title:   Manager

**Ageron Holdings, LLC**

By:    _____

Name:  Bruce C. Gates

Title:   Managing Member

**Needmore Minerals, LLC**

By:    _____

Name:  Greg LaMantia

Title:   Manager

# APPENDIX A
# DEFINED TERMS

<u>Certain Defined Terms</u>. As used in the Agreement, the following terms have the meanings set forth below:

"***Accounting Referee***" has the meaning specified in **<u>Section 3.5(d)</u>**.

"***Accrual Basis***" means the accrual method of accounting under which obligations, expenses, costs, and benefits are regarded as attributable to the period in which the liability for the obligations, expenses, or costs is incurred, or the right to the benefits is earned, and regardless of when the foregoing are due, owing, invoiced, paid, and/or received.

"***Acquired Assets***" has the meaning specified in **<u>Section 2.2</u>**.

"***Acquired Contracts***" has the meaning specified in **<u>Section 2.2(i)</u>**.

"***Acquired Data***" has the meaning specified in **<u>Section 2.2(k)</u>**.

"***Acquired Easements***" has the meaning specified in **<u>Section 2.2(e)</u>**.

"***Acquired Leases***" has the meaning specified in **<u>Section 2.2(a)</u>**.

"***Acquired Personal Property***" has the meaning specified in **<u>Section 2.2(h)</u>**.

"***Acquired Properties***" has the meaning specified in **<u>Section 2.2(c)</u>**.

"***Acquired Real Estate***" has the meaning specified in **<u>Section 2.2(g)</u>**.

"***Acquired Records***" has the meaning specified in **<u>Section 2.2(l)</u>**.

"***Acquired Wells***" has the meaning specified in **<u>Section 2.2(c)</u>**.

"***AFE***" has the meaning specified in **<u>Section 7.14</u>**.

"***Affiliate***" means, with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. As used in this definition, the word "***control***" (and the words "***controlled by***" and "***under common control with***") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"***Agreement***" has the meaning specified in the introductory paragraph.

"***Allocated Value***" has the meaning specified in **<u>Section 3.6</u>**.

"***Applicable Preferential Right***" has the meaning specified in **<u>Section 9.4(c)</u>**.

"***Assignment***" means the Assignment, Bill of Sale and Conveyance from Sellers to Purchasers substantially in the form of **<u>Exhibit C</u>**.

"**Assumed Environmental Liabilities**" means any and all Claims and Losses (including any civil fines and penalties, personal injury, illness, or death of any natural person, any damage to, or destruction or loss or diminution in value of, any property, and any costs and expenses for the modification, repair, or replacement of any facilities on the Lands), arising out of or relating to the Acquired Assets, the condition, ownership, maintenance, or use of the Acquired Assets, or Operations on or with respect to the Acquired Assets, by any Person, whether before, on, or after the Effective Time, in any way: (a) arising under any past, present, or future Environmental Law or any Permit issued under any past, present, or future Environmental Law, including any violation, breach, or noncompliance with any such Environmental Law or any such Permit, and contribution obligations under CERCLA; (b) arising out of or relating to the assessment, clean-up, removal, or other Remediation of any Hazardous Material or other waste or materials of any kind, including but not limited to NORM; (c) arising out of or relating to any Release of Hazardous Materials or other contamination or pollution of the Environment; or (d) arising out of or related to any other Environmental Matter with respect to the Acquired Assets.

"**Assumed Executory Contract**" has the meaning specified in **Section 9.13(c)**.

"**Assumed Liabilities**" means all Claims and Losses (whether known or unknown or absolute or contingent) resulting from, arising out of or in connection with, attributable to, based upon, or relating to the following: (a) the Acquired Assets or the use, ownership, or operation thereof to the extent such Claims or Losses are incurred or arose on or after the Closing Date; (b)(i) all Liabilities for the payment of Property and Production Taxes allocated to Purchasers under **Section 13.1** (taking into account, and without duplication of, such Taxes effectively borne by Purchasers as a result of the adjustments to the Purchase Price made pursuant to **Section 3.3** or **3.5** (as applicable)); (ii) all Liabilities for payment to Royalty owners, working interest owners, and other interest owners; (iii) all Liabilities for the payment of Property Expenses; and (iv) all Liabilities under Acquired Leases, Acquired Easements, Acquired Contracts, and applicable Laws, in each case of this subpart (b), to the extent attributable to the Acquired Properties or the ownership or operation thereof during the period from and after the Effective Time; and (c)(i) all Assumed Suspense Liabilities; (ii) all Assumed Environmental Liabilities; (iii) all Plugging and Abandonment Obligations; (iv) all Liabilities with respect to Production Imbalances, Pipeline Imbalances, or make-up obligations; and (v) all Cure Costs, in each case of this subpart (c), regardless of whether such Claims or Losses are incurred or arose prior to, on or after the Closing Date; *provided*, *however*, "**Assumed Liabilities**" does not include any Specified Excluded Liabilities.

"**Assumed Suspense Liabilities**" has the meaning specified in **Section 9.7**.

"**Auction**" means the auction for the sale of the Acquired Assets, if any, to be conducted in accordance with the Bid Procedures.

"**Austin Chalk Formation**" means the geological formation commonly known as the Austin Chalk Formation, which includes the stratigraphic equivalent of that certain formation found in the San Roman 101H Acquired Well, API # 42-479-44505, located in Webb County, Texas, with the top thereof found at a measured depth of 11,024' to the base thereof found at a measured depth of 11,644', in each case, as shown in the gamma ray log for the foregoing Acquired Well, recognizing that the actual depths of the top and the base of such formation will vary across the Lands.

"**Background Materials**" has the meaning specified in **Section 8.10**.

"**Back-Up Bidder**" means the bidder for the Acquired Assets, determined by Sellers, to have made the next-highest or otherwise second-best bid for the Acquired Assets in accordance with the Bid Procedures.

"***Bankruptcy Case***" has the meaning specified in the recitals.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"***Bankruptcy Court***" has the meaning specified in the recitals.

"***Base Purchase Price***" has the meaning specified in **Section 3.1**.

"***Bid Procedures***" means the Bidding Procedures attached to the Bid Procedures Order as Exhibit 1.

"***Bid Procedures Order***" means the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. 228].

"***Break-up Fee***" means an amount equal to three percent (3%) of the Base Purchase Price.

"***Business Day***" means any day other than a Saturday, Sunday, or a day on which banks in the State of Texas are authorized or obligated to close.

"***Casualty Loss***" means (a) any damage to or destruction of any Acquired Wells that occurs as a result of acts of God, fire, explosion, terrorist attack, earthquake, windstorm, flood, drought, or similar occurrence or (b) a taking in condemnation or under right of eminent domain of any Acquired Property, in the case of each of **clauses (a)** and **(b)** of this definition, (i) solely to the extent such individual Casualty Loss event or taking occurs after the Effective Time and prior to Closing, (ii) without regard to any related insurance proceeds, and (iii) specifically excluding, for the avoidance of doubt, changes in market conditions, including product and commodities prices, the availability of supply and distribution channels, production declines, adverse conditions or changes in production characteristics, wellbore failures arising or occurring during drilling or completion, or reworking or re-completion or production operations, or any other downhole conditions of any wells, including any well watering out, or experiencing a collapse in the casing or sand infiltration, and depreciation through ordinary wear and tear.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

"***Claim***" means any notice, claim, demand, allegation, cause of action, chose in action, or other communication alleging or asserting Liability or seeking contribution, indemnification, cost recovery, or compensation for Losses or injunctive or other equitable relief.

"***Closing***" has the meaning specified in **Section 11.1**.

"***Closing Amount***" has the meaning specified in **Section 3.4(b)**.

"***Closing Date***" has the meaning specified in **Section 11.1**.

"***Closing Payment***" has the meaning specified in **Section 3.4(b)**.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Commitment Letters***" has the meaning specified in **Section 9.16**.

"***Competing Transaction***" means any transaction (or series of transactions), involving the direct or indirect sale, transfer or other disposition of all or any portion of the Acquired Assets to a purchaser or purchasers other than Purchasers, including any restructuring, reorganization, merger, or other transaction of any kind, the consummation of which would be substantially inconsistent with the Contemplated Transactions. For the avoidance of doubt, a liquidation of Sellers' assets under chapter 7 of the Bankruptcy Code shall not constitute a "***Competing Transaction***".

"***Confidentiality Agreement***" means (a) the Confidentiality Agreement, dated as of July 27th, 2023, by and between HB2 and SIEC; and (b) the Confidentiality Agreement, dated as of July 28th, 2023, by and between HB2 and Ageron Energy, LLC.

"***Contemplated Transactions***" means the purchase and sale of the Acquired Assets, the assumption of the Assumed Liabilities, and the other transactions provided by this Agreement or any of the other Transaction Documents.

"***Contract Notice***" has the meaning specified in **Section 9.13(e)**.

"***COPAS***" means the Council of Petroleum Accountant Societies of North America.

"***Cure Costs***" has the meaning specified in **Section 9.13(a)**.

"***Customary Post-Closing Consents***" means all rights to consent by, required notices to, filings with, or other actions by Governmental Authorities in connection with the sale, disposition, transfer, or conveyance of federal, state, tribal, or other governmental oil and gas leases or interests therein or related thereto, or the transfer of operations of any wells, in each case, where the same are customarily obtained subsequent to the assignment, disposition, or transfer of such oil and gas leases or interests therein, or such operations.

"***Data Room***" means the virtual data room hosted by Houlihan Lokey Capital, Inc. pursuant to which Background Materials and other information related to the Acquired Assets and/or Contemplated Transactions have been and are being disclosed to Purchasers' Entity Representatives and consultants.

"***Defensible Title***" has the meaning specified in **Section 5.1**.

"***Deposit***" has the meaning specified in **Section 3.2**.

"***Designation Deadline***" has the meaning specified in **Section 9.13(d)**.

"***DTPA***" has the meaning specified in **Section 15.14**.

"***Due Diligence Review***" has the meaning specified in **Section 4.1(a)**.

"***Eagle Ford Formation***" means the geological formation commonly known as the Eagle Ford Formation, which includes the stratigraphic equivalent of that certain formation found in the San Roman 101H Acquired Well, API # 42-479-44505, located in Webb County, Texas, with the top thereof found at a measured depth of 11,644' to the base thereof found at a measured depth of 11,850', in each case, as shown in the gamma ray log for the foregoing Acquired Well, recognizing that the actual depths of the top and the base of such formation will vary across the Lands.

"***Easement***" means any easement, right-of-way, license, servitude, surface lease, surface use agreement, or other similar asset, right, or interest in real property.

APPENDIX A
4

"***Effective Time***" means 12:00 a.m., Houston, Texas time on the Closing Date.

"***Entity***" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company, or joint stock company), firm, society, or other incorporated or unincorporated enterprise, association, organization, or entity.

"***Entity Representative***" means, with respect to any Entity, such Entity's directors, partners, managers, members, stockholders, officers, employees, agents, advisors, and attorneys.

"***Environment***" means soil, land surface, or subsurface strata, surface waters, groundwaters, stream sediments, ambient and other air, atmosphere, plant and animal life, or other environmental medium or natural resource.

"***Environmental Assessment***" has the meaning specified in **Section 4.3(a)**.

"***Environmental Law***" means any present or future Law relating to: (a) protection of human health or the Environment or workplace safety or occupational health; (b) the presence, use, production, generation, handling, transportation, treatment, recycling, storage, importing, labeling, testing, Release, cleanup or control of Hazardous Materials; (c) Liability for or costs of Remediation or prevention of Releases of Hazardous Materials; (d) Liability for or costs of any other actual or future threat to human health or the Environment; or (e) any wrongful death, personal injury, or property damage that is caused by or related to the handling, storage, or the presence of a Hazardous Material; including CERCLA, the Emergency Planning and Community Right to Know Act, the Hazardous Substances Transportation Act, the Resource Conservation and Recovery Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substances Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, the Federal Water Pollution Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Endangered Species Act, the National Environmental Policy Act, the River and Harbors Appropriation Act, and any state counterparts of the foregoing. The term "Environmental Law" does not include good or desirable operating practices or standards that may be voluntarily employed or adopted by other oil and gas well operators or recommended, but not required, by a Governmental Authority.

"***Equipment***" means all Lease Owned equipment, fixtures, physical facilities, and surface and subsurface machinery located on the Lands and used or held for use in connection with the operation, production, treating, storing, or transportation of Hydrocarbons from the Acquired Wells, including all such tanks, boilers, buildings, improvements, injection facilities, saltwater disposal facilities, compression facilities, gathering systems, Christmas trees, derricks, platforms, separators, compressors, gun barrels, and similar items, but excluding Operating Inventory.

"***Excluded Assets***" has the meaning specified in **Section 2.3**.

"***Excluded Executory Contract***" has the meaning specified in **Section 9.13(c)**.

"***Execution Date***" has the meaning specified in the introductory paragraph.

"***Executory Contract***" has the meaning specified in **Section 9.13(b)**.

"***Expense Reimbursement***" has the meaning specified in **Section 12.2(a)**.

"***Final Determination Date***" has the meaning specified in **Section 3.5(g)**.

"***Final Purchase Price***" has the meaning specified in **Section 3.5(g)**.

"***Final Settlement Date***" has the meaning specified in **Section 3.5(a)**.

"***Final Settlement Disputes***" has the meaning specified in **Section 3.5(d)**.

"***Final Settlement Statement***" has the meaning specified in **Section 3.5(a)**.

"***Financing***" has the meaning specified in **Section 9.16**.

"***GAAP***" means United States generally accepted accounting principles in effect as of the Execution Date, applied consistently with Sellers' application in prior periods.

"***Governmental Authority***" means any federal, state, local, tribal, or foreign government, court of competent jurisdiction, administrative or regulatory body, agency, bureau, commission, governing body of any national securities exchange, or other governmental authority or instrumentality in any domestic or foreign jurisdiction, and any appropriate division of any of the foregoing.

"***Guarantees***" has the meaning specified in **Section 9.3**.

"***Hazardous Material***" means any: (a) petroleum or any fraction thereof, petroleum products, waste oil, crude oil, natural gas, natural gas liquids, radon, toxic mold, asbestos or asbestos-containing material, urea formaldehyde, per- or polyfluoroalkyl substance, or polychlorinated biphenyl; (b) waste, gas, or other substance or material that is explosive or radioactive (including NORM);; (c) "hazardous substance", "hazardous material", "pollutant", "contaminant", "hazardous waste", "regulated substance", "hazardous chemical", or "toxic chemical" as designated, listed, or defined (whether expressly or by reference) in any statute, regulation, Environmental Law, or other Law (including CERCLA and any other so called "superfund" or "superlien" Law and the respective regulations promulgated thereunder); (d) other substance or material (regardless of physical form) that is subject to any Environmental Law or other Law that regulates, imposes liability or establishes standards of conduct in connection with, or that otherwise relates to, the protection of human health, plant life, animal life, natural resources, property, or the enjoyment of life or property from the presence in the Environment of any solid, liquid, gas, odor, noise, or form of energy; or (e) compound, mixture, solution, product, or other substance or material that contains any substance or material referred to in **clause (a)**, **(b)**, **(c)**, or **(d)** above.

"***HB2***" has the meaning specified in the introductory paragraph.

"***Hedging Instrument***" means: (a) any futures trade, put option, synthetic put option, call option, or other arrangement relating to commodities entered into by a Person on any commodities exchange to hedge such Person's exposure to or to speculate on commodity prices; and (b) any swap, collar, floor or other derivative transaction or hedging arrangement of any type or nature whatsoever in the over-the-counter derivatives market.

"***Hydrocarbons***" means crude oil, natural gas, casinghead gas, condensate, natural gas liquids, and other liquid or gaseous hydrocarbons produced in association with the foregoing.

"***Income Tax***" means any United States federal, state, local, or foreign Tax based on or measured by reference to net income, profits, revenue, or similar measure, including any interest, penalty, or addition thereto, whether disputed or not.

"***Indebtedness***" of any Person means, without duplication: (a) all obligations of such Person created, issued, or incurred for borrowed money (whether by loan, the issuance and sale of debt securities, or the sale of property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such property from such other Person); and (b) all obligations of such Person evidenced by a note, bond, debenture, or similar instrument.

"***Intellectual Property***" means, with respect to any Person, any intellectual property, industrial property, and other proprietary rights (or portion thereof) owned, licensed, or developed by such Person or any of its Affiliates, or in which such Person or any of its Affiliates has any rights or interests, including any trademark, service mark, trade name, fictitious business name, or other similar intangible asset, registered or unregistered copyrights, patents, inventions, software or systems, and all versions, forms and embodiments thereof, including source code and object code, information that derives economic value from not being generally known to other Persons, including trade secrets and customer lists, and applications for registration and registrations of any of the foregoing (whether pending, existing, abandoned, or expired).

"***Knowledge***" means, (a) with respect to Sellers, the actual knowledge of the following Entity Representatives of Sellers: Craig Perry (Chairman & CEO), Reagan Brown (Chief Administrative Officer), and William Wicker (Chief Investment Officer) all, after due inquiry of Bruce C. Gates but, otherwise, without any obligations of inquiry or investigation, and (b) with respect to Purchasers, the actual knowledge of the following Entity Representatives of Purchasers: Paul Dirks and Greg LaMantia all, after due inquiry of Bruce C. Gates but, otherwise, without any obligation of inquiry or investigation.

"***Lands***" has the meaning specified in **Section 2.2(b)**.

"***Law***" means any law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, proclamation, treaty, convention, rule, regulation, permit, writ, or decree, whether legislative, municipal, administrative, or judicial in nature, enacted, adopted, passed, promulgated, made, or put into effect by or under the authority of any Governmental Authority.

"***Lease Owned***" means any Equipment or Operating Inventory in which a Seller owns an interest used or held for use in connection with the operation of a Well or Wells which is (i) chargeable under applicable joint operating agreements consistent with the standards established by COPAS or (ii) is included within the scope of items that are chargeable under Section II (Direct Charges) of the COPAS 2005 Accounting Procedure, but excluding items considered part of overhead.

"***Liability***" means, with respect to any Person, any Indebtedness or other liability or obligation of such Person of any kind, nature, character, or description, whether known or unknown, absolute or contingent, accrued or unaccrued, in contract, tort, strict liability, or otherwise, including all costs and expenses relating to the foregoing.

"***Lien***" means any mortgage, deed of trust, pledge, assessment, security interest, lien, adverse claim, levy, charge, or similar encumbrance.

"***Loss***" means any direct or indirect loss, damage, injury, Liability, fine, sanction, penalty, Tax, charge, fee, assessment, demand, claim, Proceeding, judgment, cost (including costs incurred in settlement of any Proceeding), or expense (including any legal fees, expert fees, accounting fees, or advisory fees) of any kind or character (whether known or unknown, fixed or unfixed, conditional or unconditional, based on negligence, strict liability, or otherwise, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent, or other legal theory).

"*Material Adverse Effect*" means a material adverse effect on: (a) the ownership, operation, or value of the Acquired Assets considered as a whole, where such adverse effect could reasonably be expected to impact the value of the Acquired Assets by an amount exceeding twenty-five (25%) of the Base Purchase Price; or (b) the ability of Sellers to consummate the Contemplated Transactions; *provided*, *however*, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: any adverse change, event, development, or effect arising from or relating to: (A) general business or economic conditions, including such conditions related to the business or Operations of Sellers; (B) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment, or personnel of the United States; (C) financial, banking, commodities, products, or securities markets (including any disruption thereof and any decline in the price of any commodity, product, security or any market index); (D) disruptions in transportation and distribution channels, including channels into which Sellers sell any commodities or products; (E) reclassification or recalculation of reserves, or production declines or any adverse condition or change in the production characteristics or downhole condition of any wells, including any well watering out, or experiencing a collapse in the casing or sand infiltration; (F) depreciation of any Acquired Assets that constitute personal property through ordinary wear and tear; (G) changes in GAAP; (H) fire, storms, floods, and other meteorological events, natural disasters or acts of God; epidemics, pandemics, and other public health crises; (I) the entering into (or public announcement of) this Agreement or the taking of any action contemplated by this Agreement or the other Transaction Documents; (J) any action taken (or omitted to be taken) at the request or with the written consent of Purchasers; (K) the pendency of the Bankruptcy Case or the financial condition of any Seller; (L) the departure of officers or directors of any Seller after the Execution Date; (M) the rejection of any Excluded Asset in accordance with the terms hereof; (N) any claims or Losses the extent constituting Specified Excluded Liabilities; or (O) any adverse change in or effect on the Acquired Assets or Operations of Sellers that is cured to the reasonable satisfaction of Purchasers before the earlier of the Closing Date and the termination of this Agreement.

"*Material Contracts*" has the meaning specified in **Section 7.13**.

"*Material Required Consents*" means a consent by a Third Party required under any Acquired Lease or Acquired Contract to transfer such Acquired Lease or Acquired Contract to Purchasers pursuant to this Agreement that (a) with respect to an Acquired Lease, if not obtained prior to the assignment thereof, would (expressly, pursuant to the terms of the applicable Acquired Lease or Acquired Contract) either terminate a Seller's interest therein, void or nullify the Assignment with respect thereto or trigger the payment of any material fees or liquidated damages, and (b) with respect to any Acquired Contract, if not obtained prior to the assignment thereof, would adversely affect the ownership or Operations of the Acquired Assets as currently owned and operated; *provided*, *however*, "*Material Required Consent*" does not include (i) any Customary Post-Closing Consent, (ii) any Preferential Right, or (iii) transfer orders and other filings and notices that are routine and customary in connection with the transfer of oil and gas assets where the Acquired Assets are located.

"*Negotiation Period*" has the meaning specified in **Section 3.5(c)**.

"*Net Acre*" means, as calculated separately with respect to each Acquired Lease, the product of (a) the number of gross acres of land covered by such Acquired Lease, multiplied by (b) the lessor's undivided interests in the Target Depths Hydrocarbons in the lands covered by such Acquired Lease, multiplied by (c) Sellers' aggregate Working Interest in such Acquired Lease (*provided*, *however*, if items (b) and (c) of this definition vary as to different tracts, parcels, areas or depths burdened by such Acquired Lease, a separate calculation shall be performed with respect to each such tract, parcel, area or depth).

"***Net Revenue Interest***" or "***NRI***" means, with respect to any Acquired Lease or Acquired Well, the aggregate interest of Sellers in the Hydrocarbons produced and marketed from or attributable to the Target Depths of such Acquired Lease or Acquired Well, after giving effect to all Royalties.

"***Non-Compensatory Damages***" has the meaning specified in **Section 14.6**.

"***Non-Recourse Party***" has the meaning specified in **Section 15.21**.

"***NORM***" has the meaning specified in **Section 4.4(c)**.

"***Objection Date***" has the meaning specified in **Section 3.5(b)**.

"***Objection Report***" has the meaning specified in **Section 3.5(b)**.

"***Operations***" means oil and gas exploration, development, and production, and all operations relating thereto, including: (a) the acquisition, purchase, sale, development, operation, maintenance, use and abandonment of oil, gas, and mineral leases and related interests; (b) the drilling, reworking, production, purchase, sale, transportation, storage, processing, treating, manufacture, and disposal of, or for, Hydrocarbons and associated by-products and wastes; and (c) the acquisition, construction, installation, maintenance, use, and operation of related Equipment and Operating Inventory.

"***Operating Inventory***" means Lease Owned rolling stock, pipes, casing, tubing, tubulars, fittings, and other spare parts, supplies, tools, and materials held as operating inventory for use in connection with Operations on or applicable to the Acquired Properties.

"***Operator***" means Ageron Ironroc Energy, LLC, a Texas limited liability company.

"***Order***" means any order, judgment, injunction, edict, decree, ruling, assessment, stipulation, pronouncement, determination, decision, opinion, verdict, sentence, subpoena, directive, writ or award issued, made, entered, rendered, or otherwise put into effect by or under the authority of any court or other Governmental Authority or any arbitrator or arbitration panel.

"***Ordinary Course of Business***" means any action taken in the ordinary course of Sellers' and/or Operator's, as applicable, business and Operations.

"***Organizational Documents***" means, with respect to any Entity, the articles or certificate of incorporation, formation, organization, or association; general or limited partnership agreement; limited liability company or operating agreement; bylaws; and other agreements, documents, or instruments relating to the organization, management, or operation of such Entity or relating to the rights, duties, and obligations of the equityholders of such Entity, including any equityholders' agreements, voting agreements, voting trusts, joint venture agreements, registration rights agreements, and similar agreements.

"***Outside Date***" has the meaning specified in **Section 12.1(e)**.

"***Party***" and "***Parties***" have the meanings specified in the introductory paragraph.

"***Permit***" means any permit, license, certificate of authority, franchise, concession, registration, or similar qualification or authorization issued, granted, or given by or under the authority of any Governmental Authority.

"***Permitted Encumbrances***" has the meaning specified in **Section 5.2**.

"*Permitted Matter*" has the meaning specified in __Section 9.12__.

"*Person*" means any natural person, Entity, or Governmental Authority.

"*Pipeline Imbalance*" means any Hydrocarbon imbalance of a Seller as of the Effective Time and arising pursuant to the terms of any gathering, processing, or transportation agreement included in the Acquired Contracts, regardless of whether such Seller is over-delivered or under-delivered.

"*Plugging and Abandonment Obligations*" means any and all Claims and Losses (whether known or unknown or absolute or contingent) resulting from, arising out of or in connection with, attributable to, based upon, or otherwise relating to any of the following, whether arising prior to, on, or after the Effective Time: (a) the plugging, replugging, and abandonment of all Acquired Wells; (b) the removal, abandonment, and disposal of all Acquired Personal Property and other fixtures, structures, pipelines, equipment, abandoned property, trash, refuse, and junk located on or comprising part of the Acquired Assets; (c) the capping and burying of all associated flow lines located on or comprising part of the Acquired Assets; (d) the restoration of the surface and subsurface of the Acquired Assets and Lands to the condition required by applicable Laws, Permits, Orders, Acquired Leases, and Acquired Contracts; (e) the dismantling, salvaging, removal, and abandonment of any and all Equipment and Operating Inventory; (f) all other Claims and Losses relating to the items described in clauses (a) through (e) above arising under Acquired Leases, Acquired Contracts, other agreements, or applicable Laws; and (g) obtaining and maintaining all bonds, surety arrangements, and supplemental or additional bonds and surety arrangements, that may be required by Laws, Permits, or Orders, or may otherwise be required by any Governmental Authorities.

"*Precluded Party*" has the meaning specified in __Section 12.1__.

"*Preferential Right*" means a right of first refusal or other preferential purchase right provision applicable to any Acquired Properties.

"*Preliminary Settlement Statement*" has the meaning specified in __Section 3.4(a)__.

"*Proceeding*" means any action, proceeding, litigation, suit, or arbitration (whether civil, criminal, administrative, or judicial in nature) commenced, brought, conducted, or heard before any Governmental Authority, arbitrator, or arbitration panel.

"*Production Imbalance*" means any over-production or under-production with respect to Hydrocarbons produced from or allocated to any Acquired Well where, as of the Effective Time, a Seller is out of balance with any of the following: (a) the operator of such Acquired Well pursuant to the relevant operating agreement or other operating arrangement, (b) another working interest owner in such Acquired Well, or (c) any Third Party pursuant to a production handling agreement.

"*Production Tax*" (with correlative meanings) means any federal, state or local Tax that is based on or measured by the production of Hydrocarbons from the Acquired Assets or the receipt of proceeds therefrom, including any conservation, sales, use, value added, excise or severance Taxes (but excluding any Transfer Taxes, Property Taxes, Income Taxes, and any franchise, employment, labor, unemployment, or similar Tax).

"*Property and Production Tax*" means all Property Taxes and Production Taxes.

"*Property Expenses*" means all operating expenses (including costs of insurance, title examinations, and curative actions taken in connection with obtaining or in response to drilling title opinions) and capital expenditures (including lease bonuses, broker fees, and other lease acquisition costs)

incurred in the ownership and operation of the Acquired Assets in the Ordinary Course of Business and, where applicable, in accordance with the relevant operating or unit agreement, if any, and overhead costs charged to the Acquired Assets under the relevant operating agreement or unit agreement, if any, but excluding Claims and Losses attributable to any of the following: (a) personal injury or death, property damage, or violation of any Law, (b) Title Matters, (c) Assumed Environmental Liabilities or Plugging and Abandonment Obligations, (d) obligations with respect to Production Imbalances, Pipeline Imbalances, minimum volume commitments, or other similar Hydrocarbon commitment, throughput, or delivery obligations, (e) obligations to pay working interests, Royalties, or other interest owners revenues or proceeds attributable to sales of Hydrocarbons relating to the Acquired Assets, including any such revenues or proceeds held in suspense, (f) Taxes, or (g) Cure Costs.

"***Property Tax***" (with correlative meanings) means any federal, state or local personal or real property and ad valorem or similar Taxes assessed against the Acquired Assets or based upon or measured by the ownership of the Acquired Assets (but excluding any Transfer Taxes, Production Taxes, Income Taxes, and any franchise, employment, labor, unemployment, or similar Tax).

"***Purchase Price***" has the meaning specified in **Section 3.1**.

"***Purchaser***" or "***Purchasers***" has the meaning specified in the introductory paragraph.

"***Purchaser Parties***" means each Purchaser and its Affiliates, and the respective Entity Representatives of each of the foregoing.

"***Records***" means any lease files, land files, well files, Acquired Contract files, gas gathering and processing files, division order files, abstracts, title opinions, and similar records of Sellers to the extent relating directly to the Acquired Assets.

"***Release***" means any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching, or migration on or into the Environment or into or out of any property.

"***Remediate***" or "***Remediation***" means (with correlative meanings), with respect to any Assumed Environmental Liability, violation of or non-compliance with any Environmental Laws, or any other environmental condition, the response required or allowed under Environmental Laws that addresses and resolves (for current and future use in the same manner as being currently used) the identified environmental condition in its entirety at the lowest cost (considered as a whole) as compared to any other response that is required or allowed under Environmental Laws. "***Remediation***" may consist of or include taking no action, leaving the condition unaddressed, periodic monitoring, the use of institutional controls or the recording of notices in lieu of remediation, in each case, if such response is allowed under Environmental Laws and completely addresses and resolves (for current and future use in the same manner as being currently used) the identified environmental condition in its entirety.

"***Royalties***" means royalties, overriding royalties, production payments, net profits interests, other non-cost bearing revenue interests or similar payment burdens upon, measured by, or payable out of production of Hydrocarbons therefrom.

"***Sale Hearing***" has the meaning set forth in the Bid Procedures Order.

"***Sale Motion***" means *Debtors' Emergency Motion for Entry of (A) an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving*

*Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter Into Definitive Purchase Agreements* [Docket No. 137].

"**Sale Order**" means the Order of the Bankruptcy Court, in form and substance approved by Purchasers (such approval not to be unreasonably withheld, conditioned or delayed), pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, this Agreement, the other Transaction Documents and the Contemplated Transactions, including the sale of the Acquired Assets (which Acquired Assets shall be delivered free and clear of any claims or ownership interests thereto asserted (i) by any one or more development partnerships referenced in, and as set forth in, the *Ad Hoc Committee of Drilling Partnership Claimants' Objection to Postpetition Financing Motion and Reservation of Rights Concerning All Other Requested First Day Relief* filed at Docket No. 37 in the Bankruptcy Case or (ii) by Alpine 2022 Non-OP, as set forth in the *Stipulation Regarding the Sale of Certain Interests in Oil and Gas Wells* filed at Docket No. 354 in the Bankruptcy Case) to Purchasers on the terms and conditions set forth herein, free and clear of all then existing or thereafter arising Liens (other than Assumed Liabilities and Permitted Encumbrances) of, against or created by Sellers or their bankruptcy estate (as set forth in the Sale Order) to the extent permissible under Section 363(f) (including Section 363(f)(4), among others) of the Bankruptcy Code, the assumption and assignment of the Acquired Contracts and the Acquired Leases to Purchasers, and containing a finding that Purchasers have acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, a proposed version of which Order is to be filed by Sellers with the Bankruptcy Court as soon as reasonably practicable prior to the Sale Hearing.

"**Seller**" and "**Sellers**" have the meaning specified in the introductory paragraph.

"**Seller Parties**" means Sellers, Operator, their respective Affiliates, and the respective Entity Representatives of each of the foregoing.

"**Seller Refund Obligations**" means that portion of any refunds of property, ad valorem, severance, production and similar Taxes attributable to Third Party interests in the Acquired Leases and/or Acquired Wells that are received by Sellers, their Affiliates, or Operator prior to Closing and are owing to Royalty owners, Working Interest owners, and other interest owners.

"**Special Warranty**" has the meaning specified in **Section 5.6(a)**.

"**Specified Excluded Liabilities**" means all Claims and Losses (whether known or unknown or absolute or contingent) resulting from: (a) Liabilities to Third Parties for any Seller having failed to properly pay revenues owing by such Person to any Third Party Royalty owners, working interest owners, or other interest owners to the extent such revenues are attributable to sales of Hydrocarbons produced prior to the Effective Time from the Acquired Properties and were received by any Seller or its Affiliates and were not remitted to Purchasers, excluding, however, all Assumed Suspense Liabilities; (b) Liabilities for personal injury or death or (excluding Assumed Environmental Liabilities) Third Party property damage claims to the extent attributable to ownership of or, Operations on, the Acquired Assets conducted prior to the Closing Date; (c) Liabilities to Third Parties for disposal or transportation, prior to the Closing Date, of any Hazardous Materials from the Acquired Assets to any location not on the Acquired Assets; (d) Liabilities owed by any Seller to any of its Affiliates to the extent such Liabilities accrued during the period prior to the Closing Date; (e) Liabilities for the payment of all Property Expenses attributable to the Acquired Properties or the ownership or operation thereof during the period prior to the Effective Time; (f) Liabilities for the payment of all Property and Production Taxes allocated to Sellers under **Section 13.1** (taking into account, and without duplication of, such Taxes effectively borne by Sellers as a result of the adjustments to the Purchase Price made pursuant to **Section 3.3 or 3.5** (as applicable)) and Liabilities for the payment of all Seller Refund Obligations; (g) Liabilities with respect to the Excluded Assets or any other asset or business of Sellers that is not part of the Acquired Assets; (h) Liabilities with respect to the Claims and

Proceedings listed on **Schedule 7.10**, to the extent the claims therein (other than claims in respect of Property Expenses) relate to periods prior to the Closing Date, or, if such claims are in respect of Property Expenses, to the extent the same relate to periods prior to the Effective Time; (i) Liabilities to any owner or former owner of capital stock or warrants of Sellers or any holders of Indebtedness of Sellers for borrowed money; (j) Liabilities for any Income Taxes or franchise Taxes imposed by any applicable Law on Sellers, any of their direct or indirect owners or Affiliates or any combined, unitary, or consolidated group of which any of the foregoing is or was a member; (k) Liabilities for any Claims or Losses related to the Acquired Assets or the ownership, use, or operation thereof, in each case, that are discharged under the Bankruptcy Code after passage of the applicable bar date and/or pursuant to the Sale Order; (l) fines or penalties imposed or assessed on or against any Sellers by any Governmental Authority related to or arising out of the ownership or operation of the Acquired Assets prior to the Closing Date; and (m) all other Liabilities owed to Third Parties by Sellers to the extent incurred or arising prior to the Closing Date and not constituting Assumed Liabilities; *provided, however*, nothing herein shall in any way enlarge the rights of Third Parties with respect to any of the Specified Excluded Liabilities.

"***Straddle Period***" means any taxable period that begins prior to and ends after the Effective Time.

"***Successful Bidder***" means the bidder for the Acquired Assets, determined by the Sellers, to have made the highest or otherwise best bid for the Acquired Assets as in accordance with the Bid Procedures.

"***Suspense Funds***" has the meaning specified in **Section 3.3(b)(iv)**.

"***Target Closing Date***" has the meaning specified in **Section 11.1**.

"***Target Depths***" means, (a) with respect to an Acquired Well, each geological zone and depth open to production and from which Hydrocarbons are being produced through such Acquired Well as of the Effective Time, and (b) with respect to an Acquired Lease, the Austin Chalk Formation and the Eagle Ford Formation.

"***Tax***" and "***Taxes***" means any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under the former Section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, severance, natural resources, production, property, transfer, registration, stamp, value added, alternative or add-on minimum, estimated, or other tax, levy or assessment, duty, impost, or fee of any kind whatsoever of any Governmental Authority, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not.

"***Tax Return***" means any return, declaration, report or information return (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax, and including any amendment thereof.

"***Technical Data***" means proprietary geologic, geophysical, seismic data and seismic licenses, but excluding any and all interpretive data and analysis of any of the foregoing (it being understood that all such interpretive data and analysis shall constitute an Excluded Asset).

"***Third Party***" shall mean any Person other than a Party to this Agreement or an Affiliate of a Party to this Agreement.

"***Threatened***" means a written demand or statement that (a) has been delivered by a Third Party to a Party and (b) would lead a reasonably prudent Person to conclude that an audit, investigation, or Proceeding, as applicable, is likely to be commenced or pursued in the future by such Third Party.

"***Title Claim***" has the meaning specified in **Section 5.3**.

"***Title Claim Date***" has the meaning specified in **Section 5.6(b)**.

"***Title Claim Value***" has the meaning specified in **Section 5.4**.

"***Title Disputed Matter***" has the meaning specified in **Section 5.5**.

"***Title Expert***" has the meaning specified in **Section 5.5(a)**.

"***Title Matters***" has the meaning specified in **Section 5.8**.

"***Transaction Documents***" means this Agreement, the Assignments, and the other contracts, agreements, certificates, documents, and instruments delivered or to be delivered by the Parties in connection with the Closing.

"***Transfer Taxes***" has the meaning specified in **Section 13.3**.

"***Treasury Regulations***" means the regulations issued by the United States Department of Treasury under the Code.

"***United States***" and "***U.S.***" means the United States of America.

"***Willful Breach***" means, with respect to a Party, either (a) such Party's willful or deliberate act or a willful or deliberate failure to act, which act or failure to act (i) constitutes in and of itself a material breach of any covenant set forth in this Agreement and (ii) which was undertaken with the actual knowledge of such Party that such act or failure to act would be, or would reasonably be expected to cause, a material breach of this Agreement, or (b) the refusal or inability by such Party to consummate (at the time required hereunder) the transactions contemplated by this Agreement after all conditions to such Party's obligations in **Article X**, as applicable, have been satisfied or waived in accordance with the terms of this Agreement (other than those conditions which by their terms can only be satisfied simultaneously with the Closing but which would be capable of being satisfied at Closing if Closing were to occur).

"***Working Interest***" or "***WI***" means, with respect to any Acquired Well, that share of the costs and expenses of maintenance, development, and operations attributable to the aggregate interest of Sellers in such Acquired Well, but without regard to the effect of any Royalties.

**[End of Appendix A]**

**EXHIBIT A-1**

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023,
BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS
PURCHASERS

**ACQUIRED LEASES**

| No. | Lessor | Lessee | Lease Date | County | State | Vol. / Page | Net Acres | NRI % | Allocated Value |
|---|---|---|---|---|---|---|---|---|---|
| 1 | State PUF Lease MF121175 | Ageron Energy II, LLC | 11/2/2022 | Webb | TX | 5433/0147 | 20.56 | 75 | $17,151.20 |
| 2 | [1]San Roman Mineral Partners | Ageron Energy II, LLC | 9/24/2021 | Webb | TX | 5123/0855 | 6,242.69 | 74.5000 | $5,207,667.00 |
| 3 | [1]San Roman Mineral Partners | Ageron Energy II, LLC | 3/25/2022 | Webb | TX | 5269/564 | 1,247.21 | 74.5000 | $1,040,426.00 |
| 4 | Roxanna Fay Castro | Ageron Energy II, LLC | 7/29/2022 | Webb | TX | 5433/0004 | 0.0028 | 75 | $2.34 |
| 5 | Rosa Maria Vazquez | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0880 | 0.0056 | 75 | $4.67 |
| 6 | Roberto Tijerina | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5432/0850 | 0.0481 | 75 | $40.13 |
| 7 | Roberto Castro | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0883 | 0.0056 | 75 | $4.67 |
| 8 | Raul Martinez Jr, et ux | Ageron Energy II, LLC | 4/5/2022 | Webb | TX | 5433/0052 | 29.1900 | 75 | $24,350.00 |
| 9 | Raquel C. Estrada | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5433/0013 | 0.0093 | 75 | $7.76 |
| 10 | Ramiro Castro Jr. | Ageron Energy II, LLC | 7/29/2022 | Webb | TX | 5433/0001 | 0.0028 | 75 | $2.34 |
| 11 | Patricia Landeros, et al | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | NR | .055555 | 75 | $46.34 |
| 13 | [1]OCHO MDL | Ageron Energy II, LLC | 2/24/2022 | Webb / LaSalle | TX | 5259/0804 Webb; 1154/340 LaSalle | 142.63 | 75 | $118,982.00 |
| 14 | Melinda Amaro | Ageron Energy II, LLC | 8/4/2022 | Webb | TX | 5432/0836 | 0.1925 | 75 | $160.58 |
| 15 | Marta Castro | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5433/0016 | 0.0556 | 75 | $46.38 |
| 16 | Maricela Guadalupe Galvan | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0877 | 0.0056 | 75 | $4.67 |
| 17 | Maria I. Ruiz | Ageron Energy II, LLC | 6/3/2022 | Webb | TX | 5433/0032 | 1.8397 | 75 | $1,535.00 |

[1] Sellers' interests in these Acquired Leases are subject to a back-in after payout interest in favor of a Third Party pursuant to the terms of that certain Services Agreement dated June 28, 2022, between Ageron Energy, LLC, Ageron Ironroc Energy, LLC, Ageron Holdings, LLC and AEII.

| No. | Lessor | Lessee | Lease Date | County | State | Vol. / Page | Net Acres | NRI % | Allocated Value |
|---|---|---|---|---|---|---|---|---|---|
| 18 | Maria Del Rosario Ramirez | Ageron Energy II, LLC | 6/3/2022 | Webb | TX | 5433/0035 | 1.8397 | 75 | $1,535.00 |
| 19 | Maria Consuelo Torres | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5432/0868 | 0.0056 | 75 | $4.67 |
| 20 | Marcelina Castillo | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5433/0007 | 0.0556 | 75 | $46.38 |
| 21 | Luis Armando Tijerina | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5432/0853 | 0.0481 | 75 | $40.13 |
| 22 | Laredo Real Estate Investments, LLC | Ageron Energy II, LLC | 10/28/2022 | Webb | TX | 5433/0098 | 12.42 | 75 | $10,361.00 |
| 23 | Julio A. Castro | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0895 | 0.0056 | 75 | $4.67 |
| 24 | Juanita Castro | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0889 | 0.0056 | 75 | $4.67 |
| 25 | Juan Vicente Castro | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0892 | 0.0056 | 75 | $4.67 |
| 26 | Juan Antonio Salinas | Ageron Energy II, LLC | 3/18/2022 | Webb | TX | 5432/0859 | 6.4300 | 75 | $5,364.00 |
| 27 | Josefina Noyola | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5432/0862 | 0.0056 | 75 | $4.67 |
| 28 | Jose Raul Castro, Jr. | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0871 | 0.0093 | 75 | $7.76 |
| 29 | Jorge Guillermo De La Cruz | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5433/0010 | 0.0556 | 75 | $46.38 |
| 30 | Jerome Zak II, et al | Ageron Energy II, LLC | 1/28/2022 | Webb | TX | 5433/0022 | 84.657 | 75 | $70,621.00 |
| 31 | Issac Villarreal III, et al | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5432/0839 | 0.1925 | 75 | $160.58 |
| 32 | Hector Hall | Ageron Energy II, LLC | 2/23/2023 | Webb | TX | 5433/0113 | 317.64 | 75 | $264,976.00 |
| 33 | Guillermo Castro | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0886 | 0.0056 | 75 | $4.67 |
| 34 | Gloria O. Solis, et al | Ageron Energy II, LLC | 5/6/2022 | Webb | TX | NR | 0.2452916 | 75 | $204.62 |
| 35 | Francisco O. Ramirez | Ageron Energy II, LLC | 5/16/2022 | Webb | TX | 5433/0029 | 3.6794 | 75 | $3,069.00 |
| 36 | Francisca Tellez Johnson | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5432/0865 | 0.0056 | 75 | $4.67 |
| 37 | Fondo San Miguel, SA DE CV | Ageron Energy II, LLC | 3/24/2022 | Webb | TX | 5433/0038 | 164.5800 | 75 | $137,293.00 |
| 38 | Flora Ramirez, et al | Ageron Energy II, LLC | 8/10/2022 | Webb | TX | NR | 1.83969 | 75 | $1,535.00 |
| 40 | Eduardo Canamar et ux | Ageron Energy II, LLC | 6/27/2022 | Webb | TX | 5433/0082 | 5.86 | 75 | $4,888.00 |
| 41 | Daniel Palomo, et ux | Ageron Energy II, LLC | 5/2/2022 | Webb | TX | 5433/0019 | 82.8200 | 75 | $69,089.00 |
| 42 | D.E. Ranch Management, LLC | Ageron Energy II, LLC | 6/27/2022 | Webb | TX | 5433/0067 | 50.89 | 75 | $42,452.00 |

| No. | Lessor | Lessee | Lease Date | County | State | Vol. / Page | Net Acres | NRI % | Allocated Value |
|-----|--------|--------|-----------|--------|-------|-------------|-----------|-------|-----------------|
| 43 | Cuauhtemoc Perez and wife, Aly Perez | Ageron Energy II, LLC | 5/18/2022 | Webb | TX | 5432/0856 | 4.3659 | 75 | $3,642.00 |
| 44 | Berta Alicia Castro | Ageron Energy II, LLC | 7/1/2022 | Webb | TX | 5432/0874 | 0.0056 | 75 | $4.67 |
| 45 | Anita Mendiola | Ageron Energy II, LLC | 8/4/2022 | Webb | TX | 5432/0833 | 0.1925 | 75 | $160.58 |
| 46 | Amador Tijerina III | Ageron Energy II, LLC | 4/15/2022 | Webb | TX | 5432/0847 | 0.0481 | 75 | $40.13 |

**EXHIBIT A-2**

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF
AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS
SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**ACQUIRED WELLS**

| No. | Well Name & Number | API Number | County | State | WI% | NRI% | Allocated Value |
|---|---|---|---|---|---|---|---|
| 1 | AI Ocho 101H | 42-479-44665 | Webb | TX | 99.68% | 74.76% | $7,834,038.00 |
| 2 | AI San Roman 101H | 42-479-44505 | Webb | TX | 15.00% | 11.18% | $886,348.00 |
| 3 | AI San Roman 102H | 42-479-44506 | Webb | TX | 7.50% | 5.59% | $520,450.00 |
| 4 | AI San Roman 103H | 42-479-44627 | Webb | TX | 99.46% | 74.10% | $7,261,235.00 |
| 5 | AI San Roman 104H | 42-479-44628 | Webb | TX | 99.46% | 74.10% | $6,275,113.00 |
| 6 | AI San Roman 105H | 42-479-44838 | Webb | TX | 100.00% | 74.50% | $11,353,475.00 |
| 7 | AI San Roman 106H | 42-479-44839 | Webb | TX | 100.00% | 74.50% | $9,339,623.00 |
| 8 | AI San Roman 201H | 42-479-44755 | Webb | TX | 99.14% | 73.84% | $6,209,836.00 |
| 9 | AI San Roman 202H | 42-479-44756 | Webb | TX | 99.14% | 73.86% | $10,918,823.00 |
| 10 | AI San Roman South 101H | 42-479-44666 | Webb | TX | 99.73% | 74.23% | $8,176,802.00 |
| 11 | AI San Roman South 102H | 42-479-44667 | Webb | TX | 99.73% | 74.23% | $7,098,257.00 |
| 12 | San Roman Water Well #1 | N/A - Water Well | Webb | TX | 100.00% | N/A | $50,000.00 |
| 13 | San Roman Water Well #2 | N/A - Water Well | Webb | TX | 100.00% | N/A | $50,000.00 |

**EXHIBIT A-3**

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**ACQUIRED EASEMENTS**

| | Grantor | Grantee | Agreement Type | Effective Date | County / State | Vol/Page |
|---|---|---|---|---|---|---|
| 1. | David Juarez | Ageron Energy II, LLC | Pipeline Easement and ROW | 10/28/2022 | Webb County, TX | 5433/0173 |
| 2. | Eduardo Canamar and Alejandro Pena | Ageron Energy II, LLC | Memo Pipeline Easement and ROW | 3/24/2022 | Webb County, TX | 5336/400 |
| 3. | Eduardo Canamar and Alejandro Pena | Ageron Energy II, LLC | Pipeline Easement and ROW | 3/24/2022 | Webb County, TX | |
| 4. | Eliseo Rojas Botello & Silvia M. Rojas | Ageron Energy II, LLC | Subsurface Agreement | 1/6/2023 | Webb County, TX | 5433/0169 |
| 5. | Jesus Emmanuel Moreno | Ageron Energy II, LLC | Memo of Non-Exclusive Pipeline ROW | 5/23/2022 | Webb County, TX | 5336/0391 |
| 6. | Jesus Emmanuel Moreno | Ageron Energy II, LLC | Non Exclusive Pipeline ROW | 5/23/2022 | Webb County, TX | |
| 7. | Juan Eduardo Trevino & Maria Teresa de Arcos Zamora | Ageron Energy II, LLC | Pipeline Easement and ROW | 2/17/2023 | Webb County, TX | 5433/0183 |
| 8. | La Buchaca, Inc. | Ageron Energy II, LLC | Memo of Non-Exclusive Pipeline ROW | 5/23/2022 | Webb County, TX | 5336/0395 |
| 9. | La Buchaca, Inc. | Ageron Energy II, LLC | Non-Exclusive Pipeline ROW | 5/23/2022 | Webb County, TX | |
| 10. | Laredo Real Estate Investments, LLC | Ageron Energy II, LLC | Pipeline Easement and ROW | 10/28/2022 | Webb County, TX | 5433/0178 |

| | Grantor | Grantee | Agreement Type | Effective Date | County / State | Vol/Page |
|---|---|---|---|---|---|---|
| 11. | Oziel E. Pedraza | Ageron Energy II, LLC | Pipeline Easement and ROW | 12/16/2022 | Webb County, TX | 5433/0159 |
| 12. | Rancho Cobre | Ageron Energy II, LLC | Surface Agreement | 12/21/2022 | Webb County, TX | |
| 13. | Rancho Los Isauros, LLC | Ageron Energy II, LLC | Memo of Surface Use Agreement | 6/13/2022 | Webb County, TX | 5336/0407 |
| 14. | Rancho Los Isauros, LLC | Ageron Energy II, LLC | Surface Use Agreement | 6/13/2022 | Webb County, TX | |
| 15. | Rancho Rosales, LLC | Ageron Energy II, LLC | Memo Non Exclusive Pipeline ROW | 11/4/2021 | Webb County, TX | 5263/0427 |
| 16. | Rancho Rosales, LLC | Ageron Energy II, LLC | Non Exclusive Term Pipeline ROW | 11/4/2021 | Webb County, TX | |
| 17. | Raul Martinez III, et ux | Ageron Energy II, LLC | Memo of Surface Use Agreement | 10/27/2022 | Webb County, TX | |
| 18. | Raul Martinez III, et ux | Ageron Energy II, LLC | Surface Use Agreement | 10/27/2022 | Webb County, TX | |
| 19. | Raul Martinez Jr, et al | Ageron Energy, LLC | Memo Surface Use Agreement | 9/1/2021 | Webb County, TX | 5139/0261 |
| 20. | Raul Martinez Jr, et al | Ageron Energy, LLC | Surface Use Agreement | 9/1/2021 | Webb County, TX | |
| 21. | Texas Indigo, LP | Ageron Energy II, LLC | Memo of Road Easement & ROW | 11/22/2022 | Webb County, TX | 5387/0840 |
| 22. | Texas Indigo, LP | Ageron Energy II, LLC | Road Easement & ROW | 11/22/2022 | Webb County, TX | |
| 23. | Triple T Ranch | Ageron Energy II, LLC | Surface Agreement | 4/29/2022 | Webb County, TX | |

## EXHIBIT A-4

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

### ACQUIRED PERSONAL PROPERTY

1. San Roman 101H 16' 400 bbl water tank
2. San Roman 101H 16' 400 bbl water tank
3. San Roman 101H Ambient Air Cooler
4. San Roman 101H Ambient Air Cooler
5. San Roman 101H 1440 psi Two Phase Separator
6. San Roman 101H 250 psi Two Phase Separator
7. San Roman 102H 16' 400 bbl water tank
8. San Roman 102H 16' 400 bbl water tank
9. San Roman 102H Ambient Air Cooler
10. San Roman 102H Ambient Air Cooler
11. San Roman 102H 1440 psi Two Phase Separator
12. San Roman 102H 250 psi Two Phase Separator
13. San Roman 103H 16' 400 bbl water tank
14. San Roman 103H 16' 400 bbl water tank
15. San Roman 103H Ambient Air Cooler
16. San Roman 103H Ambient Air Cooler
17. San Roman 103H 1440 psi Two Phase Separator
18. San Roman 103H 250 psi Two Phase Separator
19. San Roman 104H 16' 400 bbl water tank
20. San Roman 104H 16' 400 bbl water tank
21. San Roman 104H Ambient Air Cooler
22. San Roman 104H Ambient Air Cooler
23. San Roman 104H 1440 psi Two Phase Separator
24. San Roman 104H 250 psi Two Phase Separator
25. San Roman 103-1C C120 Cooler
26. San Roman South 16' 400 bbl water tank
27. San Roman South 16' 400 bbl water tank
28. San Roman South Ambient Air Cooler
29. San Roman South Ambient Air Cooler
30. San Roman South 1440 psi Two Phase Separator
31. San Roman South 250 psi Two Phase Separator
32. San Roman South 16' 400 bbl water tank
33. San Roman South 16' 400 bbl water tank
34. San Roman South Ambient Air Cooler
35. San Roman South Ambient Air Cooler
36. San Roman South 1440 psi Two Phase Separator
37. San Roman South 250 psi Two Phase Separator
38. San Roman 201H 16' 400 bbl water tank
39. San Roman 201H 16' 400 bbl water tank
40. San Roman 201H Ambient Air Cooler
41. San Roman 201H Ambient Air Cooler
42. San Roman 201H 1440 psi Two Phase Separator

43. San Roman 201H 250 psi Two Phase Separator
44. San Roman 202H 16' 400 bbl water tank
45. San Roman 202H 16' 400 bbl water tank
46. San Roman 202H Ambient Air Cooler
47. San Roman 202H Ambient Air Cooler
48. San Roman 202H 1440 psi Two Phase Separator
49. San Roman 202H 250 psi Two Phase Separator

**EXHIBIT A-5**

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**ACQUIRED CONTRACTS**

| | Counterparty | Seller | Contract |
|---|---|---|---|
| 1. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Base Contract for Sale and Purchase of Natural Gas dated 09-01-2022 |
| 2. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Special Provisions Attached to Base Contract for Sale and Purchase of Natural Gas dated 09- 01-2022 |
| 3. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | First Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 10-01-2022 |
| 4. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Second Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 11-01-2022 |
| 5. | Enterprise Hydrocarbons LP | Ageron Energy II, LLC | Transaction Confirmation for Base Contract dated 09-01-2022 |
| 6. | Ageron Energy, LLC | Ageron Ironroc Energy, LLC | Services Agreement dated 06-28-2022 |
| 7. | ARM Energy Management LLC | Ageron Energy II, LLC | Base Contract for Sale and Purchase of Natural Gas with General Terms and Conditions dated 03-10-2022 |
| 8. | ARM Energy Management LLC | Ageron Energy II, LLC | Special Provision Contract dated 03-10-2022 |
| 9. | ARM Energy Management LLC | Ageron Energy II, LLC | Transaction Confirmation for Base Contract dated 03-10-2022 |
| 10. | ARM Energy Management LLC | HB2 Origination, LLC | Base Contract for Sale and Purchase of Natural Gas dated 10-01-2022 |
| 11. | ARM Energy Management LLC | HB2 Origination, LLC | Special Provisions Contract dated 10-01-2022 |

|  | Counterparty | Seller | Contract |
|---|---|---|---|
| 12. | ARM Energy Management LLC | HB2 Origination, LLC | Transaction Confirmation for Base Contract dated 12-09-2022 |
| 13. | Dos Caminos LLC | Ageron Energy II, LLC<br><br>HB2 Origination, LLC | Service Confirmation for Gas Services Agreement for Intrastate Service dated 10-01- 2022 |
| 14. | Dos Caminos LLC | Ageron Energy II, LLC | Precedent Agreement dated 11-15-2022 |

## EXHIBIT B

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

## SPECIFIED EXCLUDED ASSETS

None.

## EXHIBIT C

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

## FORM OF ASSIGNMENT

*[See Attached.]*

Exhibit C-1

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

### ASSIGNMENT, BILL OF SALE, AND CONVEYANCE

| STATE OF TEXAS | § | |
|---|---|---|
| | § | KNOW ALL PERSONS BY THESE PRESENTS |
| COUNTY OF WEBB | § | |

This ASSIGNMENT, BILL OF SALE, AND CONVEYANCE (this "***Assignment***") is from HB2 ORIGINATION, LLC, a Delaware limited liability company ("***HB2***"), and AGERON ENERGY II, LLC, a Delaware limited liability company ("***AEII***", and together with HB2, "***Assignors***"), each with an address at 3322 West End Avenue, Suite 450, Nashville, TN 37203, to SAN ISIDRO ENERGY COMPANY II, LLC, a Texas limited liability company ("***SIEC***") with an address at 400 FM 534, Sandia, Texas 78383, AGERON HOLDINGS, LLC, a Texas limited liability company ("***Ageron***") with an address at 1250 NE Loop, 410 s-500, San Antonio, Texas 78209, and NEEDMORE MINERALS, LLC, a Texas limited liability company ("***Needmore***" and together with SIEC and Ageron, "***Assignees***" and each an "***Assignee***") with an address at 3900 N. McColl Road, McAllen, Texas 78501, and is dated as of the date of the latest acknowledgement appearing below but is effective as of [•] 1, 2023, at 12:00 a.m., Houston, Texas time (the "***Effective Time***").

### RECITALS

WHEREAS, this Assignment is made pursuant to that certain Purchase and Sale Agreement dated August 16, 2023, between Assignors and Assignees (as the same may be amended from time to time, the "***Purchase Agreement***") and has been approved by the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") pursuant to [the Order (I) Approving the Sale of the South Texas Assets Free and Clear of Liens, Encumbrances, Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief] entered on [•], 2023 (the "***Sale Order***") under the caption *In re: Alpine Summit Energy Partners, Inc., et al.*, Case No. 23-90739 (DRJ) (the "***Bankruptcy Case***"), Docket No. [•]; and

WHEREAS, capitalized terms used herein and not otherwise defined herein or throughout this Assignment shall have the meanings given such terms in the Purchase Agreement;

NOW, THEREFORE, for and in consideration of the mutual promises contained herein and in the Purchase Agreement, the benefits to be derived by each party hereunder and under the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignors and Assignees agree as follows:

### ARTICLE I
### ASSIGNMENT OF ACQUIRED ASSETS

***1.1     Assignment***.  Subject to the terms and conditions of this Assignment, Assignors do hereby SELL, CONVEY, ASSIGN, TRANSFER, and DELIVER to each Assignee, and each Assignee hereby acquires, all of each Assignor's respective right, title, and interest in and to the following, but excluding the Excluded Assets (less and except for the Excluded Assets, such right, title, and interest, collectively, the "***Acquired Assets***") *pro rata* based on the allocation set out in **Schedule 1.1** attached hereto:

Exhibit C-1
1

(a)     the oil, gas and mineral leases described in **<u>Exhibit A-1</u>** (the "***Acquired Leases***"), together with any and all other rights, titles, and interests of an Assignor of any kind or character in and to the Acquired Leases or in and to the lands covered or burdened thereby or unitized, pooled, or communitized therewith;

(b)     all unitization, pooling, and communitization agreements, declarations, and orders covering any part of the lands covered or burdened by the Acquired Leases (such lands as are covered by the Acquired Leases, together with all other lands pooled, unitized, or communitized under such agreements, declarations, and orders, are referred to herein, collectively, as the "***Lands***");

(c)     all wells (including all Hydrocarbon wells, water wells, disposal wells, injection wells, abandoned wells, and any other wells) and all associated lateral pipelines located on the Lands, whether producing or non-producing (the "***Acquired Wells***" and, together with the Acquired Leases, the "***Acquired Properties***"), including the wells listed on **<u>Exhibit A-2</u>**;

(d)     (i) all Hydrocarbons in, on, or under, or that may be produced from, the Lands on or after the Effective Time, (ii) all Hydrocarbon inventories from or attributable to the Lands in storage at the Effective Time, and (iii) all Production Imbalances and Pipeline Imbalances;

(e)     all Easements on or over the Lands to the extent used or held for use in connection with Operations on or applicable to any of the Acquired Properties (the "***Acquired Easements***"), including the Acquired Easements listed on **<u>Exhibit A-3</u>**;

(f)     to the extent transferable, all Permits that have been obtained, granted or issued in connection with Operations on or applicable to any of the Acquired Assets;

(g)     all fee interests in surface real property and leasehold estates in surface real property, in each case, to the extent the same are used or held for use in connection with Operations on or applicable to any of the Acquired Properties (the "***Acquired Real Estate***");

(h)     all owned and leased Equipment and Operating Inventory used or held for use in connection with Operations on or applicable to the Acquired Properties (the "***Acquired Personal Property***"), including the Acquired Personal Property listed on **<u>Exhibit A-4</u>**;

(i)     all Hydrocarbon sales, purchase, gathering, and processing contracts, transportation contracts, operating agreements, balancing agreements, joint venture agreements, partnership agreements, farmout and farmin agreements, area of mutual interest agreements, surface use agreements, contribution agreements, and other contracts and agreements, in each case, to the extent the foregoing cover, are attributable to, or relate to any of the Acquired Assets or to Operations on or applicable to the Acquired Properties and which are binding on any Assignor or any of the Acquired Assets to the extent listed on **<u>Exhibit A-5</u>** and including the Assumed Executory Contracts listed on Schedule 9.13(c)(i) of the Purchase Agreement (as such Exhibit or Schedule may be amended from time to time pursuant to Section 9.13 of the Purchase Agreement) (the "***Acquired Contracts***"); *provided*, *however*, Acquired Contracts do not include any (i) Acquired Lease, Acquired Easement, Permit, or Acquired Real Estate; or (ii) contract or agreement to the extent constituting or relating to any Excluded Asset, including any Excluded Executory Contract;

(j)     (i) all accounts receivable attributable to the Acquired Assets, and (ii) all rights, claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counterclaims, cross-claims and defenses of any Assignor, in the case of each of clause (i) and (ii), to the extent related to the

Exhibit C-1

2

Acquired Assets and arising or relating to events occurring from or after the Effective Time or relating to the Assumed Liabilities;

(k)      all Technical Data in Assignors' possession to the extent relating to the Acquired Properties (the "**Acquired Data**"); and

(l)      all Records to the extent relating to the Acquired Assets and the Assumed Liabilities; *provided*, *however*, (i) all employee files, and (ii) all other Records expressly constituting Excluded Assets, in each case, shall be excluded (such Records as described in this **Section 1.1(l)**, collectively, the "**Acquired Records**") *provided further*, *however*, Assignors may retain a copies of all such Acquired Records .

It is the intent of Assignors to convey and this Assignment hereby conveys to Assignees, from and after the Effective Time, the Acquired Assets as described herien, regardless of errors in description, any incorrect or misspelled names, or any mistranscribed or incorrect recording references.

**TO HAVE AND TO HOLD** the Acquired Assets unto each Assignee, its successors and assigns, *pro rata* based on the allocation set out in **Schedule 1.1** attached hereto, forever, subject, however, to the Permitted Encumbrances and all the terms and conditions of the Purchase Agreement and this Assignment.

*1.2*      *Excluded Assets and Reservation*.  The Acquired Assets shall not include, and Assignors hereby reserve and retain unto themselves, the Excluded Assets.

## ARTICLE II
## SPECIAL WARRANTY; DISCLAIMERS

*2.1*      *Special Warranty*.  For a period ending at 5:00 p.m. Houston, Texas time on the date that is forty-five (45) days following the Closing Date (the "**Survival Period**"), Assignors hereby warrant Defensible Title to Assignors' collective interest in the Acquired Properties unto Assignees against every Person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Assignors, but not otherwise, subject to and except for the Permitted Encumbrances (the "**Special Warranty**"). The Special Warranty shall be subject to the further limitations and provisions contained in the Purchase Agreement. For the avoidance of doubt, the Special Warranty shall cease and terminate at the end of the Survival Period.

*2.2*      *Subrogation*.  Assignors hereby assign to each Assignee, and each Assignee is subrogated to, *pro rata* based on the allocation set out in **Schedule 1.1** attached hereto, all rights, claims, and causes of action under title warranties given or made by Assignors' predecessors in interest (other than by any other Assignor or by any Affiliate of any Assignor) with respect to the Acquired Assets, and each Assignee is specifically subrogated to its *pro rata* share of all rights which Assignors may have against such predecessors in interest (other than any other Assignor or any Affiliate of any Assignor) with respect to the Acquired Assets, to the extent Assignors may legally transfer such rights and grant such subrogation.

*2.3*      *Disclaimers*.

(a)      EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS SET FORTH IN ARTICLE VII OF THE PURCHASE AGREEMENT AND EXCEPT FOR THE SPECIAL WARRANTY, (I) EACH ASSIGNEE ACKNOWLEDGES THAT NO ASSIGNOR AND NO OTHER SELLER PARTY HAS MADE, AND ASSIGNORS HEREBY EXPRESSLY DISCLAIM AND NEGATE (ON THEIR BEHALF AND ON BEHALF OF THE OTHER SELLER PARTIES), AND EACH ASSIGNEE HEREBY EXPRESSLY WAIVES AND DISCLAIMS ANY RELIANCE ON, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY

Exhibit C-1
3

STATUTE, OR OTHERWISE, INCLUDING RELATING TO PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE QUALITY, QUANTITY, VOLUME, VALUE, RECOVERABILITY, OR DELIVERABILITY OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE ACQUIRED ASSETS, OR THE ACCURACY, COMPLETENESS, OR MATERIALITY OF ANY BACKGROUND MATERIALS, ACQUIRED RECORDS, OR OTHER RECORDS, INFORMATION, DATA, OR MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE OR HEREAFTER FURNISHED TO ANY PURCHASER PARTY BY OR ON BEHALF OF ANY SELLER PARTY, OR THE ENVIRONMENTAL OR OTHER CONDITION OF THE ACQUIRED ASSETS, AND (II) ASSIGNORS EXPRESSLY DISCLAIM AND NEGATE (ON THEIR BEHALF AND ON BEHALF OF THE OTHER SELLER PARTIES), AND EACH ASSIGNEE HEREBY EXPRESSLY WAIVES, ANY AND ALL LIABILITY AND RESPONSIBILITY OF ANY SELLER PARTY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO AN ASSIGNEE OR ANY PURCHASER PARTY (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY SUCH PERSON BY ANY ASSIGNOR OR ANY OTHER SELLER PARTY).

(b)    EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS SET FORTH IN ARTICLE VII OF THE PURCHASE AGREEMENT AND EXCEPT FOR THE SPECIAL WARRANTY, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSIGNORS EXPRESSLY DISCLAIM AND NEGATE (ON THEIR BEHALF AND ON BEHALF OF THE OTHER SELLER PARTIES), AND EACH ASSIGNEE HEREBY WAIVES AND DISCLAIMS ANY RELIANCE ON, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, AS TO ANY OF THE FOLLOWING: (I) THE CONTENTS, CHARACTER, ACCURACY, COMPLETENESS, OR MATERIALITY OF RECORDS, INFORMATION, DATA, OR OTHER MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE, OR HEREAFTER FURNISHED TO ANY ASSIGNEE OR ANY PURCHASER PARTY BY OR ON BEHALF OF ANY SELLER PARTY, INCLUDING ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS, OR STATEMENTS PREPARED BY ANY SELLER PARTY OR THIRD PARTY WITH RESPECT TO THE ACQUIRED ASSETS; (II) THE CONTENTS, CHARACTER, OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL, OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ACQUIRED ASSETS; (III) ANY ESTIMATES OF THE VALUE OF, OR FUTURE REVENUES GENERATED BY, OR COST ESTIMATES CONCERNING, THE ACQUIRED ASSETS; (IV) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE QUALITY, QUANTITY, VOLUME, VALUE, RECOVERABILITY, OR DELIVERABILITY OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE ACQUIRED ASSETS OR ASSIGNORS' INTERESTS THEREIN; (V) TITLE TO ANY OF THE ACQUIRED ASSETS; (VI) MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, MARKETABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE ACQUIRED ASSETS; (VII) ANY RIGHTS OF PURCHASERS UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE; (VIII) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM DEFECTS, WHETHER KNOWN OR UNKNOWN; (IX) ANY IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW; (X) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT; (XI) THE NATURE OF, EXTENT OF, OR AMOUNT OF ANY FUTURE COSTS ASSOCIATED WITH, PLUGGING AND ABANDONMENT OBLIGATIONS; AND (XII) THE ENVIRONMENTAL OR OTHER CONDITION OF THE ACQUIRED ASSETS, INCLUDING ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF SUBSTANCES, WASTES, OR MATERIALS INTO THE ENVIRONMENT, THE PROTECTION OF THE ENVIRONMENT OR OF HUMAN HEALTH, SAFETY, OR NATURAL RESOURCES, OR THE AMOUNT OF ANY FUTURE COSTS ASSOCIATED WITH THE ASSUMED ENVIRONMENTAL LIABILITIES. IT IS THE EXPRESS INTENTION OF ASSIGNEES AND ASSIGNORS THAT, EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS SET FORTH IN ARTICLE VII OF THE PURCHASE AGREEMENT AND THE SPECIAL WARRANTY, THE ACQUIRED ASSETS ARE BEING ACCEPTED BY EACH ASSIGNEE, "AS IS" AND "WHERE IS" AND WITH ALL FAULTS AND DEFECTS (KNOWN OR UNKNOWN, PATENT OR LATENT, DISCOVERABLE,

Exhibit C-1
4

OR UNDISCOVERABLE) AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR, AND ASSIGNEES HAVE MADE ANY AND ALL SUCH INSPECTIONS AS ASSIGNEES DEEM APPROPRIATE .

(c)     EACH ASSIGNEE ACKNOWLEDGES THAT THE ACQUIRED ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT, AND PRODUCTION OF HYDROCARBONS AND THAT (I) EQUIPMENT AND SITES INCLUDED IN THE ACQUIRED PROPERTIES MAY CONTAIN NATURALLY OCCURRING RADIOACTIVE MATERIAL, RADON GAS AND ASBESTOS ("*NORM*") OR OTHER HAZARDOUS MATERIALS, (II) PHYSICAL CHANGES IN THE LAND, GROUNDWATER, OR SUBSURFACE INCLUDED IN, ON, OR UNDER THE ACQUIRED ASSETS MAY HAVE OCCURRED AS A RESULT OF ANY SUCH USES, AND (III) ADVERSE PHYSICAL CONDITIONS MAY BE PRESENT IN, ON, OR UNDER THE ACQUIRED ASSETS, INCLUDING THE PRESENCE OF UNKNOWN, ABANDONED, OR UNPRODUCTIVE OIL WELLS, GAS WELLS, EQUIPMENT, PITS, LANDFILLS, FLOWLINES, PIPELINES, WATER WELLS, INJECTION WELLS, AND SUMPS, WHICH MAY OR MAY NOT HAVE BEEN REVEALED BY SUCH ASSIGNEE'S INVESTIGATION. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS, AND EQUIPMENT AS SCALE OR IN OTHER FORMS. THE WELLS, PIPELINES, MATERIALS, AND EQUIPMENT LOCATED ON OR INCLUDED IN THE ACQUIRED ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS MATERIALS. NORM CONTAINING MATERIAL AND/OR OTHER WASTES OR HAZARDOUS MATERIALS MAY HAVE COME IN CONTACT WITH VARIOUS ENVIRONMENTAL MEDIA, INCLUDING AIR, WATER, SOILS, OR SEDIMENT. SPECIAL PROCEDURES MAY BE REQUIRED FOR THE ASSESSMENT, REMEDIATION, REMOVAL, TRANSPORTATION, OR DISPOSAL OF ENVIRONMENTAL MEDIA, WASTES, ASBESTOS, NORM, AND OTHER HAZARDOUS MATERIALS FROM THE ACQUIRED ASSETS.

(d)     ASSIGNORS AND ASSIGNEES AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>SECTION 2.3</u> ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE, OR ORDER.

# ARTICLE III
## ASSUMED LIABILITIES

Upon the terms and conditions of the Purchase Agreement and the Sale Order, effective from and after the Closing, each Assignee assumes and hereby agrees to fulfill, perform, pay, and discharge (or cause to be fulfilled, performed, paid, and discharged) its *pro-rata* share all Assumed Liabilities; *provided, however*, (x) such Assignee does not assume, and the Assumed Liabilities do not include, the Specified Excluded Liabilities; and (y) such Assignee's assumption of the Assumed Liabilities shall not in any way enlarge the rights of Third Parties relating thereto. Notwithstanding any provision in this Assignment or the Purchase Agreement to the contrary, no Assignee shall assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Specified Excluded Liabilities.

# ARTICLE IV
## ADDITIONAL DEFINITIONS

The following terms, as used herein, shall have the meanings set forth below:

"*Affiliate*" means, with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. As used in this definition, the word "*control*" (and the words "*controlled by*" and "*under common control with*") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

Exhibit C-1
5

"*Easement*" means any easement, right-of-way, license, servitude, surface lease, surface use agreement, or other similar asset, right, or interest in real property.

"*Equipment*" means all Lease Owned equipment, fixtures, physical facilities, and surface and subsurface machinery located on the Lands and used or held for use in connection with the operation, production, treating, storing, or transportation of Hydrocarbons from the Acquired Wells, including all such tanks, boilers, buildings, improvements, injection facilities, saltwater disposal facilities, compression facilities, gathering systems, Christmas trees, derricks, platforms, separators, compressors, gun barrels, and similar items, but excluding Operating Inventory.

"*Excluded Assets*" has the meaning set forth on **Exhibit B-1**.

"*Hedging Instrument*" means: (a) any futures trade, put option, synthetic put option, call option, or other arrangement relating to commodities entered into by a Person on any commodities exchange to hedge such Person's exposure to or to speculate on commodity prices; and (b) any swap, collar, floor or other derivative transaction or hedging arrangement of any type or nature whatsoever in the over-the-counter derivatives market.

"*Hydrocarbons*" means crude oil, natural gas, casinghead gas, condensate, natural gas liquids, and other liquid or gaseous hydrocarbons produced in association with the foregoing.

"*Intellectual Property*" means, with respect to any Person, any intellectual property, industrial property, and other proprietary rights (or portion thereof) owned, licensed, or developed by such Person or any of its Affiliates, or in which such Person or any of its Affiliates has any rights or interests, including any trademark, service mark, trade name, fictitious business name, or other similar intangible asset, registered or unregistered copyrights, patents, inventions, software or systems, and all versions, forms and embodiments thereof, including source code and object code, information that derives economic value from not being generally known to other Persons, including trade secrets and customer lists, and applications for registration and registrations of any of the foregoing (whether pending, existing, abandoned, or expired).

"*Lease Owned*" means any Equipment or Operating Inventory in which an Assignor owns an interest used or held for use in connection with the operation of an Acquired Well or Acquired Wells which is (i) chargeable under applicable joint operating agreements consistent with the standards established by COPAS or (ii) is included within the scope of items that are chargeable under Section II (Direct Charges) of the COPAS 2005 Accounting Procedure, but excluding items considered part of overhead.

"*Operating Inventory*" means Lease Owned rolling stock, pipes, casing, tubing, tubulars, fittings, and other spare parts, supplies, tools, and materials held as operating inventory for use in connection with Operations on or applicable to the Acquired Properties.

"*Permit*" means any permit, license, certificate of authority, franchise, concession, registration, or similar qualification or authorization issued, granted, or given by or under the authority of any Governmental Authority.

"*Records*" means any lease files, land files, well files, Acquired Contract files, gas gathering and processing files, division order files, abstracts, title opinions, and similar records of Assignors to the extent relating directly to the Acquired Assets.

Exhibit C-1

6

"*Technical Data*" means proprietary geologic, geophysical, seismic data and seismic licenses, but excluding any and all interpretive data and analysis of any of the foregoing (it being understood that all such interpretive data and analysis shall constitute an Excluded Asset).

# ARTICLE V
# MISCELLANEOUS

**5.1**      *Separate Assignments*. Where separate assignments of the Acquired Assets have been or will be executed for filing in other recording jurisdictions or counties or for filing with, and approval by, applicable Governmental Authorities, any such separate deeds and assignments (a) shall evidence this Assignment and assignment of the applicable Acquired Assets herein made and shall not constitute any duplication of this assignment of any of the Acquired Assets or interests in the properties covered hereby or thereby, (b) are not intended to modify, and shall not modify, any of the terms, covenants and conditions or limitations on warranties set forth in this Assignment or the Purchase Agreement and are not intended to create, and shall not create, any representations, warranties or additional covenants of or by Assignors to Assignees, and (c) shall be deemed to contain all of the terms and provisions of this Assignment, as fully and to all intents and purposes as though the same were set forth at length in such separate assignments.

**5.2**      *Assignment Subject to Purchase Agreement*. This Assignment is expressly subject to the terms and conditions of the Purchase Agreement, including with respect to the interests assigned hereby. If there is a conflict between the terms of this Assignment and the Purchase Agreement, then the terms of the Purchase Agreement shall control; *provided, however*, Third Parties may conclusively rely on this Assignment to vest title to the Acquired Assets in Assignees as described herein.  Assignors and Assignee intend that the terms of the Purchase Agreement remain separate and distinct from, not merge into the terms and survive the delivery of this Assignment to the extent provided for in the Purchase Agreement.

**5.3**      *Cooperation*. Assignors shall execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, to Assignees, and each Assignee shall execute, acknowledge, and deliver, and cause to be executed, acknowledged, and delivered to Assignors, such further documents and instruments, and take such other and further actions, as may be reasonably requested by each such Party in order to convey and deliver the Acquired Assets to Assignees, to accomplish the orderly transfer of the Acquired Assets and operation thereof to Assignees in the manner contemplated by this Assignment and the Purchase Agreement, to more effectively assure to Assignors the full assumption by Assignees of, and release of Assignors from, the Assumed Liabilities, and to otherwise fully accomplish the Contemplated Transactions, in each case, subject to the terms and conditions in this Assignment, the Purchase Agreement and the Sale Order.

**5.4**      *Governing Law*. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and all Claims or causes of action (whether in contract, tort, or based on any other legal theory) that may be based upon, arise out of, or relate to this Assignment or the negotiation, execution, or performance of this Assignment (including any claim or cause of action based upon, arising out of, or related to any representation or warranty made in or in connection with this Assignment or as an inducement to enter into this Assignment) shall be governed by and construed in accordance with the internal laws of the State of Texas applicable to agreements made and to be performed entirely within such State, without regard to any choice-of-law or conflicts-of-law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas.

**5.5**      *Jurisdiction and Venue*. EXCEPT AS OTHERWISE PROVIDED IN THE PURCHASE AGREEMENT, ANY PROCEEDING ARISING UNDER OR RELATING TO THIS ASSIGNMENT OR THE OTHER TRANSACTION DOCUMENTS, THE INTERPRETATION OF THIS ASSIGNMENT OR THE OTHER TRANSACTION

Exhibit C-1
7

DOCUMENTS, OR THE ENFORCEMENT OF ANY PROVISION OF THIS ASSIGNMENT OR THE OTHER TRANSACTION DOCUMENTS (WHETHER IN LAW, EQUITY, OR OTHER THEORY) SHALL BE BROUGHT OR OTHERWISE COMMENCED IN THE BANKRUPTCY COURT; PROVIDED THAT, IF THE BANKRUPTCY CASE IS CLOSED AND HAS NOT BEEN REOPENED AT THE REQUEST OF A PARTY, SUCH PROCEEDING SHALL BE BROUGHT OR OTHERWISE COMMENCED IN ANY STATE COURT OR THE UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS. EACH PARTY CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS (AND THE APPELLATE COURTS THEREOF) AND AGREES NOT TO COMMENCE ANY SUCH PROCEEDING EXCEPT IN SUCH COURTS. EACH PARTY AGREES NOT TO ASSERT (BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE), AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES IN ANY SUCH PROCEEDING COMMENCED IN SUCH COURT, ANY OBJECTION OR CLAIM THAT SUCH PARTY IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SUCH COURT OR THAT SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. IF SUCH COURTS REFUSE TO EXERCISE JURISDICTION HEREUNDER, THEN THE PARTIES AGREE THAT SUCH JURISDICTION SHALL BE PROPER IN ANY COURT IN WHICH JURISDICTION MAY BE OBTAINED. EACH PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS BY DELIVERY OF THE COPY OF THE PROCESS PURSUANT TO THE NOTICE PROVISIONS SET FORTH IN SECTION 15.7 OF THE PURCHASE AGREEMENT WITH THE SAME FORCE AND EFFECT AS IF SUCH SERVICE HAD BEEN MADE WITHIN THE STATE OF TEXAS.

   5.6     **Waiver of Jury Trial**. EACH PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ITS RIGHT TO A JURY TRIAL IN ANY LAWSUIT, ACTION, OR PROCEEDING BETWEEN OR AMONG THE PARTIES ARISING OUT OF OR RELATING TO THIS ASSIGNMENT.

   5.7     **Successors and Assigns**. This Assignment shall be binding upon the Parties and their respective successors and assigns, and shall inure to the benefit of the Parties and their respective successors and assigns.

   5.8     **Counterparts**. This Assignment may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument. The exchange of copies of this Assignment and of signature pages by facsimile or by electronic image scan transmission in .pdf shall constitute effective execution and delivery of this Assignment as to the Parties and may be used in lieu of the original Assignment for all purposes. Signatures of the Parties transmitted by facsimile or electronic image scan transmission in .pdf shall be deemed to be their original signatures for all purposes.

*[Signature pages follow]*

Exhibit C-1

8

IN WITNESS WHEREOF, this Assignment has been executed by each Assignor as of the date of its acknowledgement below, but is effective for all purposes as of the Effective Time.

**ASSIGNOR:**

_____,
a _____

By: _____
    [Name]
    [Title]

**ACKNOWLEDGMENT**

STATE OF _____

COUNTY OF _____

This instrument was executed on this \_\_\_ day of _____, 2023, by _____, as _____ of _____, a _____, on behalf of said _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My commission expires: _____.
(Notarial Seal)

Exhibit C-1
ASSIGNOR SIGNATURE AND ACKNOWLEDGMENT PAGE

IN WITNESS WHEREOF, this Assignment has been executed by Assignee as of the date of its acknowledgement below, but is effective for all purposes as of the Effective Time.

**ASSIGNEES:**

_____,
a _____

By: _____
      [Name]
      [Title]

**ACKNOWLEDGMENT**

STATE OF _____

COUNTY OF _____

This instrument was executed on this \_\_\_ day of _____, 2023, by _____, as _____ of _____, a _____, on behalf of said _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My commission expires: _____.
(Notarial Seal)

Exhibit C-1
ASSIGNEE SIGNATURE AND ACKNOWLEDGMENT PAGE

## **SCHEDULE 1.1**

**ASSIGNEE ALLOCATIONS**

**(See Attached)**

Exhibit C-1

# **EXHIBIT A–1**

**ACQUIRED LEASES**

**(See Attached)**

Exhibit C-1

**<u>EXHIBIT A–2</u>**

**ACQUIRED WELLS**

**(See Attached)**

Exhibit C-1

**<u>EXHIBIT A–3</u>**

**ACQUIRED EASEMENTS**

**(See Attached)**

Exhibit C-1

## **EXHIBIT A–4**

**ACQUIRED PERSONAL PROPERTY**

**(See Attached)**

Exhibit C-1

## **EXHIBIT A–5**

**ACQUIRED CONTRACTS**

**(See Attached)**

Exhibit C-1

**EXHIBIT B-1**

**EXCLUDED ASSETS**

"***Excluded Assets***" means any of the following of any Assignor or its Affiliates:

(a)　　corporate, financial, Income Tax, franchise tax, and legal data and records of an Assignor and its Affiliates (other than title opinions and abstracts of title pertaining to the Acquired Assets), and all other information, records, and data that relate to an Assignor's or any of its Affiliates' business generally or to businesses of an Assignor or its Affiliates other than the exploration and production of Hydrocarbons and the Acquired Assets;

(b)　　all accounts receivable and other rights to payment, refund, or indemnity accruing or attributable to any period before the Effective Time or to any Excluded Assets, including the right to any payments under any Acquired Leases (including any reduction to, rebate of, or earn-back with respect to bonus payments paid prior to the Effective Time) or otherwise with respect to any Royalties or the overpayment thereof, the full benefit of all Liens, security for such accounts, or rights to payment, and all rights, Claims, refunds, causes of action, or choses in action relating to the foregoing, except in each case with respect to Property and Production Taxes for which Assignees are responsible under Section 13.1 of the Purchase Agreement;

(c)　　all production of Hydrocarbons from or attributable to the Acquired Properties with respect to any period before the Effective Time (other than Hydrocarbons in storage at the Effective Time and make-up Hydrocarbons with respect to Production Imbalances described in **Section 1.1(d)**), including (i) all proceeds attributable to any such pre-Effective Time production, and (ii) all rights, Claims, refunds, causes of action, or choses in action relating to such pre-Effective Time production or proceeds (including settlement of take-or-pay disputes);

(d)　　except as contemplated in Section 9.5 of the Purchase Agreement in respect of Casualty Losses, all insurance policies, and all Claims, payments, and proceeds under any such insurance policies, regardless of whether arising or relating to any period prior to, at, or after the Effective Time;

(e)　　all Hedging Instruments of an Assignor and its Affiliates, if any, and all rights and obligations under any such Hedging Instruments;

(f)　　all bank accounts, cash, deposits, surety bonds, rights under any letters of credit, and collateral pledged to secure any Liability or obligation of an Assignor or its Affiliates in respect of the Acquired Assets;

(g)　　all rights and interests in any Intellectual Property;

(h)　　(i) all interpretive data and analysis of Technical Data, and (ii) all studies related to reserve assessments and economic estimates and analyses;

(i)　　all data, software, and records to the extent disclosure or transfer is prohibited or subjected to payment of a fee, penalty, or other consideration by any license agreement or other agreement with a Third Party, or by applicable Law, and for which no consent to transfer has been received or for which Assignees have not agreed in writing to pay such fee, penalty, or other consideration, as applicable;

Exhibit C-1

(j)        all information entitled to legal privilege, including attorney work product and attorney-client communications (excluding title opinions pertaining to the Acquired Properties), and all other information, records, and data to the extent relating to any of the Excluded Assets;

(k)        records relating to either (i) the auction, marketing, acquisition, or disposition (or proposed acquisition or disposition) of any of the Acquired Assets, including the existence, identity, and inquiries and proposals received from or made to, and records of negotiation with, any Person, and any economic analyses associated therewith, and all internal communications with and documents shared by and with legal counsel of an Assignor and its Affiliates in connection with any of the foregoing, or (ii) any employees of an Assignor or its Affiliates;

(l)        except to the extent related or attributable to the Assumed Liabilities, all proceeds from the settlement or disposition of any Claims, Proceedings, or disputes, all warranties and rights to indemnification, and all other rights, claims, refunds, causes of action, and choses in action, in each case, owed or paid to or in favor of an Assignor or any of its Affiliates, in each case, (i) under the Transaction Documents, (ii) arising out of or relating to any Excluded Assets, or (iii)  to the extent related to the period prior to the Effective Time;

(m)        audit rights under operating agreements or other contracts or agreements to the extent attributable or relating to periods before the Effective Time, or to any Excluded Assets;

(n)        any Claims of any Assignor or any Affiliate thereof for any credits, refunds of or loss carry forwards in respect of (i) Property and Production Taxes with respect to taxable periods or portions thereof ending on or prior to the Effective Time, (ii) Income Taxes or franchise Taxes, or (iii) Taxes attributable to any Excluded Assets;

(o)        all vehicles and all office furniture, office supplies, personal computers and associated peripherals, licensed software, and all radio (excluding SCADA equipment), cell phones and telephone equipment;

(p)        all overhead costs and expenses paid or payable by Third Party non-operators to any Assignor, its Affiliates, or Operator pursuant to any applicable joint operating agreement with respect to periods of time prior to Closing;

(q)        all electronic communications, including email;

(r)        all assets and properties specifically listed in **Exhibit B-2**, including any Excluded Executory Contracts listed thereon, regardless of whether such assets and properties may be used or held for use in connection with the Acquired Assets;

(s)        (i) any and all rights, claims or causes of action by or in the right of an Assignor against any current or former director or officer of an Assignor, and (ii) any and all claims for relief of an Assignor under chapter 5 of the Bankruptcy Code;

(t)        the Basic Documents, as that term is defined in that certain Amended and Restated Indenture dated as of September 12, 2022, between Alpine Summit Funding LLC, a Delaware limited liability company, and UMB Bank N.A., a national banking association, as indenture trustee and not in its individual capacity, as Paying Agent, and as Securities Intermediary; and

(u)        copies of the Acquired Records.

Exhibit C-1

**EXHIBIT B-2**

**SPECIFIED EXCLUDED ASSETS**

[To come][1]

---

[1] NTD: To be the same as Exhibit B to the Purchase Agreement.

Exhibit C-1

**EXHIBIT D-1**

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**FORM OF PURCHASER CLOSING CERTIFICATE**

*[See Attached.]*

## PURCHASER CLOSING CERTIFICATE

This Certificate is furnished pursuant to Section 11.2(i) of that certain Purchase and Sale Agreement (the "**Purchase Agreement**") dated [_____], 2023, by and between HB2 Origination, LLC, a Delaware limited liability company ("**HB2**"), and Ageron Energy II, LLC, a Delaware limited liability company ("**AEII**", and together with HB2, collectively "**Sellers**" and each a "**Seller**"), and San Isidro Energy Company II, LLC, a Texas limited liability company ("**SIEC**"), Ageron Holdings, LLC, a Texas limited liability company ("**Ageron**"), and Needmore Minerals, LLC, a Texas limited liability company ("**Needmore**" and together with SIEC and Ageron, "**Purchasers**" and each a "**Purchaser**"). Capitalized terms used herein and not otherwise defined herein or throughout this Certificate shall have the meanings given such terms in the Purchase Agreement.

Each of the undersigned hereby certifies to Sellers on behalf of its Purchaser (and not in his or her individual capacity) as follows:

1. Each of the representations and warranties of such Purchaser contained in the Purchase Agreement (i) that are qualified by the term "material" or contain terms such as "material adverse change", "material adverse effect", or other terms of similar import or effect (whether or not capitalized) are true and correct as of the date hereof as though such representations and warranties were made at such time (other than representations and warranties that refer to a specified date, which are true and correct on and as of such specified date), and (ii) that are not so qualified are true and correct in all material respects as of the date hereof as though such representations and warranties were made at such time (other than representations and warranties that refer to a specified date, which are true and correct on and as of such specified date).

2. Such Purchaser has performed or complied, in all material respects, with all obligations, agreements, and covenants contained in the Purchase Agreement as to which performance or compliance by such Purchaser is required prior to or on the date hereof.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of [_____], 2023.


[_____]


By:      _____

Name:   _____

Title:   _____

Exhibit D-1

## EXHIBIT D-2

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**FORM OF SELLER CLOSING CERTIFICATE**

*[See Attached.]*

## SELLER CLOSING CERTIFICATE

This Certificate is furnished pursuant to Section 11.2(i) of that certain Purchase and Sale Agreement (the "***Purchase Agreement***") dated [_____], 2023, by and between HB2 Origination, LLC, a Delaware limited liability company ("***HB2***"), and Ageron Energy II, LLC, a Delaware limited liability company ("***AEII***", and together with HB2, collectively "***Sellers***" and each a "***Seller***"), and San Isidro Energy Company II, LLC, a Texas limited liability company ("***SIEC***"), Ageron Holdings, LLC, a Texas limited liability company ("***Ageron***"), and Needmore Minerals, LLC, a Texas limited liability company ("***Needmore***" and together with SIEC and Ageron, "***Purchasers***" and each a "***Purchaser***"). Capitalized terms used herein and not otherwise defined herein or throughout this Certificate shall have the meanings given such terms in the Purchase Agreement.

Each of the undersigned hereby certifies to Purchasers on behalf of its Seller (and not in his or her individual capacity) as follows:

1. Except for any and all breaches and inaccuracies resulting from or based upon matters of which a Purchaser has Knowledge as of the Execution Date, each of the representations and warranties of such Seller contained in the Purchase Agreement (i) that are qualified by the term "material" or contain terms such as "material adverse change", "material adverse effect", or other terms of similar import or effect (whether or not capitalized) are true and correct as of the date hereof as though such representations and warranties were made at such time (other than representations and warranties that refer to a specified date, which are true and correct on and as of such specified date), and (ii) that are not so qualified are true and correct in all material respects as of the date hereof as though such representations and warranties were made at such time (other than representations and warranties that refer to a specified date, which are true and correct on and as of such specified date), in each case, except for any breaches of or inaccuracies in the representations and warranties of such Seller if the effect of all breaches of or inaccuracies in Sellers' representations and warranties (excluding breaches or inaccuracies resulting from or based upon matters of which Purchaser has Knowledge as of the Execution Date) taken together would not result in a Material Adverse Effect.

2. Such Seller has performed or complied, in all material respects, with all obligations, agreements, and covenants contained in the Purchase Agreement as to which performance or compliance by such Seller is required prior to or on the date hereof.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of [_____], 2023.

*[Signature Pages Follow.]*

**<u>SELLERS</u>:**

**HB2 Origination, LLC**

By: _____
Name: _____
Title: _____

**Ageron Energy II, LLC**

By: _____
Name: _____
Title: _____

## EXHIBIT E

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**FORM OF NON-FOREIGN CERTIFICATE**

*[See Attached.]*

## CERTIFICATE OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. To inform _____, a _____, as transferee ("**Transferee**"), that withholding of tax is not required upon the disposition of a United States real property interest owned by HB2 ORIGINATION, LLC, a Delaware limited liability company, as transferor ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor (and not in his or her individual capacity):

1.  Ageron Energy II, LLC is a disregard entity as defined in Section 1.1445-2(b)(2)(iii) of the Treasury Regulations, and is disregarded as separate from Transferor for U.S. federal income tax purposes;

2.  Transferor is not a foreign corporation, foreign partnership, foreign trust, foreign estate or other foreign person as those terms are defined under Section 1445(f)(3) of the Code and Section 1.1445-2(b)(2)(i) of the Treasury Regulations;

3.  Transferor is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii) of the Treasury Regulations;

4.  Transferor's U.S. employer identification number is _____; and

5.  Transferor's office address is:

    _____
    _____
    _____

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Transferor.

Date: _____, 2023

**TRANSFEROR:**

HB2 ORIGINATION, LLC

By:     _____
Name:  _____
Title:   _____

Exhibit E

## SCHEDULE 2.1

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

### PURCHASER ALLOCATIONS

| Purchaser | Interest in Acquired Assets |
|---|---|
| San Isidro Energy Company II, LLC | 47.5% |
| Needmore Minerals, LLC | 47.5% |
| Ageron Holdings, LLC | 5% |

## SCHEDULE 7.6

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**TAXES**

Section 7.6(a) to 7.6(f).

None.

Section 7.6(g).

HB2 holds title to certain of the Acquired Assets on behalf of Alpine 2022 Non-Op (as defined herein) pursuant to that Nominee Agreement made and entered into effective as of August 19, 2022 by and between HB2 Origination, LLC and Alpine 2022 Non-Op, a Texas general partnership ("***Alpine 2022 Non-Op***"), an entity classified as a partnership for U.S. federal income tax purposes and governed by that certain General Partnership Agreement of Alpine 2022 Non-Op dated August 19, 2022, by and between HB2 Origination LLC and each Partner signatory thereto.

<u>**SCHEDULE 7.7**</u>

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**NO CONFLICTS**

None.

**SCHEDULE 7.8**

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**MATERIAL REQUIRED CONSENTS**

**Acquired Leases**:

| No. | Lessor | Lessee | Lease Date | County | State | Vol. / Page |
|-----|--------|--------|------------|--------|-------|-------------|
| 1 | San Roman Mineral Partners | Ageron Energy II, LLC | 9/24/2021 | Webb | TX | 5123/0855 |
| 2 | San Roman Mineral Partners | Ageron Energy II, LLC | 3/25/2022 | Webb | TX | 5269/564 |
| 3 | OCHO MDL | Ageron Energy II, LLC | 2/24/2022 | Webb / LaSalle | TX | 5259/0804 Webb; 1154/340 LaSalle |

**Acquired Contracts**:

| | Counterparty | Seller | Contract |
|---|--------------|--------|----------|
| 1. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Base Contract for Sale and Purchase of Natural Gas dated 09-01-2022 |
| 2. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Special Provisions Attached to Base Contract for Sale and Purchase of Natural Gas dated 09- 01-2022 |
| 3. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | First Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 10-01-2022 |
| 4. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Second Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 11-01-2022 |

| | Counterparty | Seller | Contract |
|---|---|---|---|
| 5. | Enterprise Hydrocarbons LP | Ageron Energy II, LLC | Transaction Confirmation for Base Contract dated 09-01-2022 |
| 6. | Ageron Energy, LLC | Ageron Ironroc Energy, LLC | Services Agreement dated 06-28-2022 |
| 7. | ARM Energy Management LLC | Ageron Energy II, LLC | Base Contract for Sale and Purchase of Natural Gas with General Terms and Conditions dated 03-10-2022 |
| 8. | ARM Energy Management LLC | Ageron Energy II, LLC | Special Provision Contract dated 03-10-2022 |
| 9. | ARM Energy Management LLC | Ageron Energy II, LLC | Transaction Confirmation for Base Contract dated 03-10-2022 |
| 10. | ARM Energy Management LLC | HB2 Origination, LLC | Base Contract for Sale and Purchase of Natural Gas dated 10-01-2022 |
| 11. | ARM Energy Management LLC | HB2 Origination, LLC | Special Provisions Contract dated 10-01-2022 |
| 12. | ARM Energy Management LLC | HB2 Origination, LLC | Transaction Confirmation for Base Contract dated 12-09-2022 |
| 13. | Dos Caminos LLC | Ageron Energy II, LLC<br><br>HB2 Origination, LLC | Service Confirmation for Gas Services Agreement for Intrastate Service dated 10-01- 2022 |
| 14. | Dos Caminos LLC | Ageron Energy II, LLC | Precedent Agreement dated 11-15-2022 |

## SCHEDULE 7.9

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**PREFERENTIAL RIGHTS**

None.

### SCHEDULE 7.10

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

### LITIGATION

1.  Ad Hoc Committee of Drilling Partnership Claimants' Objection to Postpetition Financing Motion and Reservation of Rights Concerning All Other Requested First Day Relief filed at docket number 37 in the Bankruptcy Case.

2.  All those Claims of Third Parties expressly referenced or reserved in the Interim Order (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief issued by the Bankruptcy Court in the Bankruptcy Case filed at docket number 120.

3.  Black Gold Rental Tools, Inc. v. Ironroc Energy Partners, LLC d/b/a Ironroc Energy and Ageron Ironroc Energy, LLC, Cause No. 2023DCV-1417-D, 195th District Court of Nueces County, Texas.

4.  Downhole Well Solutions, LLC v. Ironroc Energy Partners, LLC, Cause No. 23-04-06025, 284th Judicial District Court of Montgomery County, Texas.

5.  Grappler Pressure Pumping, LLC v. Ironroc Energy Partners, LLC & Ageron Ironroc Energy, LLC, Cause No. CJ-2023 – 2259, 127th Judicial District Court of Oklahoma County, Oklahoma.

6.  Titan Directional Drilling, LLC v. Ironroc Energy Partners, LLC, et al., Cause No. 2023-23824, 113th Judicial District Court of Harris County, Texas.

7.  Tim Ables Trucking Company, LLC, v. Ageron Ironroc Energy, LLC, et al., Cause No. 2023CVK000716D1, 49th Judicial District Court of Webb County, Texas.

8.  Charter Pipe, LLC, v. Ironroc Energy Partners, LLC, et al., Cause No. 23-05-06937, 284th Judicial District Court of Montgomery County, Texas.

9.  Border Well Services, Inc. v. Ageron Ironroc Energy, LLC, et al., Cause No. 2023CVK000815D4, 406th Judicial District Court of Webb County, Texas.

10. Padre Tubular, Inc. v. Ageron Ironroc Energy, LLC, Cause No. 2023CVI000811D3, 341st Judicial District Court of Webb County, Texas.

11. Tanmar Rentals, LLC v. Ageron Ironroc Energy, LLC, Cause No. 2023CVH000841D1, 49th Judicial District Court of Webb County, Texas.

12. Yellowjacket Oilfield Services, LLC v. Ironroc Energy Partners, LLC, Cause No. 23-06-07880, County Court at Law #6, Montgomery County, Texas.

13. Ensign US Southern Drilling, LLC v. Ageron Ironroc Energy, LLC, et al., Cause No. 2023CVH000859D2, 111th Judicial District Court, Webb County, Texas.

14. Osprey Energy Services, LLC, v. Ageron Ironroc Energy, LLC, Cause No. 2023-40107, 189th Judicial District Court, Harris County, Texas.

15. Aldonsa, Inc. d/b/a Oilfield Instrumentation USA v. Ironroc Energy Partners, LLC, et al., Cause No. 2023-33684, 215th Judicial District Court, Harris County, Texas.

## <u>SCHEDULE 7.11</u>

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**LEGAL COMPLIANCE**

See matters disclosed on **<u>Schedule 7.22</u>**.

<u>**SCHEDULE 7.12**</u>

A<small>TTACHED TO AND MADE A PART OF THAT CERTAIN</small> P<small>URCHASE AND</small> S<small>ALE</small> A<small>GREEMENT, DATED AS OF</small> A<small>UGUST</small> 16, 2023, <small>BY AND BETWEEN</small> HB2 O<small>RIGINATION,</small> LLC <small>AND</small> A<small>GERON</small> E<small>NERGY</small> II, LLC, <small>AS</small> S<small>ELLERS, AND</small> S<small>AN</small> I<small>SIDRO</small> E<small>NERGY</small> C<small>OMPANY</small> II, LLC, <small>ET AL., AS</small> P<small>URCHASERS</small>

**ENVIRONMENTAL**

See matters disclosed on <u>**Schedule 7.22**</u>.

### SCHEDULE 7.13

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**MATERIAL CONTRACTS**

|  | Counterparty | Seller | Contract |
|---|---|---|---|
| 1. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Base Contract for Sale and Purchase of Natural Gas dated 09-01-2022 |
| 2. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Special Provisions Attached to Base Contract for Sale and Purchase of Natural Gas dated 09- 01-2022 |
| 3. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | First Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 10-01-2022 |
| 4. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Second Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 11-01-2022 |
| 5. | Enterprise Hydrocarbons LP | Ageron Energy II, LLC | Transaction Confirmation for Base Contract dated 09-01-2022 |
| 6. | Ageron Energy, LLC | Ageron Ironroc Energy, LLC | Services Agreement dated 06-28-2022 |
| 7. | ARM Energy Management LLC | Ageron Energy II, LLC | Base Contract for Sale and Purchase of Natural Gas with General Terms and Conditions dated 03-10-2022 |
| 8. | ARM Energy Management LLC | Ageron Energy II, LLC | Special Provision Contract dated 03-10-2022 |
| 9. | ARM Energy Management LLC | Ageron Energy II, LLC | Transaction Confirmation for Base Contract dated 03-10-2022 |
| 10. | ARM Energy Management LLC | HB2 Origination, LLC | Base Contract for Sale and Purchase of Natural Gas dated 10-01-2022 |
| 11. | ARM Energy Management LLC | HB2 Origination, LLC | Special Provisions Contract dated 10-01-2022 |

| | Counterparty | Seller | Contract |
|---|---|---|---|
| 12. | ARM Energy Management LLC | HB2 Origination, LLC | Transaction Confirmation for Base Contract dated 12-09-2022 |
| 13. | Dos Caminos LLC | Ageron Energy II, LLC<br><br>HB2 Origination, LLC | Service Confirmation for Gas Services Agreement for Intrastate Service dated 10-01- 2022 |
| 14. | Dos Caminos LLC | Ageron Energy II, LLC | Precedent Agreement dated 11-15-2022 |

<u>**SCHEDULE 7.14**</u>

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**CURRENT COMMITMENTS**

See those matters disclosed on <u>**Schedule 9.1**</u>.

## SCHEDULE 7.15

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

## IMBALANCES

As of the July 2023 production month: None.

## SCHEDULE 7.16

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS
OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC,
AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

## SUSPENSE ACCOUNTS

<u>As of the June 2023 production month</u>: $31,034.91.

## SCHEDULE 7.17

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

### LEASES

None.

### SCHEDULE 7.20

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**WELLS AND EQUIPMENT**

1.  There are certain operational and mechanical issues with the frac tree valves, production trees and associated Equipment which will require repairs on the following the Acquired Wells:

| No. | Well Name & Number | API Number | County | State |
|-----|--------------------|------------|--------|-------|
| 1 | AI San Roman 101H | 42-479-44505 | Webb | TX |
| 2 | AI San Roman 102H | 42-479-44506 | Webb | TX |
| 3 | AI San Roman 103H | 42-479-44627 | Webb | TX |
| 4 | AI San Roman 104H | 42-479-44628 | Webb | TX |

These issues have resulted in the shutting-in of the following Acquired Wells: AI San Roman 101H (42-479-44505) and AI San Roman 102H (42-479-44506).

2.  The following Acquired Well has been shut-in because a choke body has washed out and Sellers and Operator have been unable to obtain the necessary replacement part to repair the issue and bring the Acquired Well back to production:

| No. | Well Name & Number | API Number | County | State |
|-----|--------------------|------------|--------|-------|
| 1 | AI Ocho 101H | 42-479-44665 | Webb | TX |

3.  See those matters disclosed on **Schedule 9.1**.

<u>**SCHEDULE 7.22**</u>

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**PERMITS**

1.  There is currently no Texas Railroad Commission ("***TRRC***") T-4 Permit for the following pipelines included in the Acquired Assets: (1) Ocho pipeline; (2) San Roman South pipeline; and (3) San Roman East (east of IH-35) pipeline. An application for these Permits was filed with the TRRC on August 8, 2023, but these Permits have not yet been issued.

2.  Operator has not been registered with the Pipeline and Hazardous Materials Safety Administration (the "***PHMSA***"). Operator has not filed the annual reports for the 2022 reporting year required under Applicable Law to be filed with the PHMSA.

3.  There are no Permits in place for any reserve pits or water wells located on the Acquired Properties.

## SCHEDULE 7.23

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

### ROYALTIES

None.

## SCHEDULE 7.24

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

### BONDS

1. HB2 and Operator have deposited with the TRRC the amount of $50,000.00 in cash to satisfy the TRRC's P-5 Financial Assurances requirements.

## SCHEDULE 9.1

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

### CERTAIN OPERATIONS

1. Operations and activities to address and repair those matters disclosed on **Schedule 7.20**, including the following:

   a. Running of caliper log on the AI San Roman 101H (42-479-44505) and AI San Roman 102H (42-479-44506) to identify casing damage;

   b. Running of tubing through the wellbores of the following Acquired Wells: AI San Roman 101H (42-479-44505), AI San Roman 102H (42-479-44506), AI San Roman 103H (42-479-44627), and AI San Roman 104H (42-479-44628);

   c. Repair and/or replacement of the lower frac valves on the following Acquired Wells: AI San Roman 101H (42-479-44505), AI San Roman 102H (42-479-44506), AI San Roman 103H (42-479-44627), and AI San Roman 104H (42-479-44628); and

   d. Repair and/or replacement of the choke body on the AI Ocho 101H (42-479-44665).

2. Inspection of frac valves on the following Acquired Wells:

| No. | Well Name & Number | API Number | County | State |
|-----|--------------------|------------|--------|-------|
| 1 | AI San Roman 105H | 42-479-44838 | Webb | TX |
| 2 | AI San Roman 106H | 42-479-44839 | Webb | TX |
| 3 | AI San Roman 201H | 42-479-44755 | Webb | TX |
| 4 | AI San Roman 202H | 42-479-44756 | Webb | TX |
| 5 | AI San Roman South 101H | 42-479-44666 | Webb | TX |
| 6 | AI San Roman South 102H | 42-479-44667 | Webb | TX |
| 7 | AI Ocho 101H | 42-479-44665 | Webb | TX |

### SCHEDULE 9.1(a)(iii)

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**INSURANCE**

1. Commercial General Liability Insurance, with limits of $1,000,000 per occurrence, $2,000,000 aggregate.

2. Commercial Umbrella/Excess Liability Insurance with a limit of $20,000,000 aggregate.

3. Control of Well/Operator's Extra Expense Insurance covering workover and producing wells (but excluding drilling and completion) with a limit of 10,000,000.

4. Business Personal Property Insurance with a limit of $200,000.

## <u>SCHEDULE 9.3</u>

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

### GUARANTEES

1. HB2 and Operator have deposited with the TRRC the amount of $50,000.00 in cash to satisfy the TRRC's P-5 Financial Assurances requirements.

<u>**SCHEDULE 9.13(b)**</u>

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**EXECUTORY CONTRACTS**

1. Base Contract for Sale and Purchase of Natural Gas dated 09-01-2022 between Enterprise Hydrocarbons L.P. and Ageron Energy II, LLC

2. Special Provisions Attached to Base Contract for Sale and Purchase of Natural Gas dated 09- 01-2022  between Enterprise Hydrocarbons L.P. and Ageron Energy II, LLC

3. First Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 10-01-2022 between Enterprise Hydrocarbons L.P. and Ageron Energy II, LLC

4. Second Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 11-01-2022 between Enterprise Hydrocarbons L.P. and Ageron Energy II, LLC

5. Transaction Confirmation for Base Contract dated 09-01-2022 between Enterprise Hydrocarbons L.P. and Ageron Energy II, LLC

6. Services Agreement, dated as of June 28, 2022, but effective as of August 1, 2021, by and between Ageron Energy, LLC and Ageron Ironroc Energy, LLC

7. Base Contract for Sale and Purchase of Natural Gas with General Terms and Conditions dated 03-10-2022 by and between ARM Energy Management LLC and Ageron Energy II, LLC

8. Special Provision Contract dated 03-10-2022 by and between ARM Energy Management LLC and Ageron Energy II, LLC

9. Transaction Confirmation for Base Contract dated 03-10-2022 by and between ARM Energy Management LLC and Ageron Energy II, LLC

10. Base Contract for Sale and Purchase of Natural Gas dated 10-01-2022 by and between ARM Energy Management LLC and HB2 Origination, LLC

11. Special Provisions Contract dated 10-01-2022 by and between ARM Energy Management LLC and HB2 Origination, LLC

12. Transaction Confirmation for Base Contract dated 12-09-2022 by and between ARM Energy Management LLC and HB2 Origination, LLC

13. Precedent Agreement dated 11-15-2022 between Dos Caminos LLC and Ageron Energy II, LLC

14. Service Confirmation for Gas Services Agreement for Intrastate Service dated 10-01- 2022 between Dos Caminos LLC, on the one hand, and Ageron Energy II, LLC and HB2 Origination, LLC, on the other hand

15. Interruptible Gas Purchase Contract dated 10-1-22 between Evolve Transition Infrastructure LLC and Ageron Energy II, LLC

16. Facilities Construction Agreement between Texas Pipeline Webb County Lean System, LLC and Ageron Energy II, LLC, dated October 22, 2021

17. Natural Gas Treating Equipment Lease between Transtex, LLC and Ageron Ironroc Energy, LLC dated July 29, 2022 (Train #1)

18. Amendment No. 1 to Natural Gas Treating Equipment Lease (San Roman, Train #1)

19. Natural Gas Treating Equipment Lease between Transtex, LLC and Ageron Ironroc Energy, LLC dated July 29, 2022 (Train #2) dated January 12, 2023

20. Amendment No. 1 to Natural Gas Treating Equipment Lease (San Roman, Train #2) dated January 12, 2023.

21. The Nominee Agreement made and entered into effective as of August 19, 2022 by and between HB2 Origination, LLC and Alpine 2022 Non-Op, a Texas general partnership, and the associated General Partnership Agreement of Alpine 2022 Non-Op dated August 19, 2022, by and between HB2 Origination LLC and each Partner signatory thereto.

**SCHEDULE 9.13(c)(i)**

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

**ASSUMED EXECUTORY CONTRACTS**

|  | Counterparty | Seller | Contract |
|---|---|---|---|
| 1. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Base Contract for Sale and Purchase of Natural Gas dated 09-01-2022 |
| 2. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Special Provisions Attached to Base Contract for Sale and Purchase of Natural Gas dated 09- 01-2022 |
| 3. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | First Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 10-01-2022 |
| 4. | Enterprise Hydrocarbons L.P. | Ageron Energy II, LLC | Second Amendment to NAESB Base Contract, Special Provisions, and Transaction Confirmation dated 11-01-2022 |
| 5. | Enterprise Hydrocarbons LP | Ageron Energy II, LLC | Transaction Confirmation for Base Contract dated 09-01-2022 |
| 6. | Ageron Energy, LLC | Ageron Ironroc Energy, LLC | Services Agreement dated 06-28-2022 |
| 7. | ARM Energy Management LLC | Ageron Energy II, LLC | Base Contract for Sale and Purchase of Natural Gas with General Terms and Conditions dated 03-10-2022 |
| 8. | ARM Energy Management LLC | Ageron Energy II, LLC | Special Provision Contract dated 03-10-2022 |
| 9. | ARM Energy Management LLC | Ageron Energy II, LLC | Transaction Confirmation for Base Contract dated 03-10-2022 |
| 10. | ARM Energy Management LLC | HB2 Origination, LLC | Base Contract for Sale and Purchase of Natural Gas dated 10-01-2022 |
| 11. | ARM Energy Management LLC | HB2 Origination, LLC | Special Provisions Contract dated 10-01-2022 |

|     | Counterparty | Seller | Contract |
| --- | --- | --- | --- |
| 12. | ARM Energy Management LLC | HB2 Origination, LLC | Transaction Confirmation for Base Contract dated 12-09-2022 |
| 13. | Dos Caminos LLC | Ageron Energy II, LLC<br><br>HB2 Origination, LLC | Service Confirmation for Gas Services Agreement for Intrastate Service dated 10-01- 2022 |
| 14. | Dos Caminos LLC | Ageron Energy II, LLC | Precedent Agreement dated 11-15-2022 |

## SCHEDULE 9.13(c)(ii)

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF AUGUST 16, 2023, BY AND BETWEEN HB2 ORIGINATION, LLC AND AGERON ENERGY II, LLC, AS SELLERS, AND SAN ISIDRO ENERGY COMPANY II, LLC, ET AL., AS PURCHASERS

## EXCLUDED EXECUTORY CONTRACTS

1. Interruptible Gas Purchase Contract dated 10-1-22 between Evolve Transition Infrastructure LLC and Ageron Energy II, LLC

2. Facilities Construction Agreement between Texas Pipeline Webb County Lean System, LLC and Ageron Energy II, LLC, dated October 22, 2021

3. Natural Gas Treating Equipment Lease between Transtex, LLC and Ageron Ironroc Energy, LLC dated July 29, 2022 (Train #1)

4. Amendment No. 1 to Natural Gas Treating Equipment Lease (San Roman, Train #1)

5. Natural Gas Treating Equipment Lease between Transtex, LLC and Ageron Ironroc Energy, LLC dated July 29, 2022 (Train #2) dated January 12, 2023

6. Amendment No. 1 to Natural Gas Treating Equipment Lease (San Roman, Train #2) dated January 12, 2023.

7. The Nominee Agreement made and entered into effective as of August 19, 2022 by and between HB2 Origination, LLC and Alpine 2022 Non-Op, a Texas general partnership, and the associated General Partnership Agreement of Alpine 2022 Non-Op dated August 19, 2022, by and between HB2 Origination LLC and each Partner signatory thereto.