IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| ALPINE SUMMIT ENERGY PARTNERS, *et al.*, | § § § § | Case No. 23-90739 |
| Debtors.[1] | § § § § | (Jointly Administered) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' JOINT CHAPTER 11 PLAN, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH <u>RESPECT THERETO, AND (V) GRANTING RELATED RELIEF</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Alpine Summit Energy Partners, Inc. and affiliates debtors (the "<u>Debtors</u>") objects to the Disclosure Statement Motion,[2] and respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. The Plan accomplishes only one objective that a chapter 7 trustee cannot: exonerating the Debtors' management, directors, and officers from liability for the $8.5 million in prepetition insider transfers made within the year prior to the Petition Date and other D&O claims

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Alpine Summit Energy Partners, Inc. (3755), HB2 Origination, LLC (6760), Ageron Energy II, LLC (1436), Ironroc Energy Partners, LLC (9801), Ageron Ironroc Energy, LLC (N/A), Alpine Summit Energy Investors, Inc. (4428), and Alpine Carbon, LLC (N/A). The location of the Debtors' service address is: 3322 West End Ave, Suite 450, Nashville, TN 37203.

[2] The "Disclosure Statement Motion" is *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Dkt. No. 1248]. Capitalized terms not defined herein have the meaning given them in the Disclosure Statement Motion.

such as breach of fiduciary duty. A central purpose of chapter 11 is protection of unsecured creditors.[3] But the Debtors contravene that policy in the Plan—depriving unsecured creditors of valuable sources of recovery through unjustifiable releases of estate claims against the Debtors' insiders.

2. The Plan further alienates unsecured creditors through a two-trust scheme that further insulates the Debtors' insiders. The main remaining chapter 11 tasks include resolving claims, distributing sale proceeds, defense in three adversary proceedings, and prosecuting claims against third parties like Bank7 and insiders. It is not uncommon for a chapter 11 plan to delegate these tasks to a post-confirmation trust. However, it is *uncommon* for a non-UCC party to control that trust. A liquidating chapter 11 plan with a two-trust structure is also uncommon—if not unprecedented—for a case of this nature.

3. The Plan's extraordinarily broad insider releases coupled with the unnecessary (and inefficient) two-trust system erects two barricades between the Debtors' insiders and unsecured creditors. The insider releases are unconfirmable—the insiders have provided no consideration in exchange for release of the estates' valuable claims against them. Recognizing that the releases are unlikely to survive confirmation, the Debtors have proposed a two-trust system that provides a second defensive front by isolating the insider claims in a GUC Trust that will not be able to prosecute those claims due to a lack of any current funding.

4. The Debtors' solicitation materials simply do not adequately describe the significant value associated with the claims against insiders that the Debtors seek to extinguish and the effect of the Debtors' inefficient two-trust scheme. The Committee respectfully requests

---

[3] *See In re Route 202 Corp.*, No. 82-01703K, 1984 Bankr. LEXIS 6389, at *20 (Bankr. E.D. Penn., Jan. 23, 1984) (noting that a "chief purpose of a Chapter 11 reorganization" is the "protection of unsecured creditors"); *In re Spenard Ventures, Inc.*, 18 B.R. 164, 168 (Bankr. D. Alaska 1982).

the Debtors include the letter attached as **Exhibit A** and revise the Disclosure Statement to include the changes marked in **Exhibit B**.

## BACKGROUND

5. The Debtors experienced financial distress in the months leading up to their bankruptcy filing. The Debtors' financial distress worsened after Bank7 failed to approve the Debtors' credit facility upsize in March 2023. According to the Debtors' former CEO, the Debtors' inability to obtain third party financing "led to and continues to be the root source of the Debtors' challenges. . . ." First Day Dec. ¶ 34–35.[4]

6. The Debtors' liquidity also suffered in the months preceding the bankruptcy filing when operating partners and contract counterparties refused to pay the Debtors. *See id*. at 38. The Debtors ceased paying vendors whose services enabled the Debtors' drilling and completion of several wells, resulting in hundreds of statutory liens filed against the Debtors' assets. Vendors collectively asserted $90 million of unpaid claims against the Debtors' as of the bankruptcy filing.[5]

7. Yet, the Debtors continued paying management and other insiders bonuses, dividends, and working interest payments days—on top of their annual salaries—notwithstanding their inability to pay creditors. By way of example, the Debtors' management paid themselves over $1.7 million in May 2023—well after they knew they could not pay creditors.

8. The Debtors filed voluntary chapter 11 petitions on July 5, 2023. The U.S. Trustee appointed the Committee, consisting of (a) Axis Energy Services, LLC, (b) Bighorn Oilfield Services, LLC, (c) Cameron International Corporation, (d) Charter Pipe LLC, and (e) Magnolia Oil & Gas Operating, LLC on July 18, 2023. The Debtors sold substantially all of their assets in

---

[4] *Declaration of Craig Perry in Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 9].
[5] *See Statement of Financial Affairs for HB2 Origination, LLC (Case No. 23-90741)* [Dkt. No. 449] at 393 & 410.

§ 363 sales. *See* Dkt. Nos. 623, 775, 991, and 1090. The Debtors filed the Plan, Disclosure Statement, and Disclosure Statement Motion seeking conditional approval to solicit votes on the Plan on December 23, 2023.[6]

9. Article X of the Plan contains exceptionally broad releases for "Released Parties" including insiders, and their respective officers, directors, shareholders, and employees.[7] The "Releasing Parties"[8] include the Debtors and creditors that do not opt out. The Releasing Parties release the Released Parities from "any and all past or present Claims, Interests, indebtedness, and obligations, rights, suits, losses, damages, injuries, costs, expenses, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims." Plan, Art. X.B. (the "<u>Debtor Releases</u>") and X.C. (the "<u>Third-Party Releases</u>") (collectively, the "<u>Releases</u>").

10. The Plan creates two trusts that further shield insiders from creditors. All the Debtors' assets, including all cash and unsold assets on the Plan's effective date are funneled to the primary trust—the Lienholder Trust. The Lienholder Trustee is the sole party responsible for objecting to and resolving all administrative, priority, Section 510(b) Claims, and secured vendor

---

[6] The "<u>Plan</u>" is the Debtors' *Liquidating Plan of Alpine Summit Energy Partners, Inc. and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Dkt. No. 1246]. The "<u>Disclosure Statement</u>" is the *Disclosure Statement for the Liquidating Plan of Alpine Summit Energy Partners, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Dkt. No. 1247].

[7] "Released Parties" means, collectively, and in each case in its capacity as such, (a) the Debtors, (b) Chief Restructuring Officer, (c) Deputy Chief Restructuring Officer, (d) DIP Lender, (e) Prepetition Lender (except to the extent of the challenge), and (f) with respect to each of the foregoing Entities in clauses (a) through (e), each such Entity's current officers, directors, shareholders, employees, agents, financial and other advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals as of the Confirmation Date, including in any such persons' capacity as director and/or officer (or any similar position) of any of the Debtors, and successors in interest of any such party.

[8] "Releasing Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors, (b) each Holder of a Claim that does not elect the Release Opt-Out on its Ballot, and (c) with respect to each of the foregoing Entities in clause (b) such Entity's current subsidiaries, and its and their managed accounts or funds, such Entity and its current officers, directors, employees, agents, financial and other advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals, in their capacities as such, and predecessors and successors in interest of any such party.

liens. The Liquidating Trustee is also responsible for defending the estate in adversary proceedings that the Development Partnerships, Alpine Summit Funding, and Alpine Non-Op filed.

11. In essence, the Plan confers the Lienholder Trustee with all the power of a typical chapter 11 plan administrator or liquidating trustee. The Plan funds the Lienholder Trustee with all the Debtors' liquid assets to perform the substantial work required of the Lienholder Trustee. The Debtors, Bank7, and the secured lien claimants select the Lienholder Trustee—notwithstanding that the unsecured creditors committee appointed the post-confirmation trustee in 8 of the most recent chapter 11 cases in the Southern District of Texas. *See infra* ¶ 18.

12. The Lienholder Trustee is not permitted to pursue claims against Bank7 or the Debtors' insiders in the (likely) event that the Court does not approve the Releases—notwithstanding that those claims are the estates' most valuable unencumbered assets. Instead, those claims against Bank7 and the Debtors' insiders are banished to an unfunded GUC Trust. In other words, the Plan erects an impenetrable wall between the claims against Bank7 and the insiders and the means to pursue those claims.

13. The Debtors and the Committee select a GUC Trustee that has no power or responsibility other than prosecuting estate causes of action. This structure greatly benefits Bank7 and the Debtors' insiders, to the detriment of the unsecured creditors, because only an unfunded trustee can pursue those claims.

14. The chart below summarizes the two trusts:

| Trust: | Appointed by: | Assets: | Beneficiaries: | Purpose: |
|---|---|---|---|---|
| **Lienholder** | Debtors<br>Bank7<br>Lien Claimants | All cash<br>All unsold assets | Bank7<br>Secured lien claims[9] | Objecting to/resolving all administrative claims, priority claims, and secured claims (except Bank7), including statutory lienholder claims under the Lien Determination Procedures Order. |

---

[9] The GUC Trust is also a beneficiary if Bank7 and secured lien claims are paid in full.

| Trust: | Appointed by: | Assets: | Beneficiaries: | Purpose: |
|---|---|---|---|---|
| | | | | Liquidating and distributing Lienholder trust assets to administrative claimants, professionals, priority tax, other priority, lienholder trustee fees and expenses, lienholder trustee's professionals' fees and expenses, Bank7, and secured claims, including statutory lienholder claims. |
| | | | | Prosecuting and defending adversary proceedings filed by the Development Partnerships, Alpine Summit Funding, and Alpine Non-Op. |
| **GUC** | Debtors UCC | Retained causes of action[10] | GUC claims | Prosecuting the Debtors' causes of action[11] |

# OBJECTION

15. The Court should deny conditional approval of the Disclosure Statement unless the Debtors include the Committee's Letter attached as **Exhibit A** and revise the Disclosure Statement to include the changes in **Exhibit B**. The Disclosure Statement lacks "adequate information" to enable creditors to make an informed decision on Plan voting. However, the combined plan and disclosure statement process means that the Debtors will have already spent substantial resources soliciting a plan that the Committee believes lacks adequate information.

**A. The Disclosure Statement Fails to Adequately Describe the Anomalous Two-Trust Structure.**

16. The Debtors sold substantially all their operating assets in § 363 sales. *See* DS, Art. IV.G.–H. The Debtors no longer operate those assets or operate as a going concern. The Plan thus terminates all the Debtors' officers, directors, and managers and terminates all employment agreements on the Plan's effective date. Plan, Art. V.K., O. Yet, the Debtors have consent rights on selection of the trustees for the two post-confirmation trusts.

---

[10] The GUC Trust receives any remaining cash after payment in full of administrative claims, priority claims, the Lienholder Trustee (and its professionals') fees and expenses, Bank7, and other secured claims.

[11] These causes of action do not include the Development Partnership, Alpine Summit Funding, or Alpine Non-Op adversary proceedings: case numbers 23-03238, 23-03213, and 23-03244.

17. The Committee, however, has no power to select the Plan's main post-confirmation trustee of a trust in which unsecured creditors are the ultimate beneficiary.[12] The ability for unsecured creditors to recover from the Plan's main trust—the Lienholder Trust—depends on the Lienholder Trustee's (i) success in resolving administrative, priority, and secured vendor liens claims, (ii) success in the Development Partnerships, Alpine Summit Funding, and Alpine Non-Op adversary proceedings, and (iii) efficiency in its (and its professionals') fees and expenses.

18. The Committee should have a strong influence on the selection of the post-confirmation trustees. The chart below shows the chapter 11 plans filed in the most recent Southern District of Texas complex cases. The Debtors' two-trust system is anomalous compared to these cases. Moreover, the chart illustrates that creditor committees overwhelmingly control selection of the post-confirmation trustee or plan administrator.

| Case Name | Case/Dkt. No. | No. Trusts | Governance | Selector |
|---|---|---|---|---|
| Instant Brands Acquisition Holdings | 23-90716 Dkt. 845 | 1 | Litigation Trustee selected in Plan<br>3-member Litigation Trust Advisory Board | Plan designates<br>Lenders appoint 2 members; UCC appoints 1 member |
| Athenex, Inc. | 23-90295 Dkt. 501 | 1 | Liquidating Trustee | UCC with debtors' consent that is "reasonably acceptable" |
| Party City Holdco | 23-90005 Dkt. 1460 | 1 | GUC Trustee | UCC |
| Mining Project Wind Down | 22-90273 Dkt. 889 | 1 | Plan Administrator<br>2-member Plan Oversight Committee | Debtors<br>UCC |
| Cineworld Group | 22-90168 Dkt. 1943 | 1 | Litigation Trustee | UCC |
| Talen Energy | 22-90054 Dkt. 1722 | 1 | GUC Trustee | UCC with debtors' and unsecured noteholders' consent |
| Honx | 22-90035 Dkt. 1218 | 1 | Asbestos Trustee | FCR, in consultation with UCC and counsel for asbestos claimants |

---

[12] The Lienholder Trust Waterfall includes the GUC Trust as the 5th (and last) beneficiary. *See* Plan, Art. V.E.

| Case Name | Case/Dkt. No. | No. Trusts | Governance | Selector |
|---|---|---|---|---|
| GWG Holdings | 22-90032<br><br>Dkt. 1924 | 2 | Litigation Trustee | Unsecured Bondholder Committee[13] |
|  |  |  | Wind Down Trustee | Plan designates |

19.     The Plan's two-trust structure also impermissibly deprives unsecured creditors of the benefits of certain estate causes of action that are not released.  Notably, the Plan assigns to the Lienholder Trust all estate causes of action, including Chapter 5 claims, against the Ad Hoc Committee of Development Partnerships, Alpine NonOp, LLC, and Alpine Summit Funding (collectively, the "Title/Trust Claims" as defined in the Plan).  *See* Plan, Art. V.D.  Yet, the estates' claims are unencumbered assets that should benefit, and be controlled by, unsecured creditors.  These Title/Trust Claims should not be assigned to the Lienholder Trust, nor should the Lienholder Trust be charged with representing the estates' interests in defending against claims asserted by these claimants, all of which seek to deprive the estates of assets that represent potential recoveries for unsecured creditors.

20.     Creditors reviewing the Plan will not understand the abnormal nature of the two-trust structure based on the Disclosure Statement—let alone its likely intent to elevate insiders over creditors.  The Disclosure Statement should inform creditors of the lack of precedent for the two-trust scheme and the unprecedented alienation of unsecured creditor groups in post-confirmation trustee selection.  A plan proponent may only solicit votes to accept or reject a chapter 11 plan after the Court approves a disclosure statement containing "adequate information."  11 U.S.C. § 1125.  Conditional disclosure statement approval does not vitiate § 1125, which requires enabling a "hypothetical investor typical of the holder of claims or interest in the case" to cast an

---

[13] The Unsecured Bondholder Committee was the de factor UCC in GWG.

informed vote on the plans. *See Barron & Newburger, P.C. v. Texas Skyline, Ltd.*, (*In re Woerner*), 783 F.3d 266, 271 (5th Cir. 2015).

## B. The Disclosure Statement Fails to Adequately Describe the Extent that the Debtor Releases Deprive the Creditors of Value

21. Unsecured creditors' main source of recovery may be proceeds of avoidance actions and other claims against the Debtors' insiders. Neither the Cash Collateral Order nor the DIP Order provide prepetition secured claimants a lien on the estates' claims under chapter 5 of the Bankruptcy Code or recovery from claims against the Debtors' insiders. The Committee is unaware of any other party that purports to have a lien on these claims.

22. The Debtors' statement of financial affairs describes the following insider payments in the year preceding the bankruptcy filing:

| | |
|---|---|
| Bonus | $ 1,772,000.00 |
| Stock Dividends | $ 1,896,000.00 |
| Working Interest Payments | $ 1,906,000.00 |
| Independent Contractor | $ 230,000.00 |
| Dividend Equivalent for Vested DSUs | $ 29,000.00 |
| **Subtotal** | **$ 5,833,000.00** |
| Base Salary | $ 2,579,000.00 |
| **Grand Total** | **$ 8,412,000.00** |

23. The Debtors acknowledge that these type of insider payments are susceptible to avoidance under chapter 5 of the Bankruptcy Code. *See* DS, Art. V.D. The Debtors also mention potential D&O claims for breach of fiduciary duty, breach of contract, aiding and abetting breach of fiduciary duty. *See id.* The Debtors' mention of these potential claims is unsurprising considering the various allegations regarding the D&O's prepetition actions that various creditors have raised. For example, Alpine Summit Funding LLC ("ASF") filed an adversary proceeding against various officers and directors alleging fraudulent transfer, alter ego, breach of fiduciary

duty, and other claims. The Debtors filed a motion (the "Stay Motion") seeking Court enforcement of the automatic stay because those claims belong to the estate. *See* Dkt. No. 1186 at ¶¶ 15–19.

24. Yet, the claims the Debtors valiantly fought to protect for the estates' benefit evaporate under the Debtors' Plan without any meaningful justification. The Debtors state that they "have undertaken an analysis" of these and other claims (including the chapter 5 claims) but provide no other description to inform creditors about the investigation process, including who conducted the investigation, whether an independent party led the investigation, what investigative steps were taken, what interested-party transactions the Debtors investigated, and who ultimately determined that granting the insider releases was in the estates' best interests. *See* DS, Art. V.D. The Debtors include discussions of certain legal principles but provide no concrete value analysis to inform creditors whether to accept or reject a plan that wholesale releases these claims. *See id*.

25. The Disclosure Statement fails to provide *any* information regarding consideration to the Released Parties provided in exchange for the Releases. Instead, the Plan casually states that the Debtor Releases are pursuant to section 1123(b), "for good and valuable consideration." *See* Plan, Art. X.B. Section 1123(b)(3)(A) permits a plan to settle or adjust claims belonging to the estate. *See In re Bigler LP*, 442 B.R. 537, 543–44 (Bankr. S.D. Tex. 2010) (describing releases of estate claims under § 1123(b)(3)(A)). Courts within the Fifth Circuit consider the following factors when approving releases under a plan: (a) the probability of success of litigation; (b) the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment; and (c) all other factors bearing on the wisdom of compromise. *See Official Comm. Of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (citing *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980)).

26.     Instead of supplying creditors with supporting detail for the Debtor Releases under Fifth Circuit law, the Debtors offer the following conclusory (and self-serving) reasoning:

- "[T]he Debtors believe that claims for breach of fiduciary duty against the D&Os will be challenging to successfully assert based on the merits of the potential claims, and the time cost and risk associated with litigating such claims to conclusion."

- "[I]t will be challenging to successfully assert claims based on bonus payments, distributions and/or working interest payments based on the merits of the potential claims, and the time, cost and risk associated with litigating such claims to conclusion."

- "[T]he Debtors believe the value that has been contributed, and continues to be contributed, by the D&Os, outweighs the value of any potential claims."

*See* DS, Art. V.D.–E.

27.     The Debtors fail to meaningfully describe any "value" the D&Os have contributed in exchange for the releases—let alone whether such contributions outweigh the claims' value. *See* DS, Art. V.D.1.  Lack of consideration for the Debtor Releases renders the releases defective. *See Bigler*, 442 B.R. at 543–44 (noting that plan releases provide no value without consideration); *In re Wash. Mut. Inc.*, 442 B.R. 314, 354 (Bankr. D. Del. 2011) (finding lack of adequate contribution to justify D&O plan releases).  Further, the lack of any substantive analysis of the merits of the claims or of the alleged "contributions" deprives creditors adequate information to make an informed vote on the Plan.

28.     Additionally, the Disclosure Statement fails to identify with specificity the individuals and entities receiving releases and creates significant ambiguity regarding the extent of the releases.  As noted, the Released Parties include, among others, the Debtors', DIP Lenders', and Prepetition Lenders' respective unnamed "officers, directors, shareholders, employees, agents, financial and other advisors, attorneys, accountants, investment bankers, consultants, and representatives." *See* Plan, Art. I.102.  The universe of Released Parties is therefore unknown and

potentially unknowable to the estates' creditors. Further, there is no discussion regarding consideration provided by any of the unnamed released parties, nor is there any discussion of the potential claims against them. The Debtors should identify with specificity (1) every person or entity they seek to release; (2) the consideration provided by the Released Parties; (3) the justification for providing the releases and the benefit the estates receive from granting the releases; (4) the investigative process that led to the Debtors' decision to release those parties; and (5) the person or governing body that approved the releases on the Debtors' behalf.

29. The Debtors' desire to release countless unknown parties demonstrates precisely why unsecured creditors must have a controlling role in governing the post-confirmation trusts. The unsecured creditors are the residual estate beneficiaries, motivated to maximize the estates' value, including recoveries on litigation claims. The Debtors have demonstrated a complete abdication of this role by proposing expansive releases for *no consideration*, when those litigation claims may represent the estates' most valuable remaining assets.

## CONCLUSION

The Committee respectfully requests the Debtors include the letter attached as **Exhibit A** and revise the Disclosure Statement to include the changes marked in **Exhibit B**. Further, the Court should require the Debtors to provide the specificity requested above regarding the proposed release of estate claims.

Dated: January 9, 2024
      Houston, Texas

Respectfully Submitted,

By: */s/ Paul D. Moak*
Paul D. Moak (Texas Bar No. 00794316)
**REED SMITH LLP**
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 469-3800
Facsimile: (713) 469-3899
Email: PMoak@reedsmith.com

-and-

Omar J. Alaniz (Texas Bar No. 24040402)
Taylre C. Janak (Texas Bar No. 24122751)
**REED SMITH LLP**
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
Email: OAlaniz@reedsmith.com
      TJanak@reedsmith.com

*Counsel for the Official Committee of Unsecured Creditor*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 9th day of January, 2024, the foregoing Objection, along with the attached exhibits and proposed order, was filed with the Court and served via the Court's CM/ECF system to all parties registered to receive such notice.

*/s/ Paul D. Moak*
Paul D. Moak