**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | Chapter 11 |
| In re: | § | |
| | § | |
| ALPINE SUMMIT ENERGY PARTNERS, INC. | § | Case No. 23-90739 (MI) |
| *et al.*, [1] | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**AD HOC COMMITTEE OF DRILLING PARTNERSHIP CLAIMANTS'**
**OBJECTION TO PROPOSED LIQUIDATION PLAN**
**(RELATES TO ECF NO. 1374)**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alpine Summit Energy Partners, Inc. (3755), HB2 Origination, LLC (6760), Ageron Energy II, LLC (1436), Ironroc Energy Partners LLC (9801), Ageron Ironroc Energy, LLC (N/A), Alpine Summit Energy Investors, Inc. (4428), and Alpine Carbon, LLC (N/A). The location of the Debtors' service address is: 3322 West End Ave, Suite 450, Nashville, TN 37203.

Jonathan Auerbach, Black Tusk Partners, LLC, Charles J. Lanktree, Terrence Mullen as trustee of the Terrence Mullen Revocable Trust, OakRidge Management Group, Robert Ryan, Robert Ryan as trustee of the Armada Trust, and Leigh Ann Ryan as trustee of the RPRJ Trust (the "DP Claimants" and, collectively, the "Ad Hoc Committee of DP Claimants" or the "AHC")[2] file this objection to the Debtors' proposed *Liquidating Plan Under Chapter 11 of the Bankruptcy Code* (ECF No. 1374) (the "Plan").

## I.   <u>Preliminary Statement</u>[3]

1.      Bankruptcy law "simply does not authorize a [debtor in possession] to distribute other people's property among a bankrupt's creditors." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962).   This Plan seeks to do just that.   Specifically, the Plan proposes to take cash proceeds of certain disputed wells—for which ownership has been timely disputed by the AHC since the first day of these chapter 11 cases, including via adversary proceeding [Adv. Pro. No. 23-03238]—and pay a litany of claims (retro and prospectively) pursuant to a "Lienholder Trust Waterfall", including the administrative costs of implementing the very "Lienholder Trust" that is positioned to unlawfully take assignment of the AHC's disputed funds.   The Court should not authorize this use of the disputed funds.

2.      As noted, the AHC asserted its property interests, the filing of the chapter 11 petitions notwithstanding, on the first day of these cases.   ECF No. 38.   Recognizing that the imposition of a constructive trust is premised on the notion that a "party *should not* be holding the property at all, which makes the party's title anything but 'clear'", *Freeport-McMoRan Oil & Gas*

---

[2]     *See* ECF No. 619 for *Verified Statement of the Ad Hoc Committee of DP Claimants Pursuant to Federal Rule of Bankruptcy Procedure 2019*.

[3]     Capitalized terms not defined in the Preliminary Statement have the meanings given to them below or in the Plan.

*LLC v. 1776 Energy Partners*, LLC, 672 S.W.3d 391, 400 (Tex. 2023), *reh'g denied* (Sept. 1, 2023)

(emphasis in original), at the first day hearing, the Court expressed pessimism that such issues

could be resolved via summary proceeding:

> COURT:    "I'm just trying to be -- I'm genuinely trying to understand, that if you've got a title dispute [as raised by the AHC] -- and I don't mean anything by that word other than that was the most neutral term I could come up with. If you've got a title dispute, there's no way you're going to meet those milestone deadlines. I mean, just not going to happen. And so I'm just -- I'm trying to understand, you know, you've got to file -- you know, you've got to file a motion to sell in a week, and you don't even know what you can sell….and you've talked to your lender, and they're -- I mean, *obviously, you can't use a DIP to clear up ownership issues and 2 title issues*."    Jul. 6, 2023 Tr. at 18:22-19:5, 20:1-3 (emphasis added).

> DEBTORS' COUNSEL:    "[Referring to] the reservation of rights language that I mentioned, which basically says that the interim order does not determine ownership, and the ownership of assets will be determined at a later time. [Bank7] understand[s] that that means -- the effect of that is that it could be determined that their -- they have less collateral because the debtor doesn't own certain properties than they otherwise would."    *Id.* at 20:9-16.

> THE COURT:    "Okay. And -- but they've agreed to that?"    *Id.* at 20:17.

> DEBTORS' COUNSEL:    "Correct."    *Id.* at 20:18.

3.        Thereafter, each of the (three) DIP Orders entered in these cases provides quite

clearly that "nothing in this Final Order constitutes a determination of ownership or prejudices the

right of any party to seek determination of ownership of any property interest in a manner

consistent with the Bankruptcy Code *and applicable rules of bankruptcy procedure*" and that "the

DIP Liens [and] the DIP Superpriority Claims … extend only to property of the Debtor's estate."

*E.g.,* ECF No. 691 ("Final DIP Order") at ¶ 22 (emphasis added).

4.        The DIP Orders further provide that "sale proceeds will be held by the Debtors

pending such resolution or court order" and that the AHC, the Debtors, and Bank7 would proceed

to "expedited mediation" concerning these "Title Disputes" (*id.* at ¶ 45), which the parties did,

unsuccessfully, Mr. Alfredo Perez's best efforts notwithstanding.    The DIP Orders next provide

that, "[i]f mediation is not successful, *the Parties agree to promptly file a court proceeding to determine the Title Disputes*." *Id.* a Ex. 3, ¶ 4 (emphasis added).

5.      And "file a court proceeding" is precisely what the AHC did.   The AHC—*not the Debtors and certainly not Bank7*—promptly commenced Adversary Proceeding No. 23-03238, as required under Bankruptcy Rule 7001(2), in order to have these property interests properly adjudicated.   Bank7, for its part, has shown no desire to resolve these issues, instead filing a meritless "partial" motion to dismiss (Adv. Pro. ECF No. 12), which the Court has taken under consideration, but has indicated will not result in the dismissal of the complaint with prejudice (if at all).   The Debtors still have not even answered the complaint (which makes some sense given they have no equity in the wells).

6.      Thus, instead of "prompt" litigation via adversary proceeding consistent "with applicable rules of bankruptcy procedure" and the three DIP Orders, the Debtors and Bank7 instead determined to negotiate and prosecute a plan that threatens to diminish the AHC's property interests by using such funds to pay Bank7's DIP (and 100% roll-up), administrative expenses, and the cost of the very "winddown" those parties negotiated, all pending litigation of the issues pursuant to the AHC's adversary proceeding.   This is impermissible.

7.      There is little reason to be disappointed that the Debtors' Plan is unconfirmable. The members of the AHC are also the estates' largest unsecured creditors on account of the fact that the Debtors promised them individually that the Debtors would make capital contributions to the Development Partnerships—which the Debtors never made or even had the ability to make. But, this liquidating Plan offers unsecured creditors no tangible distribution and instead appears to be a vehicle designed primarily to:   (i) pay off a DIP-financing facility even though the DIP Lenders agreed (no less than three times) that their liens and claims would have no recourse to

property that was not property of the estate; (ii) hand out gratuitous releases to insiders, for no consideration, who are responsible for the Debtors' abject failure and for stakeholders' massive losses; and (iii) provide patently unlawful exculpation to Bank7.

8.     Thus, there are additional reasons why the Plan should not be confirmed.   The Plan includes broad, gratuitous releases.   A release for no consideration is anathema to bankruptcy and to any cognizable concept of bankruptcy, trust, or estate law.   When no consideration is being paid to the estate, it is exceedingly difficult, if not impossible, for the Court to conclude that the settlement is either "fair and equitable" or "in the best interest of the estate." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *see also In re Allied Properties, LLC,* 2007 WL 1849017 at \*7 (Bankr. S.D. Tex. June 25, 2007) (rejecting a compromise because the settling defendant offered no material benefit to the estate and noting "[e]xpeditious closure is a worthy goal, but not a goal that can be obtained at creditors' expense.").

9.     It is disappointing that the debtor in possession—charged with the duties of a trustee—proposed these gratuitous releases.   Just as disappointing is that the Plan proposes to exculpate Bank7—a shameless grab by Bank7 which the Fifth Circuit has recently reaffirmed to be an unlawful proposition.   Even worse, on the eve of confirmation proceedings, the Debtor filed claims objections against the claims filed by the members of the AHC.   ECF Nos. 1562-67. There is no good reason for the Debtors to incur the administrative cost of preparing and filing these objections when it is altogether uncertain that the Debtors' proposed "GUC Trust" will have any proceeds to distribute.   These claim objections reflect an obvious and wasteful attempt to oppress the AHC.   Proposing gratuitous releases; offering exculpation to non-fiduciary Bank7; and filing wasteful claim objections to silence objections to their Plan—this sort of post-petition

conduct is not befitting of a debtor in possession and does not justify exculpation for the Debtors' officers and directors.

10. The Plan should not be confirmed for these reasons as well.

## II.    Relevant Factual Background

11. The AHC has asserted that certain of the wells held by the Debtors (the "<u>Disputed Wells</u>") are not property of the estates or, alternatively, that the Disputed Wells were property of the Debtors' estates solely to the extent of the Debtors' bare legal title.[4]   ECF Nos. 37-38.

12. Following the first day hearing, pursuant to a negotiated resolution between the AHC, the Debtors, and Bank7, the AHC's claims over the Disputed Wells were preserved in the three DIP-financing orders entered by the Court, which orders further provide that Bank7's pre- and post-petition liens extend "only to property of the Debtor's estate."   ECF Nos. 120, 427, and 691 (the "<u>DIP Orders</u>") at ¶22 ("…nothing in this Final Order constitutes a determination of ownership or prejudices the right of any party to seek determination of ownership of any property interest *in a manner consistent with the Bankruptcy Code and applicable rules of bankruptcy procedure*…) (emphasis added)).   More importantly, each of the three DIP Orders further acknowledges that the "Parties reserve their rights with respect to title, liens and entitlement to sale proceeds" and that "*sale proceeds will be held by the Debtors pending such resolution or court order*…."   ECF No. 691 at 51/51, ¶ 3 (emphasis added).

---

[4]    *See Matter of Quality Holstein Leasing*, 752 F.2d 1009, 1013 (5th Cir. 1985) ("We start with the proposition that imposition of a constructive trust under state law upon a bankruptcy debtor's property generally confers on the true owner of the property an equitable interest in the property superior to the trustee's….   The debtor retains legal title, but the constructive trust beneficiary may reclaim in full his equitable interest in bankruptcy proceedings.."); 11 U.S.C. § 541(d).

13.     The DIP Orders next provide that the parties would proceed to mediation concerning the Title Disputes, and that "[i]f mediation is not successful, the Parties agree to promptly file a court proceeding to determine the Title Disputes."   *Id.* at 51/51, ¶¶ 3-4.

14.     After complying with the Final DIP Order's requirement that it provide notice to the Debtors and Bank7 of "the legal, equitable, and factual basis" for its claims, (ECF No. 691 at ¶ 48), on October 30, 2023, the AHC commenced adversary proceeding No. 23-03238, captioned *Ad Hoc Committee of Drilling Partnership Claimants v. Bank7 and HB2 Origination, LLC* (the "Adversary Proceeding").

15.     In the Adversary Proceeding, the AHC alleged and seeks a judgment that the "all of the Disputed Wells (and proceeds thereof) are held in express, resulting, or constructive trust for the benefit of the Development Partnerships and are therefore property of the Development Partnerships."   Adv. Pro. No. 23-03238, ECF No. 3 at 26.

16.     The Disputed Wells include the following thirteen wells:   AI San Roman 105H, AI San Roman 106H, AI San Roman 201H, and AI San Roman 202H; Electric Mayhem 1H, Lonie Mae 2H, Electric Mayhem 2H, and Cincinnatus 2H; and AI San Roman 101H, AI San Roman 102H, AI Ocho 101H, Samson-Mueller 5H and Porter Murphy 1H.   *See id.* at ¶ 54.

17.     Thus, the AHC has complied with the procedures set forward in this Court's orders.

18.     In addition, the AHC has complied with the important procedural rule that where a party is "seeking an equitable interest in property, such as a constructive trust, rather than a general unsecured claim, it [is] incumbent on him to file an adversary proceeding in the bankruptcy court." *Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 437 (5th Cir. 1994) (*citing* Fed.R. Bankr.P. 7001).

### III.     Sale Orders and Sale Proceeds

19.     Certain of the Disputed Wells were sold pursuant to an order entered on August 31, 2023 in a batch of properties referred to as the "South Texas Assets."   ECF No. 623.

20.     Certain of the Disputed Wells were sold pursuant to an order entered on October 31, 2023 in a batch of properties referred to as the "Giddings Assets."   ECF No. 991.

21.     Each of the sale orders acknowledged the DIP Orders and the AHC's interests, providing that "[t]he proceeds of the Sale will be placed in a segregated account maintained by the Debtors pending further Court order.   For avoidance of doubt, no proceeds of the Acquired Assets shall be released or paid from such segregated account without a further order of the Court, after notice and hearing (if necessary)."   ECF Nos. 623 and 991 at ¶¶ L, 17.

22.     The Debtors have ascribed approximately <u>$57.7 million</u> in sale proceeds attributable to the Disputed Wells.   *See* ECF Nos. 1078-1 at 2 and 1129-1 at 2.

### IV.     <u>Proposed Plan Provisions</u>

23.     With respect to the foregoing, the Plan provides the following:

- The Lienholder Trust is to take ownership of the Lienholder Trust Assets, which include, among other things, "all of the Debtors' remaining Cash as of the Effective Date after the payment of the DIP Claims and excluding amounts reserved for Professional Fee Claims…." Plan, Art. I.A.73.

- The AHC's interests asserted in the Adversary Proceeding are defined as "Ad Hoc Committee of DP Claimants' Claims" and, in turn, "Title/Trust Claims."   *Id.*, Art. I.A.2, 124.

- Title/Trust Claims have recourse to a "Claims Reserve", which is to hold funds "in a segregated account to be established by the Debtors or the Lienholder Trustee, as applicable, into which Cash in an amount to be determined by the Debtors in consultation with Bank7, as disclosed in the Plan Supplement and allocated to each Disputed Title/Trust Claim, shall be deposited on or before the Effective Date for the Disputed Title/Trust Claims, which account/s shall vest in the Lienholder Trust as of the Effective Date…." *Id.*, Art. I.A.21

- Relevant to the AHC, the Claims Reserve is to be funded, in the first instance, with only $41.03 million.   ECF No. 1435-3 (Lienholder Trust Agreement) at 3/4.

- Worse, however, the Claims Reserve, "shall be reduced dollar for dollar by any payments made from the Lienholder Trust on Allowed (i) Administrative Claims, (ii) the reasonable and necessary, documented and out-of-pocket fees and expenses incurred in connection the administration of the Lienholder Trust ('Wind Down Costs'), other than fees and costs incurred on Adv. Proc. No. 23-03238 (*Ad Hoc Committee of Drilling Partnership*

*Claimants v. Bank7 and HB2 Origination, LLC*), (iii) Priority Tax Claims, (iv) Other Priority Claims, (v) Senior Other Secured Claims, or (vi) Statutory Lien Claims, as to each of the foregoing (iii) through (vi), solely to the extent such Allowed Claims are Claims attributable to the DP Wells (as defined in the Complaint, Adv. Proc. No. 23-03238), and as to each of the foregoing (i) and (ii), applied pro rata to the DP Wells."   *Id.*

- Apparently, there are not additional funds with which the Debtor could pay such Administrative Claims and Wind Down Costs because the Debtor is seeking to pay off the DIP financing (including its dollar for dollar roll-up), ECF No. 1435-7 (Notice of DIP Paydown Allocation) at 5/5, notwithstanding that the DIP Loans have no recourse to the Disputed Well proceeds.

24.     In addition, Section X.B. of the Plan grants gratuitous releases to all of the Debtors' current and former (as of the Petition Date) directors and officers "based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party….".   Plan at 37.

25.     Section Section X.D of the Plan, *Exculpation*, grants similarly broad exculpation, not just for estate fiduciaries, but for the "DIP Lender; and[] the Prepetition Lender"—*i.e.*, Bank7.

### V.     Applicable Law

26.     Bankruptcy law "simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors."   *Pearlman*, 371 U.S. at 135–36 ("…if the surety at the time of adjudication was . . . either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt.").   Nothing about the enactment of the Bankruptcy Code altered the foregoing,   *See In re Horton*, 618 B.R. 22, 27 (Bankr. D.N.M 2020) ("The Code, like the Act, does not authorize the trustee to distribute other people's property" including property held in constructive trust by

the debtor); *American States Ins. Co. v. US*, 324 B.R. 600, 604-05 (Bankr. N.D. Tex. 2005) (vacating prior bankruptcy court orders and holding that *Pearlman* "survived the enactment of the Bankruptcy Code" certainly with respect to funds subject to an "equitable owner of funds under state law").[5]

27.     The Bankruptcy Rules require that an adversary proceeding be commenced in order to determine "the validity, priority, or extent of a lien or other interest in property…."   Fed.R. Bankr.P. 7001(2); *see also Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 437 (5th Cir. 1994) (adjudication of "equitable interest in property", such as constructive trust, requires adversary proceeding).

28.     Nothing about the context of plan confirmation—a contested matter—alters the foregoing.   See, e.g., *In re Worcester Country Club Acres, LLC*, 655 B.R. 41, 47 (Bankr. D. Mass. 2023) (concluding proposed chapter 11 plan was unconfirmable because plan provided for use of disputed "property prior to the resolution of whether the Debtor owns the Disputed Property").

29.     Indeed, section 1123 concerns itself exclusively with "property of the estate." That section provides that a plan may provide for the "retention by the debtor of *all or any part of the property of the estate* [and/or] transfer of all or any part of *the property of the estate* to one or more entities, whether organized before or after the confirmation of such plan."   11 U.S.C. § 1123(a)(5); *see also* 11 U.S.C. § 1123(b)(4) (providing for the "sale of all or substantially all of *the property of the estate*, and the distribution of the proceeds of such sale among holders of claims or interests") (emphases added).

---

[5]     *See also In re Robertson*, 203 F.3d 855, 863 (5th Cir. 2000) (Trustee lacked authority to sell property that was not property of the estate.); *In re Whitehall Jewelers Holdings, Inc*., No. 08-11261 (KG), 2008 WL 2951974, at *4 (Bankr. D. Del. July 28, 2008) ("A bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the property is property of the estate.").

## VI.   <u>Objection</u>

**A.    AHC's Property Interests**

30.    The Plan is not confirmable because it seeks to take the AHC's property and, among other things:   (i) pay Administrative Claims (immediately); (ii) assign it to the Lienholder Trustee; (iii) pay future "Wind Down Costs"; and (iv) pay various other uncertain claims purportedly "attributable" to the Disputed Wells.

31.    The AHC's interests are not property of the estate.    Rather, they are property held in express, resulting or constructive trust.   "The constructive trust doctrine common to many states [including Texas] takes on great significance in bankruptcy cases because of § 541(d) of the Code.   Under that provision, if a debtor holds only legal title and not an equitable interest in property at the commencement of the bankruptcy case, that property becomes property of the estate 'only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.'"   *Haber Oil*, 12 F. 3d at 435 (quoting 11 U.S.C. § 541(d)).

32.    Thus, the Debtors are not authorized to use, sell, or dispose of the AHC's interests pending resolution in an adversary proceeding pursuant to the legal authority cited above.

33.    Moreover, the Debtors' statement that "the Plan shall constitute a motion to estimate the maximum amount of the disputed Title/Trust Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of establishing the amount of the Claims Reserve" does not save the Plan for at least two reasons.   Plan, Art. VIII.D.

34.    *First*, section 502(c) concerns "any contingent or unliquidated claim" for purposes of "allowance" under section 502.   11 U.S.C. § 502(c).   The AHC's interests are not "claims" under the Bankruptcy Code to be allowed or disallowed, nor to be adjusted or treated under a chapter 11 plan.   *Cf. American States Ins. Co. v. US*, 324 B.R. 600 (Bankr. N.D. Tex. 2005) (a

surety's equitable subrogation right is not a claim under the Bankruptcy Code).   Rather, the AHC's interests sound in express, resulting, and constructive trust under Texas law.   These interests are not property of the estate, pursuant to section 541(d) of the Bankruptcy Code, and are simply not subject to the Bankruptcy Code's priority system.

35.   *Second*, even assuming the AHC's interests were "claims", "Section 502(c) allows this Court to estimate only contingent and unliquidated claims, but not claims that are merely disputed." *In re Comdisco, Inc.*, 271 B.R. 273 (Bankr. N.D. Ill. 2002).   There is nothing contingent or unliquidated about the Disputed Wells.   Indeed, they have been monetized and the AHC accepts and agrees with the Debtors' allocation of sale proceeds as referenced above.   Even the Plan describes the putative "Title/Trust Claims" as merely "disputed", not contingent or unliquidated.   Plan, Art. VIII.D.

36.   *Third,* the putative "motion" fails to provide due process, setting forth no support or explanation of the basis for the estimation.   Nowhere in the Plan or Disclosure Statement is there any description of the quantum or reasoning that could potentially support such estimation. The reference to estimation is devoid of any particulars whatsoever.

37.   The AHC understands that constructive trusts "wreak havoc with the priority system ordained by the Bankruptcy Code." *Haber Oil*, 12 F. 3d at 436.   That is in part why the AHC raised their property interests from the first days of these cases.   The Debtor and Bank7, thus, have been on notice of this dispute and, indeed, are party to this dispute, and instead chose to seek to "steamroll" the dispute through Plan confirmation.   This is neither permissible nor equitable.

38.     Moreover, it is also a fundamental import of bankruptcy law that a party be afforded due process to prove up its interest under governing state law.   Here, the AHC has sought to do that throughout the pendency of these chapter 11 cases and will continue to do so.

**B.     No Gratuitous Releases and No Exculpation**

39.     No citation is needed for the proposition that the releases proposed by the Debtors' Plan are repugnant to bankruptcy law.[6]   This is a Debtor that took everyone's money and paid no one—not vendors, not unsecured creditors, not shareholders, not its non-Debtor affiliates.   The statutory creditors' committee has concluded, unsurprisingly, that "the Debtors' estates own valuable claims against the Debtors' directors and officers[] and other insiders…."   *See* Jan. 10, 2024 letter from UCC counsel included in solicitation materials.   This the antithesis of a case that could possibly justify gratuitous releases.   The release provision should be struck under all circumstances.

40.     Moreover, the exculpation provision should be stricken as well.   The mere filing of this proposed Plan, with the unconfirmable releases, has probably caused more than a million dollars of administrative expenses to be wasted between the Debtors and the Creditors' Committee "negotiating" something that a fair debtor in possession never would have put on the table.

41.     Even worse, on the eve of confirmation proceedings, the Debtor filed claim objections against the claims filed by the members of the AHC.   ECF Nos. 1562-67.   There is no good reason for the Debtors to incur the administrative cost of preparing and filing these objections when it is altogether uncertain that the Debtors' proposed "GUC Trust" will have any

---

[6]     Gratuitous releases are themselves fraudulent transfers.   A chapter 11 plan that itself houses such transfers should not be confirmed.   *See* 11 U.S.C. § 1123(a)(7) ("a plan shall…contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy….").

proceeds to distribute.    These claim objections reflect an obvious and wasteful attempt to oppress the AHC (and waste more administrative costs).

42.    In any event, and under all circumstances, the "DIP Lender" and the "Prepetition Lender", *i.e.*, Bank7, is not entitled to exculpation.    *See Matter of Highland Capital Management, L.P.*, 48 F.4th 419, 437-38 (5th Cir. 2022) (finding "unlawful" and striking exculpation of parties other than "the debtor, the creditors' committee and its members").    Indeed, this entire proposed Plan is being prosecuted in order to pay Bank7 its DIP financing (and 100% roll-up).    That is the opposite of grounds to justify Bank7 exculpation.

43.    For the foregoing reasons—*i.e.*, gratuitous releases, exculpation for Bank7, claim objections designed to oppress the AHC—this Plan has not been proposed in good faith.    11 U.S.C. § 1123(a)(3).    Confirmation should be denied.

## VII.    CONCLUSION

44.    For all of the foregoing reasons, the Plan should not be confirmed.


DATED:   February 9, 2023

/s/ Benjamin I. Finestone
Benjamin I. Finestone (*pro hac vice*)
Kate Scherling (*pro hac vice*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

*Counsel for the Ad Hoc Committee of DP Claimants*